UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**CV 04·5449** 

-------------------------------------------------------------------x
PHILIP LITLE, PHILIP LITLE FOR THE ESTATE OF ABIGAIL LITLE:
ELISHUA LITLE, HANNAH LITLE, HEIDI LITLE, JOSIAH LITLE, :
NOAH LITLE, NATAN APPLEBAUM FOR THE ESTATE OF :
DAVID APPLEBAUM, DEBRA APPLEBAUM, THE ESTATE OF :
JACQUELINE APPLEBAUM, NATAN APPLEBAUM, NATAN :
APPLEBAUM FOR THE ESTATE OF NAAVA APPLEBAUM, SHIRA :
APPLEBAUM, YITZHAK APPLEBAUM, GEELA APPLEBAUM :
GORDON, BILLY BAXTER, CATHERINE BAXTER, FRAN :
STRAUSS BAXTER, JACK BAXTER, BARBARA PSAROUDIS :
MARY LAZIN, AGNES PARSONS, JOHN PARSONS, JOHN W. :
PARSONS, THE ESTATE OF MARK PARSONS, MATTHEW :
PARSONS, ARIELA FREIRMARK, MENACHEM FREIRMARK :
HADASSAH FREIRMARK  CATHERINE TYOKODY, BATSHEVA :
HOROVITZ, DAVID HOROVITZ, BERNICE WOLF FOR THE :
ESTATE OF DEBRA RUTH HOROVITZ, BERNICE WOLF FOR THE :
ESTATE OF ELI NATAN HOROVITZ, LEAH HOROVITZ, MOSHE :
HOROVITZ, NECHAMA HOROVITZ, SHULAMITE HOROVITZ :
TOVI HOROVITZ, TVI HOROVITZ, URI HOROVITZ, BERNICE :
WOLF, BRIAN WOLF, STANLEY WOLF, DOV KLIEMAN, THE :
ESTATE OF ESTHER KLIEMAN BY AARON KESNER, GAVRIEL :
KLIEMAN, NACHMAN KLIEMAN, RUANNE KLIEMAN, YOSEF :
KLIEMAN, DEBORAH MARGALIT, NATAN MARGALIT :
EVYATAR MARGALIT, PHYLLIS PAM, RIVKA REENA PAM :
RACHEL POTOLSKI OVADIA TOPPOROWITCH, TEHILA :
TOPPOROWITCH, YISRAEL TOPPOROWITCH, YITZCHAK :
TOPPOROWITCH, MIRIAM EHRENFELD, JOSEPH ROSE, NICHA :
OSTREICHER, DEVORA POLLACK, BENJAMIN REINITZ, CHAIM :
REINITZ, CHAYA REINITZ, JOSEPH REINITZ, LEIBEL REINITZ :
MALVIA REINITZ, MARGALJ REINITZ, MENDY REINITZ :
MIRIAM REINITZ, RIVKA REINITZ, SAMUEL REINITZ, SHMUEL :
REINITZ, YAKOV REINITZ, THE ESTATE OF YISSOCHER DOV :
REINITZ, YITZCHOK REINITZ, RAIZEL SHIMON LEAH TAUBER :
HELEN WEIDER, AVROHOM D. RICHTER, BREINA RICHTER :
MIRIAM LEAH RICHTER, MOSHE RICHTER, NECHAMA RICHTER:
SARA MALKA RICHTER, SHLOMO CHAIM RICHTER, TRANNE :
RICHTER,YAKOV YOSEF RICHTER, YECHIEL RICHTER,YEHUDIS:
RICHTER, YISROEL RICHTER, YITZCHOK RICHTER, MIRIAM :
BLUM, PERL BRAILOFSKY, YOSEF BRAILOFSKY, MALKY :
BREUER, ESTER BUXMAUM, GITTEL COHEN, CHAYA FREISEL :
RACHEL ROSNER, ELIZABETH SCHWARTZ, JACOB SCHWARTZ :
MAX SCHWARTZ, MICHAEL SCHWARTZ, PHILLIP SCHWARTZ :
SHLOMO TRATNER, THE ESTATE OF TIFERET TRATNER :
ABRAHAM ZARKOWSKY, ARON ZARKOWSKY, BSHAVA :

GERSHON, J.

CHREIN, J.

ZARKOWSKY, MENDEL ZARKOWSKY FOR THE ESTATE OF THE : 
ESTATE OF ELI ZARKOWSKY, EZRIEL ZARKOWSKY, GITTEL :
ZARKOWSKY, MENDEL ZARKOWSLY FOR THE ESTATE OF :
GOLDIE ZARKOWSKY, JOSEPH ZARKOWSKY, MENDEL :
ZARKOWSKY, MIRIAM ZARKOWSKY, SHRAGE ZARKOWSKY :
TRANY ZARKOWSKY, YEHUDA ZARKOWSKY :

                                                                         :
                              Plaintiffs,                            :
                                                                         :
            -against-                                             :
                                                                         :
ARAB BANK, PLC,                                         :
                              Defendant.                      :
                                                                         :
----------------------------------------------------------------------x

Plaintiffs Philip Litle, Philip Litle for the Estate of Abigail Litle, Elishua Litle, Hannah Litle, Heidi

Litle, Josiah Litle, Noah Litle ("Litle Plaintiffs"); Natan Applebaum for the Estate of David

Applebaum, Debra Applebaum, The Estate of Jacqueline Applebaum, Natan Applebaum, Natan

Applebaum for the Estate of Naava Applebaum, Shira Applebaum, Yitzak Applebaum, Geela

Applebaum Gordon ("Applebaum Plaintiffs");Billy Baxter, Catherine Baxter, Fran Strauss Baxter,

Jack Baxter ("Baxter Plaintiffs"); Barbara Psaroudis, Mary Lazin, Agnes Parsons, John Parsons, John

W. Parsons, The Estate of Mark Parsons, Matthew Parsons, Catherine Tyokody ("Parsons Plaintiffs");

Ariela Freirmark, Menachem Freirmark, Hadassah Freirmark, ("Freirmark Plaintiffs"); Ari Horovitz,

Batsheva Horovitz, David Horovitz, Bernice Wolf for the Estate of Debra Ruth Horovitz, Bernice

Wolf for the Estate of Eli Natan Horovitz, Leah Horovitz, Moshe Horovitz, Nechama Horovitz,

Shulamite Horovitz, Tovi Horovitz, Tvi Horovitz, Uri Horovitz, Bernice Wolf, Brian Wolf, Stanley

Wolf ("Horovitz Plaintiffs"); Dov Klieman, The Estate of Esther Klieman by its Administrator Aaron

Kesner, Gavriel Klieman, Nachman Klieman, Ruanne Klieman, Yosef Klieman ("Klieman Plaintiffs");

Deborah Margalit, Natan Margalit, Evyatar Margalit ("Margalit Plaintiffs"); Phyllis Pam, Rivka Reena

Pam ("Pam Plaintiffs"); Rachel Potolski, Ovadia Topporowitch, Tehila Topporowitch, Yisrael

Topporowitch, Yitzchak Topporowitch ("Nathenson Plaintiffs"); Miriam Ehrenfeld, Joseph Rose, Leibel Reinitz, Malvia Reinitz, Margali Reinitz, Mendy Reinitz, Miriam Reinitz, Rivka Reinitz, Samuel Reinitz, Shmuel Reinitz, Yakov Reinitz, The Estate of Yissocher Dov Reinitz, Yitzchok Reinitz, Raizel Shimon Leah Tauber, Helen Weider ("Reinitz Plaintiffs"); Avrohom D. Richter, Breina Richter, Miriam Leah Richter, Moshe Richter, Nechama Richter, Sara Malka Richter, Shlomo Chaim Richter, Tranne Richter, Yakov Yosef Richter, Yechiel Richter, Yehudis Richter, Yisroel Richter, Yitzchok Richter ("Richter Plaintiffs"); Shlomo Tratner, The Estate of Tiferet Tratner ("Tratner Plaintiffs"); Miriam Blum, Perl Brailofsky, Yosef Brailofsky, Malky Breuer, Ester Buxbaum, Gittel Cohen, Chaya Freisel, Rachel Rosner, Elizabeth Schwartz, Jacob Schwartz, Max Schwartz, Michael Schwartz, Phillip Schwartz, Abraham Zarkowsky, Aron Zarkowsky, Bshava Zarkowsky, Mendel Zarkowsky for the Estate of Eli Zarkowsky, Ezriel Zarkowsky, Gittel Zarkowsky, Mendel Zarkowsky for the Estate of Goldie Zarkowsky, Joseph Zarkowsky, Mendel Zarkowsky, Miriam Zarkowsky, Shrage Zarkowsky, Trany Zarkowsky, Yehuda Zarkowsky ("Zarkowsky Plaintiffs") and each of them, by their attorneys, allege the following upon information and belief:

## NATURE OF THE ACTION

1. This is a complaint for damages arising out of the conduct of the Arab Bank, PLC ("Arab Bank") – a Jordanian bank headquartered in Amman, Jordan with a federally licensed and regulated branch office in the State of New York – pursuant to which it has heretofore and is continuing to knowingly and willfully provide, distribute, and administer the distribution of financial benefits, money and financial services as rewards and incentives to (a) terrorists who have killed, injured and maimed civilians, or attempted to do so, (b) the families and beneficiaries of such terrorists, and (c) Foreign Terrorist Organizations (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as part of a scheme, plan and

3

design to encourage, aid, assist, incentivize and facilitate acts of international terrorism as defined by 18 U.S.C. § 2331. By these acts, defendant Arab Bank has aided and abetted and conspired to commit said acts of international terrorism, resulting in the killing, attempted killing and maiming of scores of American citizens in Israel since September 2000, and has violated the prohibitions on providing material support for acts of international terrorism set forth in the Anti-Terrorism Act ("ATA") as amended by the AEDPA (see e.g., 18 U.S.C. §§ 2339A, 2339B and 2339C) and is civilly liable under § 2333 of the ATA to those American citizens (and their estates, survivors and heirs) who have been killed or injured in their person, property or business by reason of such acts of international terrorism. Plaintiffs are all American citizens or family members of American citizens who have been injured, maimed, harmed or killed by reason of the wrongful conduct of Defendant Arab Bank and its corporate affiliates acting in concert with one another, all to the damage of the Plaintiffs.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332(a)(2), and 18 U.S.C. §§ 2333 and 2334, as a civil action brought by citizens of the United States, their estates, survivors, and heirs who have been killed or injured by reason of acts of international terrorism. This Court also has subject matter jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2). The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. This Court also has supplemental jurisdiction over this action pursuant to 28 U.S.C. § 1367.

3. Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. § 1391(d).

4. Arab Bank is subject to personal jurisdiction in the State of New York pursuant to N.Y. CLPR § 301 because, among other things, it continuously and systematically does business in the

4

State of New York. Arab Bank also is subject to personal jurisdiction in the State of New York pursuant to N.Y. CPLR § 302 because, based on the facts alleged herein and upon information and belief, Arab Bank (a) transacts business within the State of New York; (b) contracts to supply goods and services in the State of New York; (c) has committed tortuous acts within the State of New York and (d) has committed tortuous acts outside the State of New York causing injury within the State of New York and (i) derives substantial revenue from goods used or consumed in the State of New York or (ii) expected or should reasonably have expected such acts to have consequences in the State of New York and derived substantial revenue from international commerce. Arab Bank also is subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a).

## THE PARTIES

### A. The Plaintiffs

#### The Litle Family (1)

5. Abigail Litle was a citizen of the United States. She was, at the time of her murder, living with her parents and family in Haifa, Israel when she was killed in the terrorist bombing of Bus No. 37 in Haifa, Israel on March 5, 2003. HAMAS, a designated Foreign Terrorist Organization, claimed responsibility for the bombing.

6. A Christian activist in Arab-Jewish co-existence projects and an eighth-grade student majoring in biology and environmental studies, Abigail was riding the bus on her way home from school when a suicide bomber detonated a bomb filled with metal shrapnel killing 17 people and wounding 53. The terrorist left behind a note praising the September 11, 2001 attacks on the World Trade Center in New York City.

5

7.   Philip and Heidi Litle are citizens of the United States and presently reside in the City of Haifa in the State of Israel pursuant to their work with the Baptist ministry . They are the natural mother and father of Abigail Litle.

8.   Mr. and Mrs. Litle first learned of the bus bombing when a family friend called their house to ask if their five children were all right. Mr. and Mrs. Litle turned on the television to view news reports of the terrorist attack.  The reports initially provided misinformation regarding the location of the attack and in which direction the bus had been traveling. The Litle's accordingly believed all of their children were okay, but as further news reports and photographs came in, they became increasingly alarmed.

9.   By looking at photographs of the charred remains of the bus, the Litles could recognize its location and realized that it had been traveling in a different direction than they previously thought. All of the Litles' children other than Abigail were either at home or their location had otherwise been accounted for.

10.   The mobile phone network was down and Mr. and Mrs. Litle were unsure if Abigail had a mobile phone with her, so they clung to the belief that she could be alive. Abigail's friends began calling her house to see if she was all right, and Mr. and Mrs. Litle began to realize that most of Abigail's friends had been accounted for.  However, Mr. and Mrs. Litle had still heard nothing from their daughter when Mr. Litle saw a picture of the destroyed remains of Bus. No. 37, with a blue coat that he believed to be Abigail's draped across one of the seats.

11.   Mr. and Mrs. Litle called the three major hospitals in the area. The first two hospitals had no matching description.  Mr. and Mrs. Litle were unable to get through to the third so their pastor went to the hospital to search for Abigail among the victims. Mr. and Mrs. Litle finally got through to the hospital and were told they could come look for their daughter.  When they neared the

6

hospital entrance, Mr. and Mrs. Litle received a telephone call from the hospital telling them to come immediately.

12. Mr. and Mrs. Litle located the hallway within the hospital designated as the meeting point for those attempting to locate loved ones possibly injured or killed in the attack. The Litles' pastor was waiting and told them the dreaded news that he had personally seen Abigail and she was dead. Mr. and Mrs. Litle waited to identify their daughter in the morgue for the Israeli police.

13. Both the death of their beloved daughter and watching the various newscasts about the terrorist attack that displayed the bus' charred remains has caused Mr. and Mrs. Litle severe mental anguish, pain, suffering and extreme emotional distress.

14. The Litles' other children waited at their home with a family friend for their parents to return.

15. Elishua Litle is a citizen of the United States and currently resides in Israel with his parents and family. He is the 12-year-old brother of Abigail Litle.

16. While his parents went to the hospital, he waited at his family's home with his siblings, other than Abigail, and a family friend, anxiously awaiting his parents' return.

17. Elishua found out about his sister's death when his parents returned with the family pastor, a social worker, and a family friend who was also a psychologist.

18. The murder of his sister Abigail has caused Elishua severe mental anguish, pain, suffering and extreme emotional distress over the loss of his sister.

19. Hannah Litle is a citizen of the United States and currently resides in Israel with her family. She is the 13-year-old sister of Abigail Litle.

20. While her parents went to the hospital, Hannah waited at her family's home with her siblings, other than Abigail, and a family friend, anxiously awaiting her parents' return.

7

21. She found out about her sister's death when her parents returned with the family pastor, a social worker, and a family friend who was also a psychologist.

22. The murder of her sister Abigail has caused Hannah severe mental anguish, pain, suffering and extreme emotional distress over the loss of her sister.

23. Josiah Litle is a citizen of the United States and currently resides in Israel with his family. He is the brother of Abigail Litle.

24. While his parents were at the hospital, he Josiah waited at his family's home with his siblings, other than Abigail, and a family friend, anxiously awaiting his parents' return.

25. He found out about his sister's death when his parents returned with the family pastor, a social worker, and a family friend who was also a psychologist.

26. The murder of his sister Abigail has caused Josiah severe mental anguish, pain, suffering and extreme emotional distress over the loss of his sister.

27. Noah Litle is a citizen of the United States and currently resides in Israel with his family. He is the brother of Abigail Litle.

28. While his parents went to the hospital, Noah waited at his family's home with his siblings, other than Abigail, and a family friend, anxiously awaiting his parents' return.

29. He found out about his sister's death when his parents returned with the family pastor, a social worker, and a family friend who was also a psychologist.

30. The murder of his sister Abigail has caused Noah severe mental anguish, pain, suffering and extreme emotional distress over the loss of his sister.

### The Applebaum Family (2)

31. Dr. David Applebaum and his daughter, Naava Applebaum, were both murdered in the terrorist bombing of Café Hillel in Jerusalem, Israel on September 9, 2003. HAMAS has claimed responsibility for the bombing.

32. Dr. Applebaum, having been born and educated in the United States was, at the time of his death, one of Israel's most prominent physicians specializing in emergency trauma medicine. He had personally assisted many injured victims of terrorism in Israel, and removed the remains of many victims of terrorism who had been murdered in Israel. On the night of his own death, one night before the planned marriage of his daughter, Naava, he and Naava had gone on a walk and were at Café Hillel in Jerusalem

33. Dr. Applebaum and Naava were at the café when a suicide bomber entered the restaurant and detonated a bomb, murdering both Dr. David Applebaum and his daughter, Naava.

34. Debra Applebaum is a citizen of the United States and resides in Israel. She is the wife of David Applebaum and the mother of Naava Applebaum.

35. Upon hearing of the bombing, Mrs. Applebaum immediately began attempting to contact her husband on his pager so that he would respond to the scene, as he had responded to many of the previous bombing sites in Israel, so that he could provide his medical expertise to the bombing victims of this incident. When Mrs. Applebaum did not receive a return from her page, she began to fear that her husband was not at the bombing scene as a first responder, but rather feared that her husband and daughter were victims themselves. Debra Applebaum has suffered irreparable loss over the murder of her husband and daughter, and has suffered severe mental anguish, pain, suffering and extreme emotional distress over the loss of her husband and daughter.

9

36. Jacqueline Applebaum was a citizen of the United States lived in Israel. She was the mother of David Applebaum.

37. Upon hearing of the murder of her son and granddaughter, Jacqueline Applebaum suffered severe mental anguish, pain, suffering and extreme emotional distress.

38. Recently Jacqueline Applebaum passed away. Her estate is a plaintiff in this action.

39. Natan Applebaum is a citizen of the United States and currently resides in Israel. He is the son of David Applebaum and the brother of Naava Applebaum.

40. The murder of his father, David, and sister, Naava, has caused Natan severe mental anguish, pain, suffering and extreme emotional distress as a result of said losses.

41. Shira Applebaum is a citizen of the United States and currently resides in Israel. He is the son of David Applebaum and the brother of Naava Applebaum.

42. The murder of her father, David, and sister, Naava, has caused Shira severe mental anguish, pain, suffering and extreme emotional distress as a result of said losses.

43. Yitzchak Applebaum is a citizen of the United States and currently resides in Israel. He is the son of David Applebaum and the brother of Naava Applebaum.

44. The murder of his father, David, and sister, Naava, has caused Yitzchak severe mental anguish, pain, suffering and extreme emotional distress as a result of said losses.

45. Geela Applebaum Gordon is a citizen of the United States and resides in Israel. She is the sister of David Applebaum.

46. The murder of her brother, David, and niece, Naava, has caused Geela severe mental anguish, pain, suffering and extreme emotional distress as a result of said losses.

## The Baxter Family (3)

47. Jack Baxter is a citizen of the United States and a citizen of the State of New York.

48. Jack was seriously injured by a suicide bomber while at Mike's Place, a nightclub in Tel Aviv, Israel, on April 30, 2003. HAMAS claimed responsibility for the bombing. The nightclub is located next door to the US Embassy to Israel and is frequented by many tourist and US Embassy personnel.

49. Jack Baxter was on the front patio of Mike's Place at around 1:00am. The bar was near capacity when a suicide bomber detonated his explosives at the entrance of the club killing 3 people and wounding more than 50 (fifty) including Jack who was just a few steps from the blast.

50. Mr. Baxter was knocked into a coma and clung to life for three days at Ichilov Hospital in Tel Aviv.

51. As a result of the attack Mr. Baxter is still suffering from a brain contusion, hearing loss, burns that have peeled away skin from his face and arms, and is partially paralyzed.

52. Fran Strauss Baxter is a citizen of the United States and a resident of the State of New York. She is the wife of Jack Baxter.

53. Fran Strauss Baxter tried to fly to Israel to see him but was stopped by Israel's general work strike and other problems. She arrived two days after the attack, on a flight organized and paid for by the Israeli Embassy just as Jack left the intensive care unit.

54. The attack against her husband Jack has caused Fran severe mental anguish, pain, suffering and extreme emotional distress.

55. Billy Baxter is a citizen of the United States and a resident of the State of New York. He is the brother of Jack Baxter.

11

56. The attack against his brother Jack has caused Billy severe mental anguish, pain, suffering and extreme emotional distress.

57. Catharine Baxter is a citizen of the United States and a resident of the State of New York. She is the sister of Jack Baxter.

58. The attack against her brother Jack has caused Catharine severe mental anguish, pain, suffering and extreme emotional distress.

59. Barbara Psaroudis is a citizen of the United States and a residentof the state of New Jersey. She is the sister of Jack Baxter.

60. The attack against her brother Jack has caused Barbara severe mental anguish, pain, suffering and extreme emotional distress.

### The Parsons Family (4)

61. Mark Parsons was a citizen of the United States and a resident ofthe state of Colorado. He was 31 years old at the time of his death.

62. On October 15, 2003, Mark Parsons and two other DynCorp employees, including John Linde, Jr., were part of a security detail escorting U.S. diplomats on their way to interview Palestinian applicants for Fulbright scholarships when the vehicle he was in was blown up by a remote controlled bomb near the Beit Hanoun junction in northern Gaza.

63. John W. and Agnes Parsons are citizens of the United States and citizens of the state of New Jersey. They are the natural mother and father of Mark Parsons. The murder of their son Mark has caused John W. and Agnes Parsons severe mental anguish, pain, suffering and extreme emotional distress.

64. John Parsons is a citizen of the United States and a citizen of the state of New Jersey. He is the older brother of Mark Parsons.

12

65. The murder of his brother Mark has caused John severe mental anguish, pain, suffering and extreme emotional distress.

66. Mary Lazin is a citizen of the United States and a citizen of the State of New York. She is the sister of Mark Parsons.

67. The murder of her brother Mark has caused Mary severe mental anguish, pain, suffering and extreme emotional distress.

68. Catherine Tyukody is a citizen of the United States and a citizen of the State of New Jersey. She is the sister of Mark Parsons.

69. The murder of her brother Mark has caused Catherine severe mental anguish, pain, suffering and extreme emotional distress.

70. Matthew Parsons is a citizen of the United States and a citizen of the State of New Jersey. He is the older brother of Mark Parsons.

71. The murder of his brother Mark has caused Matthew severe mental anguish, pain, suffering and extreme emotional distress.

72. On October 15, 2003, Matthew Parsons' mother telephoned Matthew's wife and informed her that Mark had been a victim of a bombing in Israel. Matthew Parsons' wife telephoned Matthew at work and asked that he return home. Upon his arrival at home, Matthew learned that his younger brother had been killed.

73. Later that day, Matthew Parsons saw videotape footage of the scene of the terrorist attack that was broadcast on the evening news in the United States, including discussions of the wreckage and the difficulty in identifying the remains of the victims. He also saw photographs of the incident on the Internet when he went online that day. Both the death of his beloved brother and the

13

experience of watching the newscasts containing the images of the charred remains of the vehicle have caused Matthew Parsons to suffer severe mental anguish and extreme emotional distress.

### The Freirmark Family (5)

74. Ariela Freirmark is a citizen of the United States and currently resides in the State of Israel.

75. On June 11, 2003, Ariela Freirmark was on Bus 14A in Jerusalem, Israel on her way to a course in sign language. Ariela is a speech therapist who works with handicapped children and she had left home to take the bus to attend the course. At the time, Ariela was 26 years old. She is the daughter of Menachem and Hadassah Freirmark. The Freirmark family grew up in Detroit, Michigan and moved to Israel in approximately 1982 when Ariela was 4 years old. Around 5:30 p.m., an individual dressed as an ultra-orthodox Jew boarded Egged Bus No. 14A at the Mahane Yehuda Market, and a short while later, as the bus drove down Jaffa Road, he detonated his bomb wrecking the bus and killing sixteen passengers. Over 100 people were wounded, including dozens of nearby pedestrians. HAMAS claimed responsibility for the bombing. Jerusalem police stated that the terrorist was carrying a huge bomb containing a great deal of metal fragments, creating massive injuries.

76. Ariela suffered serious physical, personal and emotional injuries as a result of the explosion. The blast caused her to lose consciousness. When she awakened on the bus, she saw scores of people dead and injured lying around her. She suffered shrapnel wounds and a hearing loss which has required numerous operations and medical attention. Her injuries are permanent and ongoing and she has suffered pain, scars and severe emotional distress and mental anguish. She required surgery to remove the bolts from her body that were contained in the bomber's explosives.

77. Menachem and Hadassah Freirmark are the natural parents of Ariela Freirmark. They have suffered severe emotional distress as a result of their daughter being a victim of this terrorist

14

incident. They have also incurred medical expenses for the reasonable and necessary care of Ariela that was caused by this incident.

### The Horovitz Family (6)

78. Eli Natan and Debra Ruth Horovitz, husband and wife, were in their apartment on a Friday, March 7, 2003 eating Shabbat dinner when terrorists disguised as students infiltrated Kiryat Arba shooting and killing them both HAMAS claimed responsibility for the attack.

79. Moshe and Leah Horovitz are citizens of the United States and currently reside in Israel. They are the natural mother and father of Eli Natan Horovitz.

80. They heard about their son and daughter-in-law's deaths through their granddaughter. Their son and daughter-in-law's deaths caused them severe mental anguish, pain, suffering and extreme emotional distress.

81. Shulamite Horovitz is a citizen of the United States and currently resides in Israel. She is the daughter of Eli Natan and Debra Ruth Horovitz.

82. Shulamite was the first in her family to hear about her parents' death.

83. She was by herself visiting friends in Eilat on the day her parents were murdered. Her parents were scheduled to go to Eilat with her, but because her mother was not feeling well they decided to meet Shulamite in Eilat the following day instead.

84. Shulamite learned of her parents' murders while still in Eilat, but could not reach any of her family members and could not return to Jerusalem to be with her family because of Shabbat.

85. She returned to Jerusalem and told her family the tragic news.

86. The family in Israel congregated together at Eli's parents' house and prepared the funeral arrangements.

15

87. Her parents' deaths and the pain, mental anguish and suffering she endured while waiting to be able to return to Jerusalem and be with her family caused Shulamite severe mental anguish and extreme emotional distress.

88. Batsheva Horovitz is a citizen of the United States and currently resides in Israel. She is the daughter of Eli Natan and Debra Ruth Horovitz.

89. She found out about her parents' deaths through her sister Shulamite. Her parents' deaths caused her severe mental anguish and extreme emotional distress.

90. Nechama Horovitz is a citizen of the United States and currently resides in Israel. She is the daughter of Eli Natan and Debra Ruth Horovitz.

91. She found out about her parents' deaths through her sister Shulamite. Her parents' deaths caused her severe mental anguish and extreme emotional distress.

92. Tvi Horovitz is a citizen of the United States and currently resides in Israel. He is the son of Eli Natan and Debra Ruth Horovitz.

93. He found out about his parents' deaths through his sister Shulamite. His parents' deaths caused him severe mental anguish and extreme emotional distress.

94. Ari Horovitz is a citizen of the United States and currently resides in Israel. He is the brother of Eli Natan Horovitz.

95. He heard of his brother and sister-in-law's murders through his family in Israel. Their deaths caused him severe mental anguish and extreme emotional distress.

96. David Horovitz is a citizen of the United States and currently resides in Israel. He is the brother of Eli Natan Horovitz.

97. He heard of his brother and sister-in-law's murders through his family in Israel. Their deaths caused him severe mental anguish and extreme emotional distress.

98. Tovi Horovitz is a citizen of Florida/Washington and currently resides in Israel. He is the brother of Eli Natan Horovitz.

99. He heard of his brother and sister-in-law's murders through his family in Israel. Their deaths caused him severe mental anguish and extreme emotional distress.

100. Uri Horovitz is a citizen of the United States and currently resides in Israel. He is the brother of Eli Natan Horovitz.

101. He heard of his brother and sister-in-law's murders through his family in Israel. Their deaths caused him severe mental anguish and extreme emotional distress.

102. Bernice Wolf is a citizen of the United States and currently resides in Israel. She is the natural mother of Debra Ruth Horovitz.

103. Mrs. Wolf lived in Florida when her daughter was killed, but had plans to move to Israel to live with her daughter.

104. Accordingly, she did not hear the news of her daughter and son-in-law's murders with the rest of the family in Israel.

105. Mrs. Wolf originally learned that a couple in Kiryat Arba was murdered by terrorists when she read about the attack on the Internet on Friday, March 7, 2003.

106. Because the article she read did not give the names of the victims, Mrs. Wolf had no confirmation that her daughter and son-in-law were the couple murdered in their home, although she was severely distressed by the news and feared that they were the ones killed.

107. Mrs. Wolf could not reach her daughter and had heard nothing by the next morning.

108. Mrs. Wolf attended the Saturday morning service at her synagogue.

17

109.     When she returned, she received a telephone call from her granddaughter in Israel informing her that Debra and Eli were murdered in the attack.

110.     Mrs. Wolf was devastated upon hearing the news of her daughter and son-in-law's murders.

111.     Despite her immense personal grief, Mrs. Wolf had just two hours to pack her belongings, pass on the horrible news to her family in the United States and meet with officials from the Israeli Embassy to retrieve her ticket to Israel, so she could attend her daughter and son-in-law's funeral the next day.

112.     Mrs. Wolf waited frantically in her home for someone to arrive from the Embassy, but nobody came.

113.     Eventually, Mrs. Wolf was forced to buy a second ticket to Israel, as she feared she would miss her daughter and son-in-law's funeral.

114.     She flew by herself to Canada, where she met her son, Stanley, and they completed the remainder of the trip to Israel together.

115.     When they arrived in Israel, they met Mrs. Wolf's other son, Brian Wolf, and the three drove to Jerusalem together.

116.     When they arrived in Jerusalem, the funeral procession had begun five hours before, and they were escorted through a crowd of more than 15,000 people to reach the covered bodies.

117.     Mrs. Wolf is nearly eighty years old and currently resides in Israel. Because she had planned to live in Israel with her daughter and son-in-law, her future there remains uncertain.

118. In addition to the fear for her own future, the murders of Eli Natan and Debra Ruth Horovitz have caused Mrs. Wolf severe mental anguish, pain, suffering and extreme emotional distress.

119. Stanley Wolf is a citizen of the United States and a citizen of the State of Florida. He is the brother of Debra Ruth Horovitz.

120. His mother told him of his beloved sister's death over the telephone the news of his beloved sister's death.

121. His sister and brother-in-law's murders caused him severe mental anguish and extreme emotional distress.

122. Brian Wolf is a citizen of the United States and a citizen of the State of Maryland. He is the brother of Debra Ruth Horovitz.

123. Mrs. Wolf was unable to reach him by telephone, and so he found out about his sister's death through a voice mail Mrs. Wolf left for him on his answering machine.

124. He then flew to Israel to attend his sister and brother-in-law's funeral.

125. Due to his immense grief, Mr. Wolf was unable to stand on his own as he viewed his sister's covered body at her funeral, which lasted more than 13 hours.

126. His sister and brother-in-law's murders caused Mr. Wolf severe mental anguish, pain, suffering and extreme emotional distress.

### The Klieman Family (7)

127. On March 24, 2002 Esther Klieman, age 23, was aboard Bus Route 468 in Israel when she struck in the heart and killed by bullets fired from weapons held by terrorists who were positioned on a bridge near the road. Al Aqsa Martyr's Brigade claimed responsibility for the attack.

128. The Estate of Esther Klieman, a Cook County, Illinois estate, is represented in this action by Aaron Kesner, duly appointed by said court as the Adminstrator of said Estate.

129. Nachman and Ruanne Klieman are citizens of the United States and Israel and currently reside in Israel. They are the natural mother and father of Esther Klieman.

130. On the morning of March 24, 2002, Nachman drove his daughter Esther to the bus stop and saw her board the 7:00am Egged civilian bus which would take her to work. By 7:10am, he and his wife Ruanne were driving towards Ben Gurion Airport where she worked. After dropping Ruanne off, Nachman intended to drive to his job at EL AL Israel Airlines when he heard a bulletin on the radio that a shooting attack had been carried out on a vehicle on the road that they were driving on but in the opposite direction. The news bulletin indicated that a woman had been seriously injured.

131. Nachman and Ruanne never considered that the vehicle might be the bus that Esther was riding. They tried to reach a friend who was a member of the emergency response team of their community in order get some information about what happened but we not able to reach him.

132. As they continued their drive to work, reports on the radio indicated that the vehicle was indeed a civilian bus and that a woman had been seriously injured in the shooting attack. They both began to feel anxious.

133. Nachman dropped Ruanne off but remained in the parking and began to make phone calls. A news update indicated that the woman had died. Their three sons who had also heard the reports, called Nachman one behind the other for information but he told them that he would get back to them. Upon reaching his friend on the emergency committee, Nachman asked him about the shooting. When he did not respond Nachman knew that it was his daughter. Nachman remember crying and shouting at him, and asked him to tell him if it was Esther. His reply, was a whispered, "I

20

can't". After hanging up he sat in the car crying and thinking how he could tell his wife that their daughter had been murdered.

134.    When Nachman left the car and approached his wife's office he saw her outside moving from her building to another. From fifty feet she saw his face and instantly knew what had happened. Nachman will never forget her scream. They held each other as people from the office poured outside after hearing her screaming. Instinctively they moved towards their car in order to be alone. The phone in the car rang and rang as a trauma team from the community went into action and contacted them. They intended to send a car to drive Nachman and Ruanne home where they would be attended by a Doctor and a Psychologist. They refused the ride, and drove home together. When they arrived home an ambulance was waiting outside and a Doctor, Psychologist, and Social Worker were all present and stood by them as they contacted their 3 sons who then went to their parent's house. They stood by their parents in the ensuing hours as they made funeral plans and tended to the emotional needs of their family members who included Ruanne's, eighty year old mother, a daughter in law and infant granddaughter. During the funeral procession and interment, the medical team stood by them along with many friends and relatives.

135.    Nachman took an extended vacation from his job with EL AL and was subsequently granted early retirement. He couldn't return to the pressure and long hours, which were a part of his work ethic. He has spent time trying to accompany his wife and sons through their healing process and to volunteer in the organization that Esther herself had volunteered for, working with children with limited mental and physical development. Ruanne has also joined Nachman in this endeavor.

136.    Dov Klieman is a citizen of the United States and Israel and currently resides in Israel. He is the brother of Esther Klieman.

21

137.     Gavriel Klieman is a citizen of the United States and Israel and currently resides in Israel. He is the brother of Esther Klieman.

138.     Yosef Klieman is a citizen of the United States and Israel and currently resides in Israel. He is the brother of Esther Klieman.

139.     Dov, Gavriel and Yosef all shared special relationships with the sister they loved. Esther always had the patience and time to devote to each one and was able to relate to their different personalities.

140.     The Klieman's have all sought assistance and counseling from social workers as well as group therapy through group forums with other families who were victimized by terrorists. The mental pain, suffering and anguish each of Esther's siblings and parents continue to experience is immeasurable.

### The Margalit Family (8)

141.     Evyatar Margalit is a citizen of the United States and a currently resident of the State of Israel.

142.     On June 11, 2002, Evyatar was a 15-year-old teenager attending school in Israel. He was seriously injured when a bomb placed in a field by a terrorist exploded. As a result, Evyatar spent several months in the hospital and suffered through over nine surgical medical operations, treating his wounds and burns. The perpetrator of this terrorist attack was an individual sent by Force 17 which is affiliated with the Palestinian Authorities' Fatah Organization.

143.     Evyatar Margalit has suffered severe physical and mental anguish and extreme emotional distress as a direct result of this terrorist attack.

144.     Deborah and Natan Margalit are United States citizens currently residing in Israel and are the natural parents of Evyatar Margalit.

22

145. As a result of the terrorist attack on their son, they have suffered severe mental anguish, pain, suffering and extreme emotional distress and have incurred medical expenses for the necessary medical treatment for their son.

## The Pam Family (9)

146. Rivka Pam is a citizen of the United States.

147. On June 11, 2003, 16 year old Rivka Pam was on Bus No. 14A in Jerusalem, Israel. Around 5:30 p.m., an individual dressed as an ultra-orthodox Jew boarded Egged Bus No. 14A at the Mahane Yehuda market, and a short while later, as the bus drove down Jaffa Road, he detonated his bomb wrecking the bus and killing sixteen passengers. Over 100 people were wounded, including dozens of passerby's. HAMAS claimed responsibility for the bombing. Jerusalem police stated that the terrorist suicide bomber was carrying a huge bomb containing a great deal of metal fragments, creating massive injuries.

148. Rivka works with children and this teenager's life has changed dramatically as a result of her injuries in this terrorist incident. She was hospitalized for a number of days in intensive care, suffered burns, lung damage, eye injury, scarring and severe hearing loss, which requires future medical and surgical care. Her happy outgoing personality has been affected because of the severe emotional distress and hearing loss that she has experienced from this terrorist incident.

149. Phyllis Pam is a United States citizen and currently resides in the State of Israel. She is the natural mother of Rivka Pam.

150. Phyllis has suffered severe emotional distress, pain and anguish as a result of her daughter being seriously injured in this terrorist incident. She has also incurred medical expenses for the reasonable and necessary care of Rivka that was caused by this incident.

### The Nathansen Family (10)

151.  Tehilla Nathansen was killed and Chana, Matanya, Shoshana and Yehudit Nathansen were injured in the bombing of Bus No. 2 in Jerusalem, Israel on August 19, 2003. HAMAS claimed responsibility for the bombing. The Estate of Tehilla Nathansen and Chana, Matanya, Shoshana and Yehudit Nathansen individually are listed in *Linde v. Arab Bank*, an action that is pending the U.S. District Court, Eastern District of New York.

152.  Rachel Potolski is a citizen of the United States and Israel and currently resides in Israel. She is the sister of Chana Nathansen.

153.  The murder of her sister Chana has caused Rachel severe mental anguish, pain, suffering and emotional distress.

154.  Ovadia Topporowitch is a citizen of the United States and Israel and currently resides in Israel. She is the sister of Chana Nathansen.

155.  The murder of her sister Chana has caused Ovadia severe mental anguish, pain, suffering and extreme emotional distress.

156.  Tehila Topporowitch is a citizen of the United States and Israel and currently resides in Israel. She is the sister of Chana Nathansen.

157.  The murder of her sister Chana has caused Tehila severe mental anguish, pain, suffering and extreme emotional distress.

158.  Yisrael Topporowitch is a citizen of the United States and Israel and currently resides in Israel. She is the brother of Chana Nathansen.

159.  The murder of his sister Chana has caused Yisrael severe mental anguish, pain, suffering and extreme emotional distress.

24

160.    Yitzchak Topporowitch is a citizen of the United States and Israel and currently resides in Israel. He is the brother of Chana Nathansen.

161.    The murder of his sister Chana has caused Yitzchak severe mental anguish, pain, suffering and extreme emotional distress.

## The Reinitz Family (11)

162.    Mordechai Reinitz and his two sons, Yissocher Dov and Mendy were on a bus No. 2 in Jerusalem, Israel on August 19, 2003 when a suicide bomber detonated his weapon and the bus exploded. HAMAS claimed responsibility for the bombing. Mordechai and Yissocher Dov were both killed and Mendy was injured in the bombing.

163.    Mendy received shrapnel wounds in the shoulders and back and underwent intensive surgery the surgery was successful, but Mendy will still have some shrapnel in his body for the rest of his life. Mendy is a dual citizen of United States and Israel and resides in Israel.

164.    The murder of his father, Mordechai, and brother, Yissocher Dov, has caused Mendy severe mental anguish, pain, suffering and extreme emotional distress.

165.    Chaya Reinitz is a legal resident of the United States and currently resides in Israel. She is the wife of Mordechai and the mother of Yissocher Dov and Mendy.

166.    The murder of her husband, Mordechai, and son, Yissocher Dov, has caused Chaya severe mental anguish, pain, suffering and extreme emotional distress.

167.    Malvia and Joseph Reinitz are citizens of the United States and currently reside in Israel. They are the natural mother and father of Mordechai Reinitz.

168.    The murder of their son, Mordechai, and grandson, Yissocher Dov, has caused Malvia and Joseph severe mental anguish, pain, suffering and extreme emotional distress.

25

169. Nicha Ostreicher is a dual citizen of the United States and Israel and currently resides in Israel. She is the daughter of Mordechai and the sister of Yissocher Dov and Mendy.

170. The murder of her father, Mordechai, and brother, Yissocher Dov, has caused Nicha severe mental anguish, pain, suffering and extreme emotional distress.

171. Chaim Reinitz is a dual citizen of the United States and Israel and currently resides in Israel. He is the son of Mordechai and the brother is Yissocher Dov and Mendy.

172. The murder of his father, Mordechai, and brother, Yissocher Dov, has caused Chaim severe mental anguish, pain, suffering and extreme emotional distress

173. Margali Reinitz is a dual citizen of the United States and Israel and currently resides in Israel. She is the daughter of Mordechai and the sister of Yissocher Dov and Mendy.

174. The murder of her father, Mordechai, and brother, Yissocher Dov, has caused Margali severe mental anguish, pain, suffering and extreme emotional distress

175. Miriam Reinitz is a dual citizen of the United States and Israel and currently resides in Israel. She is the daughter of Mordechai and the sister of Yissocher Dov and Mendy.

176. The murder of her father, Mordechai, and brother, Yissocher Dov, has caused Miriam severe mental anguish, pain, suffering and extreme emotional distress

177. Rivka Reinitz is a dual citizen of the United States and Israel and currently resides in Israel. She is the daughter of Mordechai and the sister of Yissocher Dov and Mendy.

178. The murder of her father, Mordechai, and brother, Yissocher Dov, has caused Rivka severe mental anguish, pain, suffering and extreme emotional distress

179. Shmuel Reinitz is a dual citizen of the United States and Israel and currently resides in Israel. He is the son of Mordechai and the brother of Yissocher and Mendy.

180. The murder of his father, Mordechai, and brother, Yissocher Dov, has caused Shmuel severe mental anguish, pain, suffering and extreme emotional distress.

181. Yakov Reinitz is a dual citizen of the United States and Israel and currently resides in Israel. He is the son of Mordechai and the brother of Yissocher Dov and Mendy.

182. The murder of his father, Mordechai, and brother, Yissocher Dov, has caused Yakov severe mental anguish, pain, suffering and extreme emotional distress

183. Yitchok Reinitz is a dual citizen of the United States and Israel and currently resides in Israel. He is the son of Mordechai and the brother of Yissocher Dov and Mendy.

184. The murder of his father, Mordechai, and brother, Yissocher Dov, has caused Yitchok severe mental anguish, pain, suffering and extreme emotional distress

185. Leah Tauber is a dual citizen of the United States and Israel and currently resides in Israel. She is the daughter of Mordechai and the sister of Yissocher Dov and Mendy.

186. The murder of her father, Mordechai, and brother, Yissocher Dov, has caused Leah severe mental anguish, pain, suffering and extreme emotional distress.

187. Miriam Ehrenfeld is a citizen of the United States and currently resides in Israel. She is the sister of Mordechai.

188. The murder of her brother, Mordechai, and nephew, Yissocher Dov, has caused Miriam severe mental anguish, pain, suffering and extreme emotional distress.

189. Rose Joseph is a citizen of the United States and currently resides in Israel. She is the sister of Mordechai.

190. The murder of her brother, Mordechai, and nephew, Yissocher Dov, has caused Rose severe mental anguish, pain, suffering and extreme emotional distress.

27

191.     Devora Pollack is a citizen of the United States and currently resides in Israel. She is the sister of Mordechai.

192.     The murder of her brother, Mordechai, and nephew, Yissocher Dov, has caused Devora severe mental anguish, pain, suffering and extreme emotional distress.

193.     Benjamin Reinitz is a citizen of the United States and currently resides in Israel. He is the brother of Mordechai.

194.     The murder of his brother, Mordechai, and nephew, Yissocher Dov, has caused Benjamin severe mental anguish, pain, suffering and extreme emotional distress

195.     Leibel Reinitz is a citizen of the United States and currently resides in Israel. He is the brother of Mordechai.

196.     The murder of his brother, Mordechai, and nephew, Yissocher Dov, has caused Leibel severe mental anguish, pain, suffering and extreme emotional distress

197.     Samuel Reinitz is a citizen of the United States and currently resides in Israel. He is the brother of Mordechai.

198.     The murder of his brother, Mordechai, and nephew, Yissocher Dov, has caused Samuel severe mental anguish, pain, suffering and extreme emotional distress

199.     Raizel Shimon is a citizen of the United States and currently resides in Israel. She is the sister of Mordechai and aunt of Yissocher Dov.

200.     The murder of her brother, Mordechai, and nephew, Yissocher Dov, has caused Raizel severe mental anguish, pain, suffering and extreme emotional distress

201.     Helen Weider is a citizen of the United Stated and currently resides in Israel. She is the sister of Mordechai and aunt of Yissocher Dov.

202.    The murder of her brother, Mordechai, and nephew, Yissocher Dov, has caused Helen severe mental anguish, pain, suffering and extreme emotional distress.

### The Richter Family (12)

203.    On August 19, 2003, Miriam Leah Richter, her great aunt, Goldie Zarkowsky and Goldie's two children were on Bus No. 2 headed to the Western Wall when a suicide bomber detonated his explosives injuring Miriam Leah. HAMAS claimed responsibility for the bombing. Miriam Leah was nine years old at the time of the bombing and is a citizen of both the United States and Israel and currently resides in Israel.

204.    As a result of the bombing Miriam Leah had shrapnel lodged in her eye, neck and chest. She underwent surgery and all of the shrapnel was removed except for what was in her chest. She will live with it there for the rest of her life.

205.    Since the attack, Miriam is traumatized. She can't possibly travel to school by bus. She wakes up every night very upset. A normally studious child, she finds it difficult to concentrate. She has become a very edgy and anxious child and is easily antagonized.

206.    Moshe and Yehudis Richter are citizens of both the United States and Israel and currently reside in Israel. They are the natural mother and father of Miriam Leah.

207.    The attack on their daughter Miriam has caused Moshe and Yehudis severe mental anguish, pain, suffering and extreme emotional distress.

208.    Avrohom D. Richter is a citizen of both the United States and Israel and currently resides in Israel. He is the brother of Miriam Leah.

209.    The attack on his sister Miriam has caused Avrohom severe mental anguish, pain, suffering and extreme emotional distress.

210. Breina Richter is a citizen of both the United States and Israel and currently resides in Israel. She is the sister of Miriam Leah.

211. The attack on her sister Miriam has caused Breina severe mental anguish, pain, suffering and extreme emotional distress.

212. Nechama Richter is a citizen of both the United States and Israel and currently resides in Israel. She is the sister of Miriam Leah.

213. The attack on her sister Miriam has caused Nechama severe mental anguish, pain, suffering and extreme emotional distress.

214. Sara Malka Richter is a citizen of both the United States and Israel and currently resides in Israel. She is the sister of Miram Leah.

215. The attack on her sister Miriam has caused Sara severe mental anguish, pain, suffering and extreme emotional distress.

216. Shlomo Chaim Richter is a citizen of both the United States and Israel and currently resides in Israel. He is the brother is Miriam Leah.

217. The attack on his sister Miriam has caused Shlomo severe mental anguish, pain, suffering and extreme emotional distress.

218. Tranne Richter is a citizen of both the United States and Israel and currently resides in Israel. She is the sister of Miriam Leah.

219. The attack on her sister Miriam has caused Tranne severe mental anguish, pain, suffering and extreme emotional distress.

220. Yakov Yosef Richter is a citizen of both the United States and Israel and currently resides in Israel. He is the brother of Miriam Leah.

221. The attack on his sister Miriam has caused Yakov severe mental anguish, pain, suffering and extreme emotional distress.

222. Yechiel Richter is a citizen of both the United States and Israel and currently resides in Israel. He is the brother of Miriam Leah.

223. The attack on his sister Miriam has caused Yechiel severe mental anguish, pain, suffering and extreme emotional distress.

224. Yisroel Richter is a citizen of both the United States and Israel and currently resides in Israel. He is the brother of Miriam Leah.

225. The attack on his sister Miriam has caused Yisroel severe mental anguish, pain, suffering and extreme emotional distress.

226. Yitzchok A. Richter is a citizen of both the United States and Israel and currently resides in Israel. He is the brother of Miriam Leah.

227. The attack on his sister Miriam has caused Yitzchok severe mental anguish, pain, suffering and extreme emotional distress.

### The Tratner Family (13)

228. On September 24, 2004, Tiferet Tratner, age 24, was killed in her home in Neve Dekalim by a terrorist mortar attack launched from or near the Gaza Strip. This murder took place the day before Yom Kippur.

229. Tiferet was an American citizen and is the daughter of Shlomo Tratner. Prior to her murder, Tiferet worked with the elderly and with people with disabilities. Shlomo Tratner has suffered severe emotional anguish, pain, suffering and distress over the murder of his daughter and brings this action individually and on behalf of the Estate of Tiferet Tratner for her wrongful death.

31

### The Zarkowsky Family (14)

230.    Goldie Zarkowsky and her son, Eli Zarkowsky, were killed in the bombing of Bus No. 2 in Jerusalem, Israel on August 19, 2003. They were citizens of the United States and residents of the State of New York. HAMAS took responsibility for the bombing.

231.    Bshava Zarkowsky was injured in the bombing of Bus No. 2 in Jerusalem, Israel on August 19, 2003. She is a citizen of the United States and a resident of the State of New York.

232.    The murder of her mother Goldie and brother Eli has caused Bshava severe mental anguish, pain, suffering and extreme emotional distress.

233.    Elizabeth and Max Schwartz are citizens of the United States and the State of New York. They are the natural parents of Goldie and the grandparents of Eli.

234.    Max Schwartz was in a business meeting with one of his sons Jacob. Jacob received an urgent call but Max thought nothing of the call until Jacob returned with a look of despair on his face. Max inquired about the call but Jacob would not talk about it.

235.    The scene around the house when Max and Jacob arrived home was unexpected. So many of his friends and family members were there to break the news to Max and his wife as well as to be there for them in their time of need. They flew to Israel immediately to tend to the matter at hand.

236.    A Holocaust survivor, Max had endured this kind of loss before and that helped him to deal with this loss yet and still nothing could compare to the pain of losing his daughter and grandson. The shock and horror of the loss of his loved ones is a feeling that he will not soon forget.

237.    Elizabeth Schwartz was tending to her usual errands at the time of the attack. She spent her last hour of errands visiting with an elderly woman. She rushed home in order to fix

32

supper for her husband. As she approached her home she noticed that there were several cars parked in front of her house. She knew then that something was going on. When she entered the house her family members are friends collectively delivered the news to her that her daughter was on a public bus when it was bombed.

238.    Elizabeth and her husband Max immediately flew to Israel to see about their daughter. That was where they found out that Goldie was dead.

239.    Also Holocaust survivor, Elizabeth had endured this kind of loss before and that helped her to deal with this loss yet and still nothing could compare to the pain of losing her daughter and grandson. The shock and horror of the loss of his loved ones is a feeling that she will not soon forget.

240.    Mendel Zarkowsky is a citizen of the United States and the State of New York. He is the husband of Goldie and the father is Eli.

241.    After a hot and humid day, Mendel was very tired and decided to go relax by learning Torah in a local study hall. Goldie traveled by bus with their daughter Bshava and their son Eli to the Western Wall to pray the afternoon prayers. He spoke with his wife for the last time over the telephone at around 6:30pm, shortly before she departed for the Western Wall with Bshava and Eli.

242.    At about 9:10pm, Mendel was getting out of a taxi when he heard sirens. Ambulances, police cars and fire engines were driving toward Shmuel HaNavi Street. At the time Mendel did not pay much attention to what was going on.

243.    Mendel arrived at his nephew's apartment where the family had been staying for his nephew's wedding. There were no adults around, only small children. The telephone rang and Mendel answered to the frantic voices of his brother-in-law and sister-in-law. They told him that there

33

had been a bombing on the bus that Goldie and the two children had been traveling on and that their daughter happened to be on the bus as well.

244.  Mendel arrived at the hospital to find his daughter Bshava covered in blood, disoriented and crying hysterically. No one had any information on the whereabouts of his wife and son.

245.  After traveling from hospital to hospital in search of his missing wife and son, he was informed that two bodies had been recovered that could possibly be them. After DNA testing, Mendel was told that indeed the bodies were those of his dead wife and son.

246.  Mendel's life has changed dramatically. He is now the sole provider and caretaker for the 7 children who remain in the home. With doctors appointments, cooking, cleaning and all of the other things that come with caring for the children, as well as trying to help them to cope with the loss of their mother and brother, Mendel has no time for the things he used to do like studying and tutoring children.

247.  As a result of the attacks, Mendel is under severe mental anguish and extreme emotional distress. He has spoken with many doctors, experts and families who have experienced trauma but has yet to find out how to deal with his pain and the pain of his children who seem to think that the loss of their mother and brother is somehow his fault.

248.  The impact of this tragedy is a constant burden on Mendel. He misses the serenity, contentment and fulfillment of the union that he shared with Goldie.

249.  Miriam Blum is a citizen of the United States and the State of New York. She is the sister of Goldie and the aunt of Eli.

250.  The murder of her sister Goldie and nephew Eli has caused Miriam severe mental anguish, pain, suffering and extreme emotional distress.

34

251.     Malky Breuer is a citizen of the United States and the State of New York. She is the sister of Goldie and the aunt of Eli.

252.     Malky was in her apartment when her niece called and told her about the attack in Israel and that she was on the bus when it was bombed. Malky was so crushed that she could not move. She sat still, devastated for hours until her brother called to check on her and to tell her that her parents were going to Israel to assist in the arrangements for her sister and nephew.

253.     Malky's life has not been the same since. She misses the long talks she had with her sister and her bright smile. The shock and horror of losing her loved ones has caused mental anguish, pain, suffering and extreme emotional distress.

254.     Esther Buxbaum is a citizen of the United States and the State of New York. She is the sister of Goldie and the aunt of Eli.

255.     Esther was in the same hotel that her sister Goldie had been staying when she learned of the attack. She arrived in Israel the same day as Goldie. They were about to celebrate Esther's son's engagement. She tried to reach Goldie was told that she had went back to the hotel. Two hours later she tried to reach Goldie several more times to no avail. Esther began to get nervous.

256.     Suddenly, she heard sirens. She saw people holding radios and looking serious and she began to inquire about what had happened. She was informed that there was a bombing on the bus that Goldie and her two children had been on.

257.     Instead of celebrating her son's engagement, she spent the next week mourning her sister and nephew at the bedside of her niece Batsheva, who was the only one of her family members who had survived the attack.

258.     Esther's life is forever changed. Even during her happy moments she fears that bad things will happen because the loss of her loved ones occurred during a time of happiness for her

own son. The shock and horror of the loss of her loved ones has caused mental anguish, pain, suffering and emotional distress. Esther has had to seek counseling to cope with her loss.

259.    Gittel Cohen is a citizen of the United States and the State of New York. She is the sister of Goldie and the aunt of Eli.

260.    The murder of her sister Goldie and nephew Eli has caused Gittel severe mental anguish, pain, suffering and extreme emotional distress.

261.    Rachel Rosner is a citizen of the United States and the State of New York. She is the sister of Goldie and the aunt of Eli.

262.    She was at in New York at a shopping mall when a friend of hers in Israel called to inform her that Goldie was missing. Her friend then told her that she had to go because there was commotion outside and she wanted to see what was going on.

263.    Rachel then went home. When she was not greeted by her daughter's happy outstretched arms, she knew that something was wrong. Her family emerged with faces of sorrow and gave her the horrible news.

264.    Since the loss of her sister, Rachel has mourned continuously. The shock and horror of losing her loved ones has caused mental anguish, pain, suffering and extreme emotional distress.

265.    Jacob Schwartz is a citizen of the United States and the State of New York. He is the brother of Goldie and uncle of Eli.

266.    Jacob was in a business meeting with his father when he found out about the attack. Jacob received a call from his oldest son, Pinchas, who lives in Israel, informing him of the bus bombing in Israel and that his sister and two of children were on the bus. He concealed his emotions because he did not want to unnecessarily alarm his father. His father repeatedly asked him who he was

36

speaking with when Jacob left the meeting numerous times to call Israel for updates but Jacob did not tell him because it looked as though Goldie and her children had perished in the attack and he did not know how to tell his father.

267.    After the meeting was over, Jacob and his father headed to home. Jacob then received a call confirming his fears; Goldie was dead. He still did not tell his father. Fortunately, it was arranged that a friend of his father's and a doctor came to break the news to Jacob's parents so that he wouldn't have to do it. Soon after Jacob's parents boarded a plane to Israel to take care of the arrangements for their daughter and grandson.

268.    During and after the incident, their years of growing up together flashed before Jacob's eyes. He specifically remembered the day she was born. He was eight years old at the time.

269.    After the incident, Jacob was given medication by a local doctor and also sought counseling and mental health treatment for his condition. He suffers from depression and has a nervous condition as a result of the death of his loved ones. His business has suffered as a result of his condition and it has also put a strain on his marriage. The shock and horror of losing his loved ones has caused mental anguish, pain, suffering and extreme emotional distress.

270.    Michael Schwartz is a citizen of the United States and the State of New York. He is the brother of Goldie and the uncle of Eli.

271.    Michael was driving on a business errand for work when he found out about the attack in Israel. Fortunately, he had reached his destination before his children called his cellphone to give him the bad news.

272.    Michael lost consciousness immediately after hearing the news. Bystanders revived him and his son was called and was by side within moments.

37

273. Since his sister's death, Michael experiences anxiety attacks, uncontrollable crying episodes, nervous tension and many sleepless nights. He unable to handle any stressful situations. The shock and horror of losing his loved ones has caused mental anguish, pain, suffering and extreme emotional distress.

274. Phillip Schwartz is a citizen of the United States and the State of New York. He is the brother of Goldie and the uncle of Eli.

275. Phillip was driving in his car listening to his radio when the station gave a report on a bus bombing in Jerusalem. Instantly, Goldie came to his mind because she was in Israel. His fear was confirmed when he was informed by his brother Jacob that his sister and two of her children were on the bus.

276. Phillip has not received any medical attention to ease the pain of his loss due to financial constraints. The shock and horror of losing his sister has caused mental anguish, pain, suffering and extreme emotional distress.

277. Perl Brailofsky is a citizen of the United States and the State of New York. She is the daughter of Goldie and the sister of Eli.

278. Perl was in Spring Valley, New York when the attacks occurred.

279. She happened to call her mother where she was staying in Israel to check up on her. The daughter of another woman that lived there answered the telephone. When Perl asked to speak with her mother the girl was silent. After asking the little girl several times where her mother was to no avail, the girl finally spoke up and said that there had been a bombing. Perl bombarded the child with questions but she had no answers.

280. Perl has had to seek counseling to cope with the loss. The shock and horror of losing her mother has caused mental anguish, pain, suffering and extreme emotional distress.

281. Perl's life changed instantly after the loss of her mother. She is very withdrawn and no longer has the many friends that she once had. The burden of helping to care for siblings has fallen on her.

282. The murder of her mother Goldie and brother Eli has caused Perl severe mental anguish, pain, suffering and extreme emotional distress.

283. Abraham Zarkowsky is a citizen if the United States and the State of New York. He is son of Goldie and the brother of Eli.

284. The shock and horror of losing his loved ones has caused mental anguish, pain, suffering and extreme emotional distress.

285. Ezriel Zarkowsky is a citizen of the United States and the State of New York. He is the son of Goldie and the brother of Eli.

286. Ezriel was at home on his lunch break when the attack occurred.

287. Ezriel called his aunt's house and was informed about the tragic incident. He was given pills by the EMS crew that attended to him at the time of notification of the attack.

288. After his mother's death, Ezriel suffered intense phobias. He suffers from nightmares and wakes up in cold sweats. Whenever a family member is not where they said they would be or does not arrive when they said they would, he became hysterical and apprehensive. Despite seeing numerous psychologists, nothing has alleviated his phobias.

289. The shock and horror of losing his mother has caused severe mental anguish and extreme emotional distress. Ezriel has had to seek counseling to cope with his loss.

290. Gittel Cohen is a citizen of the United States and the State of New York. She is the daughter of Goldie and the sister of Eli.

291. The shock and horror of losing his loved ones has caused mental anguish, pain, suffering and extreme emotional distress.

292. Joseph Zarkowsky is a citizen of the United States and the State of New York. He is the son of Goldie and the brother of Eli.

293. Joseph was engrossed in his studies when he heard about the attacks in Israel.

294. Once Joseph heard about the attacks he left the study hall where he had been studying and went to his parents home. When he arrived Joseph was greeted by the sad faces of his family members. He then called his wife, informed her of the tragic incident and told her that he was flying to Israel to be with his family.

295. After the incident Joseph was not the same. He could not concentrate on his studies and lost his study partner of four years as a result. He has nightmares and is constantly distracted.

296. Although he has not sought professional help to help him to cope, the shock and horror of losing his mother and brother has caused severe mental anguish, pain, suffering and extreme emotional distress.

297. Miriam Zarkowsky is a citizen of the United States and the State of New York. She is the daughter of Goldie and the sister of Eli.

298. The shock and horror of losing her loved ones has caused mental anguish, pain, suffering and extreme emotional distress.

299. Shrage Zarkowsky is a citizen of the United States and the State of New York. He is the eldest son of Goldie and the brother of Eli.

300. Shrage was in New York substitute teaching at a summer camp when the attack occurred.

301.     Shrage received an urgent call from his wife while teaching at a summer camp in New York. She told him that there was a bus bombing in the center of Jerusalem. He immediately shuddered because at the time his mother, father and two siblings were in Israel. It was later confirmed that his mother and siblings were on the bus.

302.     He asked his wife if she had spoken with his parents and she informed him that no one had heard from them. Finally, his sister was found alive and he just knew that his mother and brother would be located as well. After several hours and no sign of his mother and brother, Shrage grew frustrated. After flying to Israel, Shrage and the rest of his family were informed that his mother and brother were dead.

303.     The death of Shrage's mother left him a shattered and broken man. Every explosion, every noise turns him into an emotional wreck. The shock and horror of losing his mother and brother has caused severe mental anguish, pain, suffering and extreme emotional distress.

304.     Trany Zarkowsky is a citizen of the United State and the State of New York. She is the daughter of Goldie and the sister of Eli.

305.     The murder of her mother and brother has caused Trany severe mental anguish, pain, suffering and extreme emotional distress.

306.     Yehuda Zarkowsky is a citizen of the United State and the State of New York. He is the son of Goldie and the brother of Eli.

307.     The murder of his mother and brother has caused Yehuda severe mental anguish, pain, suffering and extreme emotional distress.

**B.     The Defendant**

308.     Defendant Arab Bank, PLC is a Jordanian bank with headquarters in Amman, Jordan, the common stock of which is publicly traded on the Amman Stock Exchange. Arab Bank is

majority owned and controlled by the shareholders of Arab Bank Group, a Jordanian holding company. Arab Bank and Arab Bank Group constitute a single Jordanian banking institution. Arab Bank owns, controls and/or operates bank branches worldwide, including several branches that are situated in Palestinian Authority controlled territories and branch office located at 520 Madison Avenue, New York, New York, that is regulated by the Controller of the Currency of the United States Treasury Department. Arab Bank conducts business in, and is registered to conduct business under, the laws of the State of New York. The Bank does business in the United States and approximately 30 other countries on over five continents with over 7,000 employees.

309. Arab Bank has operated its federally chartered branch in New York since approximately 1982. The New York branch is designated as a wholesale bank, and among the banking and financial services that it conducts in New York is the provision of clearing and correspondent bank services to its foreign bank branch offices and affiliated banking institutions that are also owned and/or controlled by the Arab Bank Group as well as other foreign banks. The New York branch has approximately 50 employees working in or for the New York City operation. According to the Arab Bank Group's 2003 Annual Report, the New York Branch of Arab Bank, PLC clears all of the worldwide branches' dollar transactions in New York, New York, which includes the many transactions described below.

310. Arab Bank and Arab Bank Group are majority owned and/or controlled by members of the Shoman family, including Abdul Majeed A.H. Shoman, who is the Chairman of Arab Bank and Arab Bank Group, Abdel Hamid A.M. Shoman, who is Deputy Chairman and Chief Executive Officer of Arab Bank and Arab Bank Group. The Shoman Family founded the bank in Jerusalem in 1930. Members of the Shoman family served as high ranking members and supporters of the PLO when the PLO was founded in the 1960s. The current Chairman of the Board has often made

42

public remarks demonstrating his extremist anti-Israeli views. The Bank's current Chief Banking Officer is Shukry Bishara who was responsible for the opening of the banks offices in New York in 1982 and then who moved to Ramallah in about 1994 to oversee the Bank's operation in the West Bank and Gaza. He was promoted to Chief Banking Officer and moved to Amman, Jordan only in February 2002.

311. Arab Bank has consolidated assets of US$32 billion. Arab Bank has approximately 22 branches operating in Gaza and the West Bank, the first of which was opened in late 1994 in Nablus. Since 1996, when the Israeli Central Banking Authority's supervisory role over Arab Bank's conduct in Gaza and the West Bank ended, the Palestinian Monetary Authority has had the duty to regulate the bank's branches in the Palestinian territories.

## FACTUAL ALLEGATIONS

312. Several prominent terrorist organizations operate in Palestinian-controlled territory, most notably the Palestinian Islamic Jihad (the "PIJ"), the Islamic Resistance Movement ("HAMAS") and the Al Aqsa Martyrs Brigade ("AAMB").

313. PIJ and HAMAS are both primarily radical Islamist terrorist organizations that are committed to the globalization of Islam through violent "Jihad" or holy war.

314. Both groups are formally committed to the destruction of the State of Israel, are extremely anti-American and are committed to achieving their objectives by violent means, including acts of terrorism. The HAMAS Charter states that the very purpose of HAMAS is to create an Islamic Palestinian state throughout Israel by eliminating the State of Israel through violent jihad. HAMAS propaganda since the September 11th World Trade Center attacks have praised and glorified Osama bin Laden and his supporters engaged in global jihad. HAMAS, directly and through its network of "charitable" front organizations, has engaged in a campaign of hate and virulent anti-Semitism

43

designed to indoctrinate the Palestinian population, including young kindergarten children, to hate Jews and to incite violence against them.

315.    AAMB is a paramilitary offshoot of the governing Fatah movement, which nominally functions as the one party government of the Palestinian Authority. Force 17 and Tanzim are also paramilitary offshoots of Fatah who have committed acts of terrorism since at least early 2001.

316.    AAMB's and Force 17's political lineage is secular and not Islamist in orientation, but they have adopted both the religious rhetoric of their radical Islamist counterparts and their murderous tactics.

317.    The PIJ knowingly, willfully, and unlawfully combines, conspires, confederates, and agrees together to commit numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, solicitation to commit murder and providing material support to Foreign Terrorist Organizations in violation of the federal criminal code of the United States.

318.    For example, the organization has committed numerous terrorist attacks, including several that have killed and injured American citizens. Since September 2000, the PIJ has conducted and taken credit for at least 28 murderous attacks, including at least seven mass murder bombings that have killed over 90 civilians, including U.S. citizens.

319.    On October 8, 1997, the PIJ was designated as a Foreign Terrorist Organization by the U.S. government under the AEDPA. The designation has since been renewed every two years, including in 2003.

320.    HAMAS is an acronym for "Harakat Muqawama Islamiyya," the Islamic Resistance Movement, which was founded in December 1987.

321.    The organization is nominally divided into two separate wings, the political

44

wing which supports the so-called "Dawa" (its social service or humanitarian component) and the paramilitary wing known as the Izz-el-Din al Qassam Brigade. Although these two components have separate responsibilities, the organization operates seamlessly, with each component working to conduct the operations and achieve the illegal objectives of the terrorist group as a whole.

322. HAMAS' social services are, in large part, administered by local "zakat," committees and other "charitable organizations" ("Zakat" means charity in Arabic). These committees and organizations are controlled by HAMAS by, inter alia, HAMAS members, operatives and activists sitting as members of their governing committees, a fact well known to the Defendant Arab Bank.

323. Due to the substantial expenditures of the HAMAS organization and the fungible nature of money, significant sums of monies collected externally under charitable and humanitarian banners are routed for HAMAS' military and other operational uses, in addition to being used to free up other funds for specific terrorists' acts. HAMAS uses such funds for, among other things, the provision of weapons, explosives, transportation services, safehouses, and salaries for its terrorist operatives and for terrorist recruiters.

324. Like PIJ, HAMAS is a foreign terrorist organization dedicated to radical Islamist principles and the destruction of the State of Israel. Both terror organizations are also extremely anti-American and have often praised Osama Bin Laden's and Al Qaeda's attacks on America. They also use violence, principally suicide bombings, and threats of violence to pressure Israel to cede territory to the Palestinian people, a fact well known to the Defendant Arab Bank who nonetheless knowingly provides financial services to these terror organizations, directly and through its "charitable front organizations."

325. HAMAS knowingly, willfully, and unlawfully combines, conspires, confederates and agrees to commit numerous acts of international terrorism and other related criminal

45

activity, including murder, attempted murder, solicitation to commit murder and numerous other acts of international terrorism activities as defined by 18 U.S.C. § 1331 and 18 U.S.C. § 2332 and other related acts of murder, attempted murder, solicitation to commit murder and providing material support to designated Foreign Terrorist Organizations in violation of the federal criminal code of the United States.

326.    Since September 2000, HAMAS has launched hundreds of attacks targeting civilians that have resulted in the deaths and injury of hundreds of individuals, including over twenty (20) mass murders that have killed more than three hundred (300) civilians, including numerous American citizens. HAMAS has claimed responsibility for the attacks on plaintiffs David and Naava Applebaum, Jack Baxter, Ariela Freirmark, Debra and Eli Horovitz, Abigail Litle, Rivka Pam, Miriam Leah Richter, Mordechai Reinitz, Goldie and Eli Zarkowsky.

327.    On January 25, 1995, HAMAS was designated as a Specially Designated Terrorist and, on October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS as a Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act (the "INA") and the AEDPA.

328.    The formal designation has been renewed every two years since 1997, including a renewal in August 2003.

329.    Al Aqsa Martyrs Brigade emerged at the outset of the post-September 2000 Palestinian Intifada (uprising).

330.    AAMB and Force 17 knowingly, willfully, and unlawfully combines, conspire, confederate and agree together to commit numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, solicitation to commit murder and providing material support to Foreign Terrorist Organizations in violation of the federal criminal code of the

46

United States.

331. For example, the organizations have committed numerous terrorist attacks, including several that have killed and injured Americans citizens. Since September 2000, AAMB has conducted and taken credit for dozens of murderous attacks, including a pair of January 2003 suicide bombings in downtown Tel Aviv that killed 23 people and injured approximately a hundred others and a string of other attacks that have killed more than 70 civilians and wounded more than five hundred (500) others, including U.S. citizens. AAMB has claimed responsibility for the attack which killed Esther Klieman.

332. On March 21, 2002, the Secretary of State of the United States officially designated AAMB as a Foreign Terrorist Organization pursuant to Section 219 of the INA and the AEDPA.

## The Al Aqsa Intifada or Intifada Al Quds

333. Following the collapse of the peace negotiations at the presidential retreat at Camp David in the summer of 2000, Palestinian terror organizations launched a broad-based terror campaign against the State of Israel at the end of September 2000.

334. This explosion of violence was widely termed the so-called *Al Aqsa Intifada* or *Intifada Al Quds*.

335. This new Intifada was both qualitatively and quantitatively different from prior waves of Palestinian terrorism.

336. Whereas the total number of attacks from 1993-2000 totaled less than 1,000, since September 2000 various Palestinian terrorists have attempted approximately 21,000 attacks, which have claimed more than 6,000 casualties, including over 800 civilian deaths. These indiscriminate acts of violence have likewise resulted in the deaths of at least 30 U.S. citizens and

47

caused serious bodily injury to scores of others.

337.    The preferred method of mass murder used by Palestinian terrorist groups is the suicide bombing, which involves an individual carrying an explosive device which he or she detonates in a bus, restaurant or other crowded public gathering place.

338.    The device is typically packed with nails, bolts and ball bearings, which, when detonated, lodge themselves deep within the bodies of those unfortunate individuals who happen to be inside the blast radius, causing cruel and horrific injuries. The suicide bomber is thereby regarded as a "martyr" (or "Shahid" in Arabic) by the terrorist groups and their sympathizers.

339.    The objectives of the Al Aqsa Intifada terror campaign include intimidating and coercing the civilian population of Israel and attempting to influence the policy of the Israeli government by compelling Israel to withdraw from territory it presently controls.

340.    In fact, because many suicide bombers are stopped and killed before they can successfully detonate their explosive charges and others have died as a result of premature or accidental detonations, the term "martyr" has generally been used by these organizations to include both suicide bombers and all others killed in the course of attempts to commit acts of violence against Israeli, American or other Western targets.

341.    The eruption of the Al Aqsa Intifada in late September 2000 changed the dynamics of Palestinian terrorism in four material respects:

A. The Intifada, from its inception, was marked by a massive escalation of violence, which quickly transformed the tactics of the Islamist terrorist groups from the margins to the mainstream of Palestinian politics.

B. The unrestrained violence of the Intifada and the increasing credibility and prestige it provided for the Islamist groups forced other (secular) Palestinian terrorist groups to adopt Islamist rhetoric and tactics.

48

C. The main rival terrorist groups began cooperating and coordinating their activities, including but not limited to HAMAS, PIJ, Fatah(Tanzim/AAMB), PFLP and The Popular Resistance Committees.

D. Saudi financial support for HAMAS coalesced into a more ambitious and more formal structure through the formation of the Saudi Committee in Support of the Intifada Al Quds.

## The Conspiracy to Finance Palestinian Terrorism

342.    A meeting of the Arab League was held in Cairo, Egypt in October of 2000 where it was agreed, with the knowledge and participation of Defendant Arab Bank, that a financing distribution network or mechanism needed to be put in place to fund and fuel Palestinian Terrorism to achieve various political and nationalistic goals. On or about October 16, 2000, the Saudi Committee in Support of the Intifada Al Quds (hereinafter referred to as "Saudi Committee") was established as a private charity registered with the Kingdom of Saudi Arabia in furtherance of this plan.

343.    According to the Saudi Committee, its purpose was to support the "Intifada Al Quds" and "all suffering families – the families of the martyrs and the injured Palestinians and the disabled."

344.    In practice, the Saudi Committee constitutes a professional fundraising apparatus intended to subsidize the Intifada Al Quds, i.e., to subsidize the Palestinian terror campaign and to bankroll HAMAS and the PIJ and their related front organizations in the West Bank and Gaza, a fact known to Defendant Arab Bank, who knowingly and willfully joined with the Saudi Committee to fulfill this goal.

345.    These goals are accomplished in two ways, both of which depend on the knowing participation and substantial assistance of the defendant Arab Bank.

346.    The first goal is accomplished by providing a comprehensive insurance benefit of $5,316.06 for the families of Palestinian terrorists, guaranteeing "universal coverage" to terrorists

49

and their beneficiaries whenever a terrorist is killed. The lump sum initial payment is often followed with lesser monthly payments.

347. Benefits (less than for when a terrorist is killed) are also provided if the terrorist is injured either by Israeli security forces or captured as a result of his or her criminal conduct.

348. The Saudi Committee has provided millions of dollars as benefits to the families of the so-called "martyrs," i.e., the families of suicide bombers and individuals killed by Israeli forces during the commission or attempted commission of terrorist acts and to the families of Palestinians wounded during violent confrontations with Israel's security forces as well those activists held in Israeli custody. This type of support is critical to HAMAS' efforts to win the hearts and minds of the Palestinian people and to create an infrastructure capable of solidifying HAMAS' position within Palestinian society. According to a sworn declaration of the Chief Banking Officer of Arab Bank, PLC made on November 11, 2004, "beginning in December of 2000, the Saudi Committee made approximately 200,000 payment into Palestine through Arab Bank branches totaling over US$90,000,000."

349. Moreover, the insurance benefit not only provides universal coverage for specific members of preferred terrorist organizations such as HAMAS, but is intended as universal coverage available to terrorists belonging to any terrorist organization or to none at all, thereby incentivizing and rewarding all terrorists in Israel and eliminating the potential distinctions between terrorist groups, between individual (freelance) terrorists and the more established terrorist cells, and between the secular and radical Islamist terrorist organizations.

350. Defendant Arab Bank knowingly and willfully administers this comprehensive terrorist insurance scheme by distributing the benefits in accordance with lists of families of "martyrs" and others eligible for "coverage."

50

351.     Arab Bank actively and knowingly participates in a formalized process which requires the families of so-called martyrs to obtain an official certification of their deceased relative's status as a bona fide martyr, replete with an individualized identification number.

352.     Arab Bank, in turn, is provided relatively detailed lists consisting of the names of the martyrs, personal information and details concerning the date and manner of death and other information provided to it by the Saudi Committee and representatives of the leading terrorist groups via their "charitable" front organizations.

353.     Arab Bank, in consultation with the Saudi Committee and local representatives of HAMAS, finalizes the lists, maintains a database of persons eligible under this universal coverage plan, and opens a dollar account for each beneficiary. Every Palestinian family eligible under this universal coverage plan is encouraged to collect the terrorism benefits through a local branch of the Arab Bank in the West Bank or Gaza.

354.     If they choose to collect the insurance benefit, the families are required to present to the bank an "official" certification from the Palestinian Authority (replete with a unique identification number) establishing the bona fides of the martyr.

355.     If the documentation proves satisfactory, Arab Bank issues a receipt to the designated recipient of the martyrdom insurance benefit. For example, Dia A-Tawil perpetrated a suicide bombing attack on March 27, 2001 on behalf of HAMAS. He was designated Palestinian Authority Martyr No. 449. His father, Hussien Mohamed Favah Tawil, presented the "official" certification to the defendant Arab Bank, and received a confirmatory receipt stating that the benefit was paid to his Arab Bank account in Ramallah.

356.     A recent report from the web site of the Saudi Committee for Relief of the Palestinians (originally known as the Saudi Committee in Support of the Intifada al Quds), describes

the mechanism of the donations and the transfer of the money:

The Mechanism of delivering relief:

1. Assessment study of the Aids-relief inside Palestine
2. Choosing the Programs that help in achieving the Aims and goals of the Committee
3. Exploring How to deliver Aids-relief to beneficiaries
4. Choosing some recommended Palestinian personalities for Follow-up
5. Setting a Coordination council in Gaza and West Bank
6. Listing names of beneficiaries of Committee programs and completing and revising the information
7. Studying names of beneficiaries and opening files for them for taking the needed procedures later
8. Sending Name-lists of beneficiaries to his Highness, the General Supervisor for taking the needed procedures
9. Opening accounts for each beneficiary in the branches of Arab Bank in Palestine
10. Transferring Money for each beneficiary and notifying them

(http://www.alquds-saudi.org/static/mechanism.htm):

357.    The staff of the Arab Bank in the Palestinian territories know the role of each

of these families in terrorist activity against Israel.

358.    The website section dealing with the Arab Bank -Palestine branch - reflects

certain direct financial donations of Arab Bank for "Palestinian community projects." These payments

reveal the Arab Bank's clear role in supporting the violence against civilians.

Among the donations listed are:

- 17/8/2004 - Mandella Organization/ Donating School Bags to Prisoners' Children

- Arab Bank offered prisoners' children with school bags as well as stationery, aiming to help and support them and their children with their suffering

- 2/5/2004 - Arab Bank offered donations to Abu Jihad's Center for Prisoner Movement in Jerusalem University

- Arab Bank offered donations to Abu Jihad's Center for Prisoner Movement in Jerusalem University. The donations were given through buying books about Palestinian Prisoners' lives, thus supporting the Prisoner's Movement in Palestine

52

- 21/3/2003 - Arab Bank sponsors the Event of Recognizing Mothers of Martyrs and Prisoners

- Arab Bank sponsored the event of recognizing the mothers of Martyrs and Prisoners in Al Amari refugee camp. The event was organized by the Women Center in the refugee camp.

(http://www.arabbank.ps/english/inner.asp?item=3&mtitle=4&stitle=1)

359.    The Bank explicitly acknowledges its support of "mothers of Martyrs and Prisoners," showing its direct involvement in assisting families of terrorists.

360.    The conspiracy between Arab Bank, the Saudi Committee and HAMAS and others is ultimately designed to provide substantial material support to Palestinian terrorist organizations and to provide a meaningful incentive both to prospective recruits and to individuals contemplating the commission of independent acts of violence in the name of the "popular resistance." Arab Bank knew, and knows, that the purpose of the conspiracy and acts taken pursuant thereto is to encourage others to engage in terrorist activities, and to support the continued commission of terrorist activities.

361.    Arab Bank was and is aware of the methods and means by which HAMAS and other Foreign Terrorist Organizations seek to carry out their objectives. In fact, Arab Bank's own support of, and commitment to, the violent goals of its co-conspirators are embodied by the personal commitment of Arab Bank's Chairman, Abdul Majeed Shoman who, according to published reports in *Al Bayan* (a newspaper in the United Arab Emirates), traveled to Qatar to a meeting to raise money to finance and support the Al Aqsa Intifada.

362.    In a published report in July 2000 in the Jordanian daily newspaper *Addustour*, Abdul Majeed Shoman is described as favoring the destruction of the State of Israel.

363.    A published report in an October 2000 issue of the Jordanian daily newspaper *Addustour*, stated that both the management and employees of Arab Bank were donating funds to

support the Intifada.

364.     Accordingly, neither the ideology nor the actual conduct of the Arab Bank is passive or indifferent to the goals of, and means employed by, the terrorists; rather, the Arab Bank is a knowing, willful and material participant in the terrorists' conduct. This is consistent with the ideology of the Bank's founders, the Shoman Family, who have been long time supporters and even executives of the PLO.

365.     By diligently implementing the "universal insurance" scheme, defendant Arab Bank knowingly, willingly and substantially assists in the recruitment of terrorists.

366.     Any person who chooses to participate in a suicide bombing or other terrorist attack does so secure in the knowledge that if he or she is killed in that attack, the financial needs of his or her family will be more than met for some time.

367.     Similarly, such persons are virtually assured of receiving a substantial stipend if they are injured or detained.

368.     On several occasions, the "martyr" designation has even been extended to Palestinians killed by *other Palestinians* during the commission of terrorist attacks.

369.     In short, the Saudi Committee raises funds from private donors in Saudi Arabia and elsewhere in the Persian Gulf region and then allocates payments to defendant Arab Bank to fulfill its public pledge of universal insurance coverage to Palestinian terrorists.

370.     The terrorist organizations, through their "charitable fronts", collect data on their own operatives as well as all other terrorists killed, injured or in Israeli custody and transmit the information to the Saudi Committee and defendant Arab Bank.

371.     Through the program administered by Arab Bank, the Saudi Committee paid death benefits to at least approximately 200 fallen "martyrs" in the first year of its existence alone. As

of November 2001, the Saudi Committee paid more than forty-two million dollars ($42,000,000) to terrorists and/or their beneficiaries.

372.    Arab Bank serves as the near exclusive administrator for the Saudi Committee's universal insurance coverage plan for Palestinian terrorists and their families.

373.    Indeed, in its original website, the Saudi Committee openly declared that its funds were distributed to the families of martyrs through local branches of the Arab Bank in Palestine. Although it has since been removed from the Internet, the original archived webpage located at www.alquds-saudia.org\indexa.htm provided a list under the caption: "What has been done with your donations?"

374.    Item number ten (10) on the web page responds with the answer: "Opening a bank account for every entitled [Palestinian] through the Arab Bank in Palestine."

375.    The website further listed numerous "martyrs" whose cause of death was listed as "suicide attack."

376.    Similarly, in the annual report issued by the Saudi Committee and published in the Saudi newspaper *Al-Jazira* on February 11, 2001, the Saudi Committee identifies payments made to Palestinian prisoners as well as Palestinian "martyrs." Notably, Table 4, Column 10 of the report helpfully identifies the cause of death for each martyr.

377.    For example, Musa Abd al-Qadir Ghanimat, the HAMAS operative who perpetrated a suicide attack at the Apropo restaurant in Tel Aviv is listed as an illustrative martyr.

378.    Accordingly, there can be no confusion as to whether the insurance plan includes the families of suicide bombers and no question that defendant Arab Bank possesses knowledge of this fact.

379.     Defendant Arab Bank provides a convenient means for distributing this universal coverage death and dismemberment benefit across Palestinian controlled territories that would be far more difficult if attempted by other means, such as courier. Israeli territory separates Gaza from the West Bank and Israeli military checkpoints often separate one Palestinian city from another.

380.     Arab Bank makes it possible for the terrorist groups to transcend physical obstacles and to provide an organized and professional distribution system that literally underwrites the terror campaign. The Arab Bank knowingly allows the terrorist groups to use the speed and efficiencies of the international banking system, including the SWIFTS system of wire transfers, to further their terrorism agenda.

381.     Arab Bank knows the criminal purpose that the accounts it opens and maintains for the Saudi Committee are intended to serve. Arab Bank has knowingly and intentionally joined with HAMAS and the Saudi Committee in the above described financial distribution network with the goal, desire and objective of furthering HAMAS' objectives to achieve it political goals through violent attacks against civilians in Israel, including Plaintiffs.

382.     The Saudi Committee and local HAMAS "charitable" front organizations have publicly and repeatedly advertised that purpose in both Saudi and Palestinian newspapers, on television and on the Saudi Committee's website, all of which are known to or should be known to Arab Bank and all of which are calculated to – and do – reach terrorists and potential terrorists. For instance:

- In the February 10, 2001 edition of the Saudi newspaper *Al-Jazirah*, the Saudi Committee published an annual report in which it listed the names of Palestinian prisoners to whom it provided terrorism benefits as well as the names of the Palestinian martyrs (including the names of those killed in suicide bombings) whose families received terrorism death benefits;

- In a November 23, 2001 edition of the Palestinian newspaper, *Al Quds*, the Saudi Committee placed an announcement listing the names of more than 1,000 individuals who had been injured during the Intifada or held in Israeli custody and invited them or their families "to go to the

56

branches of the Arab Bank in their places of residence to receive their allocations donated by the Committee..."; and

- In a February 18, 2002 advertisement in the Palestinian newspaper *Al Hayyat Al Jedida*, a HAMAS charitable front organization in Ramallah announced that the Saudi Committee "requests that the families of the martyrs whose names are listed herein to go to a branch of the Arab Bank in their place of residence to receive the tenth payment offered by the Saudi Committee in the amount of $5,316.06 ...."

383. Since the Saudi Committee raises its funds in Saudi currency, which cannot conveniently be converted into Israeli currency (most commonly used in Palestinian controlled areas), those funds are primarily converted into U.S. dollars through the New York branch of Arab Bank and then routed to the local branches of Arab Bank in the West Bank. Arab Bank's role is material and essential to the furtherance of the criminal conspiracy in two (2) important respects.

384. Firstly, Arab Bank provides both professionalism and transparency to the process thereby reassuring wealthy Saudi and Gulf State donors that the money they are contributing will not be siphoned off by corrupt officials, but will in fact reach the families of terrorists as intended.

385. Secondly, Arab Bank, through its extensive network of local branches in the West Bank and Gaza, provides an ideal distribution system that offers both convenience to the families of the terrorists, who are able to bypass both the corruption of the Palestinian Authority and the uncertainty of cash payments delivered by courier, and the certainty of an accounting system that minimizes the risk of duplicate payments and unreliable record-keeping.

386. By knowingly and actively participating in this process, Arab Bank and its co-conspirators, the Saudi Committee and others, have knowingly aided and abetted each and every terrorist act, including those that have injured, harmed or killed Plaintiffs, committed by Palestinian terrorists since the formation of the Saudi Committee's universal insurance coverage scheme in October 2000 in violation of 18 U.S.C. § 2332, 18 U.S.C. § 2339A, 18 U.S.C. § 2339B and 18 U.S.C. § 2339C. Arab Bank has knowingly participated in the process for the purpose of supporting and

57

providing financial assistance to terrorists, including, but not limited to HAMAS and other designated
Foreign Terrorist Organizations, agents of HAMAS and other HAMAS controlled organizations,
families of HAMAS operatives and the families of other terrorists.

## Defendant Arab Bank Provides Material Support To Foreign Terrorist Organizations

387.     Both HAMAS and the PIJ raise funds to support their terrorist acts through
"charitable" front organizations which they control.  They also raise funds to finance an educational
and social services network through which they can indoctrinate the population with a hatred for Israel,
Jews, Americans and other non-radical Islamists, while glorifying acts of violence by "shaheeds" so
that HAMAS and PIJ will have a Palestinian population ready and willing to engage in terrorism.
Especially during the last 4 years, HAMAS has built a socioeconomic infrastructure in Gaza and the
West Bank, with the material support of the Arab Bank, upon which HAMAS supports its operational
attack apparatus.

388.     Arab Bank knowingly provides banking services to these "charitable"
committees and affirmatively assists them in distributing funds to support the Intifada terror and hate
campaign. Throughout the Al-Aqsa Intifada, the Arab Bank has knowingly permitted various terrorist
organizations and persons engaged in terrorism to solicit funds for their armed struggle over the radio,
TV, and Internet and helped that endeavor by providing bank accounts and financial services to further
the collection and distribution of funds for that purpose.

389.     Arab Bank knowingly provides banking services to HAMAS directly through
its Al-Mazra Branch Account # 3-810-622473-0330 in Beirut, which collects funds directly in the
name of HAMAS, and through charitable front organizations controlled by HAMAS, which Arab
Bank affirmatively assists in distributing funds to support the terror campaign.

390.     The United States Department of Justice has identified the website:

www.palestine-info.com as the "official" website of HAMAS. The website itself solicits funds and

asks contributors to send money to its Al-Mazra Branch Account # 3-810-622473-0330 at the Arab

Bank in Beirut, but it also asks donors "to cite only the account number and not the name of the

[Palestine Information] Center or any other names."

391.     This request is necessary because Account # 3-810-622473-0330 is one of the

few accounts that Arab Bank operates on behalf of HAMAS and that HAMAS controls and maintains

directly. To assist it in carrying out its terrorist activities, HAMAS has established or taken over

numerous "charitable organizations," including:

> i. Al-Ansar Charity;

> ii. Ramallah Charitable Committee or Society;

> iii.Tulkarem Charitable Committee;

> iv.the Islamic Association (Gaza) a/k/a Al Jamaya Al-Islamiya;

> v.Al Mujama Al-Islami;

> vi.Nablus Charitable Committee;

> vii.     Jenin Charitable Committee or Society; and

> viii.    Islamic Charitable Society of Hebron aka Al-Jamiyah Al-Khiriah Al-Islamiyah

> ix.Bethlehem Orphan Care Society aka jami'yya ri'aya al-yatim

392.     Arab Bank provides direct financial services to Al-Ansar Charity, Ramallah

Charitable Committee, Tulkarem Charitable Committee, the Islamic Association (Gaza) a/k/a Al

Jamaya Al-Islamiya, Nablus Charitable Committee and Jenin Charitable Committee.

393.     The Tulkarem Charitable Committee, Nablus Charitable Committee, Ramallah

Charitable Committee, Jenin Charitable Committee and Islamic Charity Society of Hebron have all

59

been identified by the United States Department of Justice as HAMAS front organizations and the management of each of these "charities" is in fact controlled by HAMAS operatives.

394. The Tulkarem, Ramallah and Jenin Charitable Committees and Islamic Charity Society of Hebron were all designated as "Unlawful Organizations" by the government of Israel in February 2002 because of their connection to HAMAS, a fact which either was known or but for its willful blindness should have been known to Defendant Arab Bank.

395. Plaintiffs allege that the following entities are fronts, agents or instrumentalities or alter egos of Hamas:

Islamic Charity Association aka Islamic Charitable Society in Hebron;

    a. Charity Committee in Ramallah aka Ramallah Zakat Committee;

    b. Jenin Zakat Committee aka The Charity Association in Jenin;

    c. Nablus Zakat Committee;

    d. Toklarem aka Tularm Zakat Committee;

    e. Orphan Care Association (Bethlehem);

    f. Qalqulia, aka Qalqiliyah Zakat committee;

    g. Hebron Zakat Committee aka Hebron Tithing And Alms Committee;

    h. Halhul Zakat Committee; and

    i. Al Aslah Association in el Bireh.

396. Plaintiffs will show that these entities are the alter ego of HAMAS and knowingly act as agents for HAMAS, all of which is well known to the Defendant Arab Bank because, among other things:

    a. leaders of the committees are HAMAS operatives;

    b. the Committees are connected to HAMAS military operations;

c. The PA has treated the entities as HAMAS' entities;

d. The Palestinian population considers the committees "to be HAMAS."

397.     The Arab Bank continues in many instances in 2004 to knowingly render financial services for many of these HAMAS fronts, terrorist operatives and their families, and others. Arab Bank has also knowingly served as a conduit for transferring money from Iran and Syria and its agents and instrumentalities to persons and organizations in Gaza and the West Bank who use such funds to engage in terrorism and incite violence.

398.     The PIJ has also established numerous front organizations, including:

a. Al-Ihsan Charitable Society aka Elehssan Society aka Elehssan Charitable Society; and

b. Islamic An-Naqqa Society for Women, Bethlehem.

399.     Arab Bank provides direct financial services to Al-Ihsan Charitable Society with knowledge of or willful blindness to its role in supporting PIJ.

400.     The HAMAS charitable front, Al-Ansar Charity, maintains a website proclaiming that:

> Al-Ansar Society opens its doors to the families of the martyrs who intend to register their dead who, with their splendid blood, saturated pure Palestine and drew the lines of liberty and the coming dawn. The Al-Ansar Society is following in their footsteps and shares in the sorrow and the hopes of the families of the martyrs and their relatives.

401.     The website further boasts that it has given money to Palestinians whom were wounded, incarcerated or killed during the Intifada, including $6,000.00 to the family of Iz Aldin (also spelled: "Azzadin") Al Masri, the suicide bomber who massacred 15 people, including 7 children, and injured more than one hundred people at the Sbarro pizzeria in downtown Jerusalem on August 9, 2001.

61

402.	The website of Al-Ansar shows the vital role of the Arab Bank:

The Director General of the Al-Ansar Charitable Society and the person in charge of the portfolio for the care of the martyrs at the Society's website said that the Society has furnished the management of the Arab Bank with lists of names of the martyrs and the families of the entitled beneficiaries, in order to pay the monies to which the martyrs are entitled.

403.	Al-Ansar maintains an account with the Arab Bank in Gaza.

404.	Defendant Arab Bank has also knowingly laundered funds for the Holy Land Foundation for Relief and Development ("HLF"), a Texas based "charity" which has raised funds in the United States for HAMAS for more than a decade. Arab Bank, in turn, channeled tens of thousands of dollars for HLF through its New York branch to the Ramallah Charitable Committee, an agent of HAMAS.

405.	HLF and its officers have been criminally indicted in the United States District Court for the Northern District of Texas for providing material support to a designated Foreign Terrorist Organization (HAMAS) – including for specific transactions involving payments made by HLF to the Ramallah Charitable Committee, Tulkarem Zakat Committee, and the Islamic Charity Society of Hebron.

406.	The indictment specifies particular financial transactions initiated by HLF which resulted in monetary transfers to the Ramallah Charitable Committee, which violate 18 U.S.C. §2339B. HLF has been adjudicated liable for violating the ATA in the recent summary judgment order in the case of Boim v. Quranic Literacy Institute, et al., 2004 WL 2554446, __F. Supp. 2d__(N. D. Ill. Nov. 10, 2004).

407.	Over 7 years ago, on May 6, 1997, the government of Israel designated HLF as a HAMAS front organization and declared that HLF "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks …."

408.     Nonetheless, Arab Bank continued to provide financial services to HLF and its New York branch and continued to wire thousands of dollars to the Ramallah Charitable Committee at HLF's behest.

409.     On January 10, 2001 a federal district court in Illinois rendered a decision declining to grant a motion to dismiss in a case initiated by the parents of David Boim, who was killed by a HAMAS terrorist in 1997. The Boims had sued, among others, HLF, for providing material support to HAMAS, a designated Foreign Terrorist Organization.

410.     Nonetheless, Arab Bank continued to deposit HLF fund transfers and credit the Arab Bank account of the Ramallah charitable front even after the *Boim* case placed the defendant on further notice of HLF's criminal activities.

411.     Similarly, the New York branch of the Arab Bank has facilitated the transfer of significant sums to Tulkarem Charitable Committee despite the fact that in some cases both the "donor" of the funds as well as the recipient had been previously formally designated as "Unlawful Organizations" by the government of Israel.

412.     Moreover, following the Israeli army's military operations in the spring of 2002, the government of Israel obtained and subsequently disclosed extensive materials (most of them available on the internet) demonstrating the Tulkarem Charitable Committee's connections to HAMAS.

413.     Nonetheless, Arab Bank and its New York branch continued to convert substantial sums of money and forward tens of thousands of dollars from New York to the Tulkarem account of the Tulkarem Charitable Committee at the Arab Bank.

414.     One of the signatories on the Tulkarem Charitable Committee account is Ammar Tawfiq Ahmad Badawi, a prominent member of the Muslim Scholars Association who was a

signatory on the infamous *Fatwa* – or Islamic religious ruling – declaring that suicide bombings are permitted by Islamic law. Mr. Badawi is a leading figure in HAMAS.

415.    Arab Bank has also knowingly laundered funds for INTERPAL, a London based "charity" which has raised funds in Europe for HAMAS for more than a decade. Arab Bank, in turn, channeled tens of thousands of dollars for INTERPAL through its New York branch to various HAMAS zakat committees. Arab Bank has also knowingly laundered and permitted PIJ to solicit funds on its web site (www.Palestineway.com or www.abrarway.com) for its terrorist activities by sending money to various accounts maintained by Arab Bank. Often the account designated is one of the "charitable" front organizations. This demonstrates, among other things, the knowledge of the donors and the Arab Bank that the terror organizations are using the "charitable" entities as fronts to try to mask the true nature of the money. It is clear from the solicitation that money is being sought for military uses and jihad and not humanitarian uses. Arab Bank knows of these solicitations or is willfully blind to them because of its intent and desire to see the goals of jihad succeed.

## Cultivation of the Culture of Death

416.    The "charitable" front organizations play a central role in financing the terror campaign by providing the means of raising funds to maintain the institutions that serve as recruiting grounds for terrorist organizations. This fact is known to Defendant Arab Bank.

417.    As set forth in an internal HAMAS memorandum recently captured by the Israeli army during a raid of the offices of the Hebron Charitable Committee, HAMAS has arranged for the "transfer [of] large sums" to the charitable committee and other HAMAS front organizations through the "charity activities" of their operatives abroad.

418.    The memorandum emphasizes that HAMAS "require[s] new bank account numbers for money transfers" and promises that the HAMAS will:

64

> invest efforts to transfer money for the martyrs (the shahids) and
> prisoners, via the transfer [to] charitable institutions. This is a primary
> goal in the framework of the effort to transfer aid money to these
> institutions, so that these budgets are released in the best manner and in
> order to bring about an improvement in the level of the movement's
> performance.

The memorandum concludes with the promise that HAMAS will continue to "build up the activities and operations" of its front organizations by, among other things, *"taking advantage of the conditions and the atmosphere of death."*

419.    The financial support provided by the Saudi Committee via the Arab Bank as well as the accounts maintained by the terror organizations' charitable fronts constitutes the backbone of the donor base and operational budgets of HAMAS and the PIJ, and has allowed them to expand their operations, attract more recruits, and professionalize their financial distribution channels.

420.    Each of these front organizations officially holds itself out to the general public as a charitable organization with a purely humanitarian and benign purpose. In fact, however, the primary mission of these organizations, which is known and understood by Defendant Arab Bank, is to raise and launder funds for terrorist organizations and otherwise to coordinate and conduct activities that are essential to the conduct of terrorist operations and to the material support of terrorist operations. Funds raised by the "charitable" front organizations are fungible and are allocated in part to terrorist activities. Plaintiffs allege, as the Assistant Director of the FBI's Counterterrorism Division (Dale L. Watson) has stated, that crucial financial support for families of HAMAS suicide bombers is assisting HAMAS by providing a constant flow of suicide volunteers and buttresses a terrorist infrastructure. Further, HAMAS uses the zakat committees to provide needed social services for the Palestinian population thereby gaining support for their movement, including their illegal terrorist attacks against civilians.

421.     In addition to the Saudi Committee's universal coverage plan, contributions from individual and corporate sponsors abroad are primarily made to the "charitable" front organizations. The front organizations make those contributions available to HAMAS and the PIJ in accordance with the instruction of their leaders. These organizations then disburse a percentage of the funds they receive from their front organizations to purchase weapons and explosive materials, to recruit and train operatives and otherwise to plan and carry out terrorist attacks.

422.     By recklessly or knowingly providing banking and administrative services to "charitable" front organizations that are controlled and directed by designated Foreign Terrorist Organizations, including collecting, transferring and laundering funds for those organizations through its New York branch, Arab Bank has substantially assisted HAMAS and the PIJ in the furtherance of a murderous conspiracy to commit multiple acts of international terrorism as defined by 18 U.S.C. §§ 2331 and 2332 and has committed numerous overt acts in furtherance of the conspiracy. Plaintiffs allege that Arab Bank has acted with knowledge and intent to materially assist and support HAMAS and other terror organizations in this way. This wrongful conduct was approved and ratified by senior executives of the bank and by management level employees of the Defendant.

423.     Indeed, had the doors of Arab Bank not been opened to HAMAS or the PIJ during the past three and a half years, the leaders of these terrorist organizations would have had to make far more onerous arrangements for transfer of foreign contributions to terrorists within Palestinian-controlled territory and the great bulk of those funds would likely have never reached their destination.

66

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### AIDING AND ABETTING THE MURDER, ATTEMPTED MURDER AND SERIOUS BODILY INJURIES TO UNITED STATES CITIZENS IN VIOLATION OF 18 U.S.C. § 2332(a); 18 U.S.C. § 2332(b); 18 U.S.C. § 2332(c) AND 18 U.S.C. § 2333

424. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

425. Each of the plaintiffs has been injured in his person, property or business by reason of acts committed by Palestinian terrorists that involve violence or are dangerous to human life and that violate the criminal laws of the United States, including the prohibition on killing, attempting to kill, causing serious bodily injury or attempting to cause serious bodily injury to U.S. citizens as set forth in 18 U.S.C. § 2332.

426. The acts of the Palestinian terrorists in killing, and attempting to kill U.S. nationals and other persons were and are intended (a) to intimidate or coerce the civilian population of Israel, (b) to influence the policy of the government of Israel by intimidation or coercion, and (c) to affect the conduct of the government of Israel by mass destruction and murder.

427. The acts of terrorism set forth herein are extreme and outrageous and were committed with the knowledge of and intention to cause extreme physical pain and suffering to any and all persons within close proximity of the attack and extreme emotional distress to the family members of those who were killed or injured by reason of those acts.

428. The extraordinary financial and administrative services that Arab Bank has provided to the terrorists and their families, and to HAMAS, the PIJ and AAMB, including administering universal coverage insurance to the families of suicide bombers and other terrorists, provides substantial assistance to and help to HAMAS, the PIJ and AAMB and others in recruiting and

incentivizing suicide bombers and other terrorists and since money is fungible, in freeing up funds for use in military operations and the commission of violent acts resulting in death and injury, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. § 2332 that have caused injuries to the plaintiffs.

429. The defendant Arab Bank knows, or has recklessly disregarded, that it is providing material support for acts of international terrorism by HAMAS and other terror groups, as is evidenced by its close contact with the Saudi Committee and its coordination of the payment schedules and lists of martyrs, and the repeated public advertisement of the activities of the Saudi Committee in various Palestinian newspapers as set forth above. The Arab Bank is thus providing HAMAS and other terror groups with material support. When it did so, it knew about HAMAS' and the other terror groups' illegal activities, desired to help those activities succeed, and took affirmative steps to help.

430. As set forth more fully above, but for the assistance provided by the Arab Bank, the funding of the universal coverage death and dismemberment benefits plan for terrorists and the families of terrorists would have been substantially more difficult to implement.

431. Throughout the period in which it has provided these extraordinary financial and administrative services to HAMAS, the PIJ, AAMB and to individual terrorists and their families, the Arab Bank knew or recklessly disregarded the fact that the charitable front organizations of the terrorist organizations have played a major role in raising funds for HAMAS and the PIJ, which have committed numerous criminal acts including suicide bombings intended to intimidate and coerce the civilian population of Israel and to influence the policy of the Israeli Government.

432. Throughout the period in which it has been involved in activities assisting the PIJ, HAMAS and AAMB and individual terrorists and their families, Arab Bank knew or recklessly

68

disregarded the fact that those activities have substantially assisted and encouraged dangerous and criminal acts set forth herein.

433.    By aiding and abetting violations of 18 U.S.C. § 2332 that have caused each of the plaintiffs to be injured in his or her person, property, or business, Arab Bank is jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that plaintiffs have sustained as a result of such injuries.

## SECOND CLAIM FOR RELIEF

### CONSPIRACY TO COMMIT MURDER AND ATTEMPTED MURDER OF UNITED STATES CITIZENS IN VIOLATION OF 18 U.S.C. §§ 2332(b) and 2333

434.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

435.    Each of the plaintiffs has been injured in his person, property or business by reason of acts committed by Palestinian terrorists that involved murder or attempted murder in violation of the criminal laws of the United States, including the prohibition on killing or attempting to kill U.S. citizens as set forth in 18 U.S.C. § 2332.

436.    The acts of the Palestinian terrorists in killing or attempting to kill U.S. citizens and other persons were intended (a) to intimidate or coerce the civilian population of Israel, (b) to influence the policy of the government of Israel by intimidation or coercion, and (c) to affect the conduct of the government of Israel by mass destruction and murder.

437.    The acts of terrorism set forth herein are extreme and outrageous and were committed with the knowledge of, and intention to, cause extreme physical pain and suffering to any and all persons within the close proximity of the attack and extreme emotional distress to the family members of those who were injured or killed by reason of those acts.

69

438. Arab Bank knowingly joined a conspiracy and agreed to combine with other persons to act unlawfully, in the manner set forth in this complaint and committed overt acts in furtherance of the conspiracy. At all relevant times, Arab Bank knew of the conspiracy and knew and knows, in particular, of the roles of the charitable front organizations and their leaders in furtherance of that conspiracy, or, at a minimum, recklessly disregarded the nature and purposes of the conspiracy.

439. Arab Bank knowingly and purposefully agreed to perform extraordinary banking and administrative services for the Saudi Committee, HAMAS, the PIJ and AAMB with the knowledge, and for the purpose, that such services facilitate the activities of its leaders and support terrorist activities pursuant to a common scheme to encourage and incentivize acts of terrorism. Arab Bank's actions, in fact, facilitated the conspirational scheme because, as set forth more fully above, but for the actions of the Arab Bank, the funding of the universal coverage death and dismemberment benefit plans for terrorists and their families would have been substantially more difficult to implement. Arab Bank has acted in concert with others, as describe herein, to commit illegal acts as part of its agreement to inflict a wrong or injury against civilians. Arab Bank has intentionally committed numerous overt acts in furtherance of this illegal conspiracy.

440. By conspiring to act with the Saudi Committee, HAMAS, the PIJ and AAMB, and their respective charitable front enterprises to support, encourage and facilitate violations of 18 U.S.C. § 2332 that have injured each plaintiff's respective person, property, or business, Arab Bank is jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that plaintiffs have sustained as a result of such injuries.

## THIRD CLAIM FOR RELIEF

### PROVISION OF MATERIAL SUPPORT TO TERRORISTS
### IN VIOLATION OF 18 U.S.C. § 2339A AND 18 U.S.C. § 2333

441.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

442.    The extraordinary financial and administrative services that Arab Bank has knowingly provided to the terrorists, their families, and HAMAS, the PIJ and AAMB and their alter egos, including serving as the exclusive administrator of universal coverage insurance to the families of suicide bombers and other terrorists, provides material support to the preparation and carrying out of numerous acts of international terrorism which have caused direct injury to the plaintiffs.

443.    As set forth more fully above, but for the assistance provided by the Arab Bank, the funding of the universal coverage death and dismemberment benefits plan for terrorists and the families of terrorists would have been substantially more difficult to implement.

444.    By participating in the commission of violations of 18 U.S.C. § 2339A that have caused each of the plaintiffs to be injured in his or her person, business or property, defendant Arab Bank is jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that plaintiffs have sustained as a result of such injuries.

## FOURTH CLAIM FOR RELIEF

### COMMITTING ACTS OF INTERNATIONAL TERRORISM
### IN VIOLATION OF 18 U.S.C. § 2339B(1) AND 18 U.S.C. § 2333

445.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

446.    By knowingly transferring funds from and to agents of HAMAS, including the Holy Land Foundation, the Tulkarem Charitable Committee and the Ramallah Charitable Committee,

71

defendant Arab Bank's New York branch office has provided material support to a designated Foreign Terrorist Organization under the Anti-Terrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C. §§ 2339B(2)(a) and 2339B(2)(b).

447.    As set forth more fully above, but for the assistance provided by the Arab Bank, the funding of the universal coverage death and dismemberment benefits plan for terrorists and the families of terrorists would have been substantially more difficult to implement.

448.    Based on the defendant's level of sophistication and presence as a federally regulated financial institution in the United States, defendant Arab Bank not only knew of the unlawful activities of HAMAS but also knew or recklessly disregarded its actual designation as a Foreign Terrorist Organization. By providing material support to a designated Foreign Terrorist Organization, Arab Bank is therefore civilly liable for damages to plaintiffs Philip Litle, Philip Litle for the Estate of Abigail Litle, Elishua Litle, Hannah Litle, Heidi Litle, Josiah Litle, Noah Litle, Natan Applebaum for the Estate of David Applebaum, Debra Applebaum, The Estate of Jacqueline Applebaum, Natan Applebaum, Natan Applebaum for the Estate of Naava Applebaum, Shira Applebaum, Yitzhak Applebaum, Geela Applebaum Gordon, Billy Baxter, Catherine Baxter, Fran Strauss-Baxter, Jack Baxter, Barbara Psaroudis, Mary Lazis, Ariela Freirmark, Menchem Freirmark, Hadassah Freirmark, Catherine Tyokody, Ari Horovitz, Batsheva Horovitz, David Horovitz, Bernice Wolf for the Estate of Debra Ruth Horovitz, Bernice Wolf for the Estate of Eli Natan Horovitz, Leah Horovitz, Moshe Horovitz, Nechama Horovitz, Shulamite Horovitz, Tovi Horovitz, Tvi Horovitz, Uri Horovitz, Bernice Wolf, Brian Wolf, Stanley Wolf, Phyllis Pam, Rivka Reena Pam, Rachel Potolski, Ovadia Topporowitch, Tehila Topporowitch, Yisrael Topporowitch, Miriam Ehrenfeld, Rose Joseph, Leibel Reinitz, Malvia Reinitz, Margali Reinitz, Mendy Reinitz, Miriam Reinitz, Rivka Reinitz, Samuel Reinitz, Schmuel Reinitz, Yakov Reinitz, The Estate of Yissocher Dov Reinitz, Yitchok Reinitz,

Raizel Shimon, Leah Tauber, Helen Weider, Avrohom D. Richter, Breina Richter, Miriam Leah Richter, Moshe Richter, Nechama Richter, Sara Malka Richter, Shlomo Chaim Richter, Tranne Richter, Yakov Yosef Richter, Yechiel Richter, Yehudis Richter, Yisroel Richter, Yitzchok A. Richter, Miriam Blum, Perl Brailofsky, Yosef Brailofsky, Malky Breuer, Ester Buxbaum, Gittel Cohen, Chaya Friesel, Rachel Rosner, Elizabeth Schwartz, Jacob Schwartz, Max Schwartz, Michael Schwartz, Philip Schwartz, Shlomo Tratner, The Estate of Tiferet Tratner, Abraham Zarkowsky, Aron Zarkowsky, Bshava Zarkowsky, Mendel Zarkowsky for the Estate of Eli Zarkowsky, Ezriel Zarkowsky, Gittel Zarkowsky, Mendel Zarkowsky for the Estate of Goldie Zarkowsky, Joseph Zarkowsky, Mendel Zarkowsky, Miriam Zarkowsky, Shrage Zarkowsky, Trany Zarkowsky, and Yehuda Zarkowsky, for their injuries pursuant to 18 U.S.C. § 2333.

### FIFTH CLAIM FOR RELIEF

## FINANCING OF TERRORISM IN VIOLATION
## OF 18 U.S.C. § 2339C and 18 U.S.C. § 2333

449.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

450.     The financial services that Arab Bank has willfully and unlawfully provided to HAMAS, the PIJ, AAMB and the Saudi Committee include the collection of funds with the knowledge that such funds have been and will be used, in part, to facilitate acts intended to cause death or serious bodily injury to civilians such as the victims of the terrorist acts described in this complaint, who were not taking part in any armed conflict.

451.     The acts committed against the plaintiffs were intended (a) to intimidate or coerce the civilian population of Israel, (b) to influence the policy of the government of Israel by intimidation or coercion, and (c) to affect the conduct of the government of Israel by mass destruction and murder.

73

452.     As set forth more fully above, but for the assistance provided by the Arab Bank, the funding of the universal coverage death and dismemberment benefits plan for terrorists and the families of terrorists would have been substantially more difficult to implement.

453.     By willfully violating 18 U.S.C. § 2339C, Arab Bank is therefore jointly and severally liable to the plaintiffs who have suffered injuries to their business, person or property by reason of such acts under 18 U.S.C. § 2333.

### SIXTH CLAIM FOR RELIEF

### COMMITTING ACTS OF INTERNATIONAL TERRORISM IN VIOLATION OF 18, U.S.C. § 2333

454.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

455.     Defendant Arab Bank's acts of providing banking and other services, including the provision of death benefits, to HAMAS, the PIJ, the AAMB and other international terrorists, were "a criminal violation if committed within the jurisdiction of the United States or of any State" and "appear to be intended to intimidate or coerce a civilian population . . . to influence the policy of a government by intimidation or coercion or to affect the conduct of a government by mass destruction" within the meaning of 18 U.S.C. § 2331.

456.     The extraordinary financial and administrative services that Arab Bank has provided to the terrorists, their families, and HAMAS, the PIJ and AAMB including administering universal coverage insurance to the families of suicide bombers and other terrorists, provides substantial assistance to HAMAS, the PIJ, AAMB and others in recruiting and incentivizing suicide bombers and other terrorists and thereby preparing and facilitating acts of international terrorism in violation of 18 U.S.C. § 2333 that have caused injuries to the plaintiffs.

74

457. Arab Bank's acts were dangerous to human life, by their nature and as evidenced by their consequences.

458. Arab Bank's acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

459. Accordingly, Arab Banks' acts constitute acts of international terrorism as defined by 18 U.S.C. §§ 2331 and 2333.

460. Arab Bank knowingly provided substantial assistance to acts of international terrorism and accordingly, its acts constitute aiding and abetting acts of international terrorism.

461. Arab Bank also agreed to combine with other persons to act unlawfully in the manner set forth above and committed overt acts in furtherance of the conspiracy. At all relevant times, Arab Bank knew of the conspiracy and knew, and knows, in particular, of the roles of the charitable front organizations and their leaders in furtherance of that conspiracy.

462. As set forth more fully above, but for the assistance provided by the Arab Bank, the funding of the universal coverage death and dismemberment benefits plan for terrorists and the families of terrorists would have been substantially more difficult to implement.

463. The acts of terrorism set forth herein are extreme and outrageous and were committed with the knowledge of and intention to cause extreme physical pain and suffering to any and all persons within close proximity of the attack and extreme emotional distress to the family members of those who were killed or injured by reason of those acts.

464. Throughout the period in which it has been involved in activities assisting the PIJ, AAMB and HAMAS and individual terrorists and their families, Arab Bank knew or recklessly

disregarded the fact that those activities have substantially assisted and encouraged dangerous and criminal acts set forth herein.

465. For the reasons set forth above, Arab Bank is therefore civilly liable for damages to plaintiffs for injuries to their person, person, property or business by reason of the acts of international terrorism pursuant to 18 U.S.C. § 2333.

## SEVENTH CLAIM FOR RELIEF

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

466. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

467. Defendant Arab Bank's acts of providing banking and other services, including the provision of death benefits and other extraordinary financial and administrative services to terrorists, their families, HAMAS, AAMB and the PIJ and their alter egos, including administering universal coverage insurance to the families of suicide bombers and other terrorists, were willful malicious, deliberate, or were done with reckless indifference to the likelihood that such behavior would cause severe emotional distress and with utter disregard for the consequences of such actions.

468. The acts of terrorism set forth herein were committed with the knowledge of and intention to cause extreme physical pain and suffering to any and all persons within close proximity of the attack and extreme emotional distress to the family members of those who were killed or injured by reason of those acts, or were done with reckless indifference to the likelihood that such behavior would cause such severe emotional distress and with utter disregard for the consequences of such actions.

469. As set forth more fully above, but for the assistance provided by the Arab Bank, the funding of the universal coverage death and dismemberment benefits plan for terrorists and the families of terrorists would have been substantially more difficult to implement.

470. Arab Bank's conduct was unreasonable and outrageous and exceeds the bounds usually tolerated by decent society, and was done willfully, maliciously and deliberately, or with reckless indifference, to cause Plaintiff severe mental and emotional pain, distress, and anguish and loss of enjoyment of life.

471. As a direct, foreseeable and proximate result of the conduct of Defendant Arab Bank as alleged hereinabove, plaintiffs have suffered non-pecuniary damages in amounts to be proven at trial.

472. Arab Bank's actions were undertaken willfully, wantonly, maliciously and in reckless disregard for Plaintiff's rights, and as a direct, foreseeable and proximate result thereof plaintiffs suffered economic and emotional damage in a total amount to be proven at trial, therefore plaintiffs seeks punitive damages in an amount sufficient to deter Arab Bank and others from similar future wrongful conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray that this Court:

a) Accept jurisdiction over this action;

b) Enter judgment against Arab Bank and in favor of each plaintiff for all compensatory and other damages in such amounts for each named plaintiff as are allowed by applicable law and as shall be determined at trial;

77

c) Enter judgment against Arab Bank and in favor of each plaintiff for treble damages of each amount awarded pursuant to the previous pray for relief, and pursuant to 18 U.S.C. § 2333;

d) Enter judgment against Arab Bank and in favor of each plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333;

e) Order any such equitable relief to which plaintiffs might be entitled,

f) Enter an Order declaring that Arab Bank has violated, and is continuing to violate, the Anti-Terrorism Act, 18 U.S.C. § 2331 et seq.; and

g) Grant such other and further relief as the interests of justice may require, including leave to amend this complaint as may permit justice to be served on behalf of each plaintiff against the defendant(s) as are or may be hereafter named herein.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: December 15, 2004
New York, New York

Shalov Stone & Bonner LLP
485 Seventh Avenue
Suite 1000
New York, New York 10018
(212) 239-4340

By: _____

Lee S. Shalov (LS-7118)
Ralph M. Stone
James P. Bonner

Attorneys for Plaintiffs

Of Counsel:

Of Counsel:

HEIDEMAN LEZELL NUDELMAN & KALIK, P.C.
Richard D. Heideman
Noel J. Nudelman
Tracy Reichman Kalik
*(pro hac vice motions to be filed)*
1146 19th Street, NW
Fifth Floor
Washington, D.C. 20036
(202) 463-1818

PERLES LAW FIRM, P.C.
Steven R. Perles
*(pro hac vice motion to be filed)*
1615 New Hampshire Avenue, NW
Suite 200
Washington, D.C. 20009
(202) 745-1300

SAYLES WERBNER P.C.
Mark S. Werbner
*(pro hac vice motion to be filed)*
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214) 939-8700

Of Counsel:

HEIDEMAN LEZELL NUDELMAN & KALIK, P.C.
Richard D. Heideman
Noel J. Nudelman
Tracy Reichman Kalik
*(pro hac vice motions to be filed)*
1146 19th Street, NW
Fifth Floor
Washington, D.C. 20036
(202) 463-1818

PERLES LAW FIRM, P.C.
Steven R. Perles
*(pro hac vice motion to be filed)*
1615 New Hampshire Avenue, NW
Suite 200
Washington, D.C. 20009
(202) 745-1300

SAYLES WERBNER P.C.
Mark S. Werbner
*(pro hac vice motion to be filed)*
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214) 939-8700