**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
**COURTNEY LINDE, et al.,**

                    **Plaintiffs,**                          <u>**OPINION & ORDER**</u>
                                                       **04 CV 2799 (NG)(VVP)**
     **- against -**

**ARAB BANK, PLC,**

                    **Defendant.**
-------------------------------------------------------x
**PHILIP LITLE, et al.,**

                    **Plaintiffs,**
                                                       **04 CV 5449 (NG)(VVP)**
     **- against -**

**ARAB BANK, PLC,**

                    **Defendant.**
-------------------------------------------------------x
**ROBERT L. COULTER, SR., et al.,**

                    **Plaintiffs,**
                                                       **05 CV 365 (NG)(VVP)**
     **- against -**

**ARAB BANK, PLC,**

                    **Defendant.**
-------------------------------------------------------x
**GERSHON, United States District Judge:**

        Plaintiffs in the above captioned suits are United States citizens, or their estates, survivors,

and heirs, who have been victims of terrorist attacks in Israel since September 2000. The sole

defendant in all three cases, and in four additional suits filed by separate groups of plaintiffs,[1] is a

---

[1] Additional motions to dismiss, which were filed on July 22, 2005, are now pending in
two of these cases, Almog v. Arab Bank, 04-CV-5564, and Afriat-Kurtzer v. Arab Bank, 05-CV-
388. In addition to bringing claims under the Anti-Terrorism Act, which are similar to the
allegations in the *Linde*, *Litle*, and *Coulter* suits, plaintiffs in these two related cases also bring

financial institution headquartered in Jordan with a federally licensed and regulated branch office in New York. Plaintiffs bring several claims under the civil remedy provision of the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, and bring common law claims for intentional infliction of emotional distress. The Linde plaintiffs' motion for a preliminary injunction, which was premised on the fifth claim for relief in the Linde First Amended Complaint, was denied on November 29, 2004. *See Linde v. Arab Bank, PLC*, 353 F.Supp.2d 327 (E.D.N.Y. 2004). Defendant now brings motions to dismiss the complaints in these three suits under Rule 12(b)(6) of the Federal Rules of Civil Procedure and on *forum non conveniens* grounds. (The Linde plaintiffs and the Litle plaintiffs have each filed a First Amended Complaint, while the Coulter plaintiffs have filed only a complaint. For purposes of this opinion, all three documents will be referred to simply as "complaints.")

## FACTUAL ALLEGATIONS AND CLAIMS

All three complaints contain nearly identical allegations regarding Arab Bank's conduct and each posit the same theories of culpability. The factual allegations concerning each plaintiff's injuries are, of course, unique to each plaintiff. To the extent these factual differences impact the legal analysis, they will be explained separately below. The following is a summary of the allegations common to all three complaints. The alleged facts are assumed to be true for the purposes of defendant's motions to dismiss.[2]

---

claims under the Alien Tort Claims Act.
        A sixth case, Bennett v. Arab Bank, 05-CV-3183, was filed on July 1, 2005, and a seventh, Roth v. Arab Bank, 05-CV-3738, was filed on August 5, 2005.

        [2] Defendant has submitted affidavits and other matters outside the pleadings in the course of briefing its motions to dismiss. Because motions for summary judgment would be premature, the Rule 12(b)(6) motions will not be converted to Rule 56 motions, and the court will not

Plaintiffs allege that, on September 29, 2000, following the collapse of peace negotiations between the State of Israel and the Palestinian Authority, Palestinian terrorist groups launched what quickly became known in Arab parlance as the Al Aqsa Intifada or Intifada Al Quds – the "Second Intifada" in western parlance. This Second Intifada was marked from the outset by numerous acts of extreme violence, including multiple murders of civilians by Palestinian terrorist groups. These terrorists utilize suicide bombers as their preferred method of carrying out such attacks. The suicide bombers are regarded as martyrs by the terrorist groups and their sympathizers.[3] The objectives of the Second Intifada include intimidating and coercing the civilian population of Israel and attempting to influence the policy of the Israeli government to withdraw from territory it presently controls.

The complaints identify the Islamic Resistance Movement ("HAMAS"), the Palestinian Islamic Jihad ("PIJ"), and the Al Aqsa Martyrs Brigade ("AAMB") as prominent terrorist organizations operating in Palestinian controlled territory. Each of these organizations has been designated as a Foreign Terrorist Organization ("FTO") by the United States Secretary of State. The complaints also identify several charities that plaintiffs allege operate as front organizations for HAMAS, assisting it in carrying out its terrorist activities. These include Al-Ansar Charity, Ramalla Charitable Committee, Tulkarem Charitable Committee, the Islamic Association (Gaza) a/k/a Al Jamay Al-Islamiya, Al Mujama Al-Islami, Nablus Charitable Committee, Jenin Charitable

---

consider these factual submissions in support of the motions.

[3] Defendant's attempt to discount this allegation on the basis that the term "martyr" has several different usages is disingenuous. Plaintiffs' allegations clearly concern the use of the term martyr to describe those who are killed or injured while carrying out suicide attacks in support of the Second Intifada.

Committee, and Islamic Charity Society of Hebron. Plaintiffs allege that these charitable organizations are in reality agents of HAMAS. Although these organizations hold themselves out as legitimate charities and collect money in the name of humanitarian purposes, they in fact route large sums of money to support the violent activities of HAMAS and other terrorist organizations. These organizations thus serve as agents of HAMAS and are able both to solicit and to launder money on HAMAS's behalf. They raise money to support all areas of HAMAS's operations. Several of the charities maintain bank accounts at Arab Bank through which the Bank provides them with financial services, such as receiving deposits and processing wire transfers. The complaints allege that the Bank knows that these organizations are fronts which support HAMAS's terrorist activities, and that the Bank's continued provision of banking services to these groups facilitates their illegal activities. The complaints identify one Arab Bank account number that plaintiffs allege belongs to HAMAS itself, and which HAMAS uses to collect funds in support of violent activities.[4]

On or about October 16, 2000, the Saudi Committee In Support of the Intifada Al Quds ("Saudi Committee") was established as a private charity registered with the Kingdom of Saudi Arabia. According to the Saudi Committee, its purpose is to support the "Intifada Al Quds" and "all suffering families–the families of the martyrs and the injured Palestinians and the disabled." According to plaintiffs, the Saudi Committee constitutes a professional fundraising apparatus intended to subsidize the Palestinian terror campaign and to bankroll HAMAS and the PIJ.

The Saudi Committee furnishes what plaintiffs variously term a "comprehensive insurance

---

[4] According to the Declaration of Shukry Bishara, the Chief Banking Officer of Arab Bank, in Support of Defendant's Motion to Dismiss, the Bank "closed this account, froze the balance of its funds and reported it to the appropriate authorities" following the commencement of plaintiffs' suits.

death benefit" or a "universal death and dismemberment plan," consisting of a payment of $5,316.06, to the families of Palestinian terrorists killed in service of the Intifada. (At oral argument, plaintiffs explained that this sum is the U.S. Dollar equivalent of 20,000 Saudi Riyals.) Lesser benefits are provided when the terrorist is either injured or captured by Israeli security forces. Although plaintiffs sometimes refer to these payments as "insurance" benefits, the scheme is not alleged to be a traditional pooled risk insurance plan, where individuals pay premiums against the risk of some future event. Rather, plaintiffs are alleging that the plan is, in effect, a reward for perpetrators of suicide attacks. Families claim this reward by obtaining an official certification of their deceased relative's status as a martyr, which includes an individualized martyr identification number. In order to obtain this certificate, families must provide the Saudi Committee with the martyr's name, personal information, and details concerning the date and manner of death.

Plaintiffs allege that the Bank is the exclusive administrator of the death and dismemberment benefit plan. Once the Saudi Committee prepares a list of eligible martyrs, the list is provided to the Bank. Arab Bank, in consultation with the Saudi Committee and local representatives of HAMAS, finalizes the lists, maintains a database of persons eligible to receive benefits under the death and dismemberment plan, and opens a dollar account for each beneficiary. Families who choose to collect the benefit must present to the Bank an official certification from the Palestinian Authority that includes the individualized identification number of the martyr. If the documentation proves satisfactory, Arab Bank issues a receipt to the designated recipient of the benefit. Plaintiffs allege that these payments create an incentive to engage in terrorist acts by rewarding all Palestinian terrorists, regardless of their affiliation with a particular group.

The complaints detail the numerous terrorist attacks in which plaintiffs themselves or their

decedents were injured. For the sake of brevity, only one attack from each complaint will be described. The Linde complaint describes an attack on May 18, 2003. On that day, plaintiff Steven Averbach, a citizen of the United States and of Israel, was seated on a commuter bus heading toward Jerusalem when a man dressed as a religious Jew boarded the bus and then detonated explosives. Seven people were killed and twenty injured in the attack, including plaintiff Averbach, who sustained severe damage to his spinal cord when a ball bearing that had been packed in the explosives lodged between his C3 and C4 vertebrae, rendering him a quadriplegic. HAMAS claimed responsibility for the attack, and the bomber was later identified by his family as Bassem Jamil Tarkrouri.

The Litle complaint describes the bombing of Bus No. 2 in Jerusalem on August 19, 2003, from which a number of plaintiffs derive their injuries. HAMAS claimed responsibility for the bombing, in which plaintiff Mendy Reinitz, a citizen of the United States and of Israel, sustained shrapnel wounds in the shoulder and back and underwent surgery. Although some shrapnel was removed, some will remain in his body for the rest of his life. Mendy's brother, Yissocher Dov Reinitz, and father, Mordechai Reinitz, were also riding the bus that day; both were killed in the attack. Other relatives are also plaintiffs.

The Coulter complaint describes the suicide bombing of a Sbarro pizza restaurant on August 9, 2001, in Jerusalem. Fifteen people were killed and approximately 130 injured in this attack, in which a suicide bomber detonated a bomb packed with nails and metal bolts. The claims of the Nachenberg, Finer, Green, Greenbaum, and Danzig families, brought in the Coulter complaint, stem from this attack. The bomber was identified as Izz Ad-Din Shuhail Ahmad Al-Masri, a terrorist acting on behalf of HAMAS. The Al-Masri family received two payments into an Arab Bank

account following this act, one from the Saudi Committee, totaling $5,316.16 (or 20,000 Saudi Riyals), and one from the Al-Ansar charity, totaling $6000.

All three complaints describe a specific benefit transaction for a suicide bomber named Dia A-Tawil. After perpetrating a suicide bombing attack on behalf of HAMAS on March 27, 2001, he was designated Palestinian Authority martyr number 449. His father, Hussien Mohamed Favah Tawil, presented the martyr certification to the Bank and received a confirmatory receipt stating that the benefit was paid to his Arab Bank account in Ramallah.

Plaintiffs also allege that funds raised by the Saudi Committee in Saudi currency, and deposited in the Committee's Arab Bank accounts, are then routed through the Bank's New York branch office, where they are converted to U.S. dollars, since Saudi currency cannot easily be converted into Israeli currency; the funds are then transferred to Arab Bank branches located in the West Bank in Israel and used to fund terrorist activities.

Based on these allegations, the Linde plaintiffs assert the following claims: Count One alleges that Arab Bank aided and abetted the murder, attempted murder, and serious bodily injury of United States nationals, in violation of 18 U.S.C. § 2332(a), (b), and (c), by providing substantial assistance to terrorists through the administration of the universal death and dismemberment plan for families of suicide bombers, and through the provision of other financial services. Count One alleges that Arab Bank "knew or recklessly disregarded" that it was providing material support for acts of international terrorism, that the charities were fronts that played a major role in raising funds for HAMAS, and that the Bank's activities substantially assisted dangerous criminal acts.

Count Two alleges that Arab Bank conspired to commit murder and attempted murder, in violation of 18 U.S.C. § 2332(b), by agreeing to "perform extraordinary banking and administrative

services for the Saudi Committee, Hamas, the PIJ, and AAMB," including exclusive administration of the death and dismemberment benefit plan, in order to "support terrorist activities pursuant to a common scheme to encourage and incentivize acts of terrorism."

Count Three alleges that Arab Bank provided material support to terrorists, in violation of 18 U.S.C. § 2339A, by providing "extraordinary financial and administrative services," including exclusive administration of the death and dismemberment benefit plan to the families of suicide bombers and other terrorists.

Count Four alleges that Arab Bank provided material support to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B, by knowingly transferring funds from and to agents of HAMAS.[5]  Plaintiffs further allege that, without the Bank's assistance in this regard, it would have been substantially more difficult to implement the death and dismemberment benefit plan.

Count Five alleges that the Bank's failure to comply with regulatory requirements to retain the assets of designated foreign terrorist organizations and report them to the Secretary of State, as required by 18 U.S.C. § 2339B(a)(2), itself constitutes the provision of material support to a designated FTO.

Count Six alleges that Arab Bank provided financial services to HAMAS, the PIJ, AAMB, and the Saudi Committee by collecting funds, with the knowledge that such funds have been and will be used to facilitate acts intended to cause death or serious bodily injury to civilians, such as plaintiffs. Plaintiffs contend that these financial services constitute financing of terrorism in violation of 18 U.S.C. § 2339C.

_____

[5] Counts Four and Five contain erroneous statutory citations.  However, the actual allegations contained in those counts, as well as subsequent briefing and argument, make clear to which statutory sections plaintiffs are referring.

Count Seven alleges that Arab Bank's provision of banking and other services to HAMAS, the PIJ, the AAMB and other international terrorists, including administering the death and dismemberment benefit plan, was itself an act of international terrorism as defined by the ATA, in that these actions were "involved" in violent criminal acts that injured plaintiffs and appeared to be intended to coerce or intimidate the people, government policy, or government conduct of Israel. Although the complaint does not cite a specific criminal provision identifying a specific act of international terrorism defendant is alleged to have committed or aided and abetted or conspired to commit, the briefs make clear that the crimes are violations of the material support and financing provisions, Sections 2339A, 2339B, and 2339C.

Finally, Count Eight alleges claims for intentional infliction of emotional distress.

The legal claims of the Litle plaintiffs and the Coulter plaintiffs are identical, except that the Litle plaintiffs omit Count Five of the Linde complaint (which is based on defendant's failure to comply with regulatory requirements), and the Coulter complaint omits Count Eight of the Linde complaint, which asserts claims of intentional infliction of emotional distress.[6]

## DISCUSSION

In considering a motion to dismiss made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of plaintiffs. *Bolt Electric, Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir. 1995). Dismissal is appropriate only where it appears beyond doubt that plaintiffs can

---

[6] Thus, both the Litle First Amended Complaint and the Coulter complaint consist of a total of seven counts, compared to the eight counts in the Linde First Amended Complaint.

prove no set of facts in support of their claims that would entitle them to relief.  *Id.*

**Pleading Standard**

Defendant, relying heavily on cases from the racketeering and securities fraud contexts, argues that plaintiffs are required to plead specific facts from which its knowledge of the wrongful acts alleged could be inferred.  Although the Bank claims that it is not trying to impose a heightened pleading standard, the effect of the Bank's argument would indeed be to impose a higher standard.

Rule 8(a) of the Federal Rules of Civil Procedure requires only that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  The Supreme Court has recently reiterated that the notice pleading standard is a limited one:

> Given the Federal Rules' simplified standard for pleading, '[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' *Hishon* v. *King & Spalding*, 467 U.S. 69, 73 (1984). If a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) before responding.  Moreover, claims lacking merit may be dealt with through summary judgment under Rule 56.  The liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim.

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002); *see also Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 167-69 (1993).  The first circuit court of appeals to address a private damages claim brought under the ATA applied the liberal pleading standard of Rule 8(a).  *See Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1008 (7th Cir. 2002).  I agree that there is no reason to do otherwise.

## Statutory Claims Under 18 U.S.C. § 2333

Plaintiffs bring their suit pursuant to 18 U.S.C. § 2333, enacted as part of the Anti-Terrorism Act ("ATA" or "the Act"), which provides in relevant part:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

18 U.S.C. § 2333(a). The ATA, at Section 2331(1), defines "international terrorism" as "activities that"

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>
> (B) appear to be intended–
>
> (i) to intimidate or coerce a civilian population;
>
> (ii) to influence the policy of a government by intimidation or coercion; or
>
> (iii) to affect the conduct of a government by mass destruction, assassination or kidnapping; and
>
> (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

Thus, in order to state a claim for civil damages under Section 2333(a), plaintiffs must allege that they were injured "by reason of" a crime that constitutes an act of international terrorism, as so defined.

Plaintiffs identify the following crimes as the predicate acts of international terrorism on which they are basing civil liability under Section 2333: murder, attempted murder, and serious bodily injuries to United States citizens, in violation of 18 U.S.C. § 2332(a), (b), and (c); conspiracy to commit murder and attempted murder of United States citizens, in violation of 18 U.S.C. § 2332(b); provision of material support to terrorists, in violation of 18 U.S.C. § 2339A; provision of material support to designated foreign terrorist organizations, in violation of 18 U.S.C. § 2339B; and financing of terrorism, in violation of 18 U.S.C. § 2339C.

The violent acts alleged by plaintiffs as giving rise to their injuries, *i.e.*, murder, attempt or conspiracy to commit murder, and physical violence that results in serious bodily injury, clearly qualify as "activities that involve violent acts or acts dangerous to human life," and thus fall within Section 2331(1)(A). Defendant does not challenge the sufficiency of plaintiffs' allegations with respect to the apparent purpose and location of these acts, as required by Section 2331(1)(B) and (C).[7] Thus, plaintiffs have alleged that they were injured "by reason of an act of international terrorism," as required by Section 2333(a). Defendant's argument that plaintiffs must allege that they were injured by reason of Arab Bank's conduct simply misstates the statutory requirement. As will be explained below, Arab Bank's liability in this case depends on whether the Bank can be held

---

[7] In briefing these motions, defendant has not seriously disputed that the majority of the attacks qualify as acts of international terrorism within the meaning of the ATA. With respect to defendant's argument that a few plaintiffs have alleged injuries resulting from drive-by shootings and other street crime, as opposed to acts of international terrorism, there is nothing on the face of the complaints to indicate that these crimes were not intended as acts of international terrorism as required by the statute. None of the facts alleged as to these acts establish that they were ordinary violent crimes, for example, robberies or personal vendettas, and none of the facts alleged remove the possibility that plaintiffs can prove they were acts of terrorism.

If, at trial, plaintiffs fail to prove that these acts were terror attacks, rather than "mere" street crime, they will have failed to establish a claim under the ATA. However, at this stage of the litigation, dismissing these claims would be premature.

liable, directly or secondarily, for its conduct in allegedly assisting the terrorists, but there can be no dispute that plaintiffs have plead adequately that they were injured by acts of international terrorism.

In addition to murder, plaintiffs identify violations of the material support and terrorist financing laws as predicate crimes. Violations of 18 U.S.C. §§ 2339A and 2339B, which make it a crime to provide material support to terrorists and to designated foreign terrorist organizations, respectively, are included in Section 2331(1)'s broad definition of "international terrorism," *see Boim*, 291 F.3d at 1014-15, as are violations of 2339C, which prohibits the financing of terrorism. Thus, violations of these provisions can serve as predicate crimes giving rise to civil liability under the ATA.

Section 2339A, entitled "Providing material support to terrorists," provides that "[w]hoever provides material support or resources ... knowing or intending that they are to be used in preparation for, or in carrying out, [various federal crimes], ... or attempts or conspires to do such an act," shall be guilty of a crime. 18 U.S.C. § 2339A(a).

Section 2339B deals with material support for organizations that have been formally designated as foreign terrorist organizations by the Secretary of State under the procedures set out in Section 219 of the Immigration and Nationality Act, codified at 8 U.S.C. § 1189. *See* 18 U.S.C. § 2339B(g)(6) (defining "terrorist organization" as an organization designated as a terrorist organization under Section 219 of the Immigration and Nationality Act). It provides that "[w]hoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be" guilty of a crime. 18 U.S.C. § 2339B(a)(1).

Both Section 2339A and Section 2339B define "material support or resources" as "any

property, tangible or intangible, or service, including currency or monetary instruments or financial securities, *financial services*, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel …, and transportation, except medicine or religious materials." 18 U.S.C. § 2339A(b) (emphasis added); *see* 18 U.S.C. § 2339B(g)(4) (incorporating the definition of "material support or resources" used in Section 2339A).

Section 2339C addresses the financing of terrorism, and provides that whoever, meeting the jurisdictional requirements set forth in subsection (b),

> by any means, directly or indirectly, unlawfully and willfully provides or collects funds with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out–
>
> (A) an act which constitutes an offense within the scope of a treaty specified in subsection (e)(7), as implemented by the United States, or
>
> (B) any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act, shall be [guilty of a crime].

18 U.S.C. § 2339C(a)(1). An act may constitute an offense under the statute without a showing that the funds were actually used to carry out the predicate act of terrorism. 18 U.S.C. § 2339C(a)(3).

Plaintiffs' claims under the ATA are based on two factual theories of conduct. The first factual theory is that the Bank's activities in administering the death and dismemberment benefit plan created an incentive for the commission of the terrorist acts by Palestinians in Israel which injured plaintiffs and thus substantially assisted their commission. The second factual theory

concerns the banking services the Bank provides to the various organizations which plaintiffs allege are fronts for, or agents of, HAMAS, a designated foreign terrorist organization. Plaintiffs contend that, on the basis of these two factual courses of conduct, the Bank may be held secondarily liable for their injuries under theories of civil aiding and abetting and civil conspiracy. Plaintiffs also maintain that the Bank's actions constituting material support for terrorists and terrorist organizations in violation of 18 U.S.C. §§ 2339A and 2339B and financing in violation of 18 U.S.C. § 2339C create direct bases for liability.

<u>The Availability of Secondary Liability</u>

Defendant contends that plaintiffs have failed to allege facts from which it can be inferred that its own acts, as opposed to those of the terrorists, proximately caused their injuries, and challenges plaintiffs' reliance on secondary liability under theories of civil aiding and abetting and civil conspiracy. However, Section 2333 does not limit the imposition of civil liability only to those who directly engage in terrorist acts. The statue specifies the class of plaintiffs who may sue under the civil remedy provision—*i.e.*, those U.S. nationals who are injured "by reason of an act of international terrorism." As noted above, plaintiffs have alleged that their injuries were caused by suicide bombings or other attacks that, for pleading purposes, meet the definition of "international terrorism." When it comes to determining the proper defendants for claims under Section 2333, however, the statute is silent. *See Boim*, 291 F.3d at 1010 ("Although the statute defines the class of plaintiffs who may sue, it does not limit the class of defendants, and we must therefore look to tort law and the legislative history to determine who may be held liable for injuries covered by the statute.").

Defendant, relying principally on the Supreme Court's decision in *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994), where the Court refused to allow civil aiding and abetting liability under Section 10(b) of the Securities and Exchange Act of 1934, argues that plaintiffs may not proceed on theories of civil aiding and abetting and civil conspiracy liability. For the reasons set forth comprehensively by the Court of Appeals for the Seventh Circuit in *Boim*, I conclude that aiding and abetting liability is available under the ATA. *See Boim*, 291 F.3d at 1018-21. In *Boim*, the court found *Central Bank* not determinative and summarized its reasons as follows:

> First, *Central Bank* addressed extending aiding and abetting liability to an implied right of action, not an express right of action as we have here in section 2333. Second, Congress expressed an intent in the terms and history of section 2333 to import general tort law principles, and those principles include aiding and abetting liability. Third, Congress expressed an intent in section 2333 to render civil liability at least as extensive as criminal liability in the context of the terrorism cases, and criminal liability attaches to aiders and abettors of terrorism. *See* 18 U.S.C. § 2. Fourth, failing to extend section 2333 liability to aiders and abettors is contrary to Congress' stated purpose of cutting off the flow of money to terrorists at every point along the chain of causation.

*Boim*, 291 F.3d at 1019. *Boim* also noted that the government, in an amicus brief, which the Court had solicited on appeal, supported the availability of secondary civil liability under the ATA.

I further find that civil conspiracy liability, not addressed in *Boim*, is also available. The statute expressly includes conspiracy to engage in terrorist acts under its criminal provisions, and there is no reason to treat the civil provisions as excluding this type of liability. *See Boim*, 291 F.3d at 1020 (noting that Congress, in Section 2333, expressed an intent "to make civil liability at least as extensive as criminal liability").

The Scope of Secondary Liability

The scope of civil aiding and abetting liability was set forth in *Halberstam v. Welch*, 705 F.2d 472 (1989), in what the Supreme Court in *Central Bank* described as a "comprehensive opinion on the subject." *Central Bank*, 511 U.S. at 181. In *Halberstam*, the Court of Appeals for the D.C. Circuit, relying heavily on The Restatement (Second) of Torts, § 876 (1979), upheld civil aiding abetting and liability, and also civil conspiracy liability, against a woman who had knowingly and substantially assisted her co-defendant, a murderer, by performing otherwise legal services, such as acting as banker, bookkeeper and secretary, knowing that these activities assisted his illegal activities, even though she had no specific knowledge of, or intent to commit, the particular illegal activity, *i.e.*, murder, with which she and he were civilly charged. As the court stated, "Although her own acts were neutral standing alone, they must be evaluated in the context of the enterprise they aided, *i.e.*, a five-year-long burglary campaign against private homes." *Halberstam*, 705 F.2d at 488. The Court noted that "the implications of tort law in this area [civil remedies for criminal acts] as a supplement to the criminal justice process and possibly as a deterrent to criminal activity cannot be casually dismissed." *Halberstam*, 705 F.2d at 489. Here, Congress has expressly made criminal the providing of financial and other services to terrorist organizations and expressly created a civil tort remedy for American victims of international terrorism.

Section 876 of the Restatement provides,

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to

conduct himself, or

> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Plaintiffs rely on all three provisions of Section 876 of the Restatement, paragraph (a) for their conspiracy claim, paragraph (b) for their aiding and abetting claim, and paragraph (c) for their claims under the material support and financing statutes, 18 U.S.C. §§ 2339A, 2339B and 2339C.

Plaintiffs' allegations are sufficient to establish secondary liability under each one of these theories. As to conspiracy, they adequately allege that Arab Bank knowingly and intentionally agreed to provide services to organizations it knew to be terrorist organizations and that they were injured by an overt act which was done in furtherance of the common scheme. It is not necessary that they allege that Arab Bank either planned, or intended, or even knew about the particular act which injured a plaintiff. *See Halberstam*, 705 F.2d at 487. The factual allegations of the complaints sufficiently support an inference that Arab Bank and the terrorist organizations were participants in a common plan under which Arab Bank would supply necessary financial services to the organizations which would themselves perform the violent acts. Administering the death and dismemberment benefit plan further supports not only the existence of an agreement but Arab Bank's knowing and intentional participation in the agreement's illegal goals. No more is required.

The same allegations support aiding and abetting liability. The complaints allege that the financial services provided by Arab Bank, and the administration of the death and dismemberment benefit plan, provided substantial assistance to international terrorism. They also allege that the Bank's administration of the benefit plan encouraged terrorists to act. These allegations are well within the mainstream of aiding and abetting liability. They describe the wrongful acts performed

by the terrorists, the defendant's general awareness of its role as part of an overall illegal activity, and the defendant's knowing and substantial assistance to the principal violation. *See Halberstam*, 705 F.2d at 477. With respect to defendant's administration of the death and dismemberment benefit plan, as the Court in *Halberstam* noted, quoting from Comment d to Clause (b) of Section 876 of the Restatement: "Advice or encouragement to act operates as a moral support to a tortfeasor and if the act encouraged is known to be tortious it has the same effect upon the liability of the adviser as participation or physical assistance."

Defendant's protestations about causation and knowledge are contrary to these principles. Just as there was no requirement for aiding and abetting liability in *Halberstam* that the murderer would not have acted as he did but for his co-defendant's conduct, there is no requirement of a finding that the suicide bomber would not, or could not, have acted but for the assistance of Arab Bank. Plaintiffs readily acknowledge that, in order to prevail on their claims premised on the Bank's alleged administration of the death and dismemberment benefit plan, they must prove that each of the victims was in fact killed by terrorists (as defined in the statute and as opposed, for example, to apolitical criminals) and that each of the killers was within the coverage of the plan. Such proof would be sufficient to hold the Bank secondarily liable, assuming the other elements of liability were established, even though it would not satisfy a "but for" causation requirement. As to plaintiffs' claims premised on their second factual theory—*i.e.*, that the Bank's provision of financial services constitutes material support to, or financing of, foreign terrorist organizations—plaintiffs acknowledge that they will have to prove that the Bank provided these services to the particular group responsible for the attacks giving rise to their injuries.

Defendant also argues that plaintiffs' claims must fail because they do not allege, and cannot

prove, that the death and dismemberment benefit payments motivated the attacks which caused their injuries. However, plaintiffs need not prove motive in order to succeed in their claims. Plaintiffs acknowledge that they are unlikely to be able to prove the motive behind any particular attack. Their theory is that the death and dismemberment benefit plan, allegedly administered by Arab Bank, creates an incentive for suicide bombings, whether or not it is also a motive in any particular instance. The Bank's active participation in creating such an incentive is a sufficient basis for liability under the broad scope of the ATA, which imposes secondary liability on those who substantially assist acts of terrorism. *See Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1136 (9th Cir. 2000), *cert. denied*, 532 U.S. 904 (2001) (noting that "even contributions earmarked for peaceful purposes can be used to give aid to the families of those killed while carrying out terrorist acts, thus making the decision to engage in terrorism more attractive"). Plaintiffs also argue that the willingness of Arab Bank, a major institution in the Middle East, to perform services for the terrorists helps to legitimize terrorism and, in that way as well, furthers its assistance to them.

Finally, the allegations that Arab Bank breached independent duties, indeed committed criminal acts in violation of the material support and financing statutes, are sufficient to establish secondary liability under Section 876 (c) of the Restatement.

Scienter

Arab Bank seeks dismissal of the first seven counts of the Linde complaint, and the corresponding counts of the Litle and Coulter complaints, on the ground that plaintiffs have not sufficiently alleged knowledge and intent. To the extent that defendant is arguing that plaintiffs have not alleged sufficient facts to establish an evidentiary basis for their allegations of knowledge

and intent, defendant simply misapprehends the pleading standard.    It is not entitled to dismissal based on the argument that plaintiffs must plead more than the requisite knowledge and intent, either as to their substantive claims or their claims of aiding and abetting and conspiracy.[8]

Arab Bank also argues, in effect, that the requisite intent is the specific intent to cause the acts of terrorism which injured the plaintiffs.  The Bank is incorrect.

Each of the various statutory provisions upon which plaintiffs rely for the underlying criminal activity alleged to meet the standards of Section 2333 has a different formulation of the required *mens rea*.  *See Humanitarian Law Project v. Gonzales*, 2005 U.S. Dist. LEXIS 16033, *32-39 (C.D. Cal. 2005) (describing the history of the enactment of these statutes).  Under Section 2332, murder, as defined in 18 U.S.C. § 1111(a), requires "malice aforethought."  No one disputes that plaintiffs have sufficiently alleged that the mental state of the persons who performed the acts which injured them meet that standard.

The dispute centers on the mental state required of the Bank.  Section 2339A makes it a crime to provide material support or resources "knowing or intending that [the resources] are to be used in preparation for, or in carrying out" terrorist attacks.  Section 2339C also requires knowledge or intent that the funds are to be used to carry out terrorist attacks and, in addition, requires that the conduct be willful.  To violate Section 2339B, it is required only that one "knowingly provide[] material support or resources" to a designated foreign terrorist organization.  *See Humanitarian Law*

---

[8]  To the extent that plaintiffs have pled reckless conduct, as well as knowledge, the allegations of recklessness do not defeat their allegations of knowledge.  There is, however, no statutory basis for plaintiffs' argument that recklessness would be sufficient to meet the statutory requirements.

*Project*, 2005 U.S. Dist. LEXIS 16033 at *25-39.  None of these provisions, however, requires specific intent to commit specific acts of terrorism.[9]

With respect to Section 2339B, in *Humanitarian Law Project v. Reno*, the Court of Appeals for the Ninth Circuit, addressing a First Amendment challenge to Section 2339B's prohibition against providing material support to designated foreign terrorist organizations, rejected the claim that the prohibition is unconstitutional unless the person providing material support has the specific intent to aid in the organization's unlawful purposes.  *Humanitarian Law Project*, 205 F.3d at 1133. The court noted that "[m]aterial support given to a terrorist organization can be used to promote the organization's unlawful activities, regardless of donor intent.  Once the support is given, the donor has no control over how it is used."  *Id.*, 205 F.3d at 1134.  Moreover, "all material support given to such organizations aids their unlawful goals."  *Id.*, 205 F.3rd at 1136; *see also id.*, 205 F.3d at 1138 n.5 (explaining that the term "knowingly" in Section 2339B "modifies the verb 'provides,' meaning that the only scienter requirement here is that the accused violator have knowledge of the fact that he has provided something, not knowledge of the fact that what is provided in fact constitutes material support"); *Humanitarian Law Project*, 2005 U.S. Dist. LEXIS 16033 at *40-41.

That the intent urged by Arab Bank is not required has been confirmed by Congress's December 17, 2004 amendment of Section 2339B to add the language:

> To violate this paragraph, a person must have knowledge that the
> organization is a designated terrorist organization (as defined in

---

[9] The district court in *Humanitarian Law Project v. Gonzales* describes Sections 2339A and 2339C as including a "specific intent requirement," while explaining that Congress dispensed with this requirement in Section 2339B.  2005 U.S. Dist. LEXIS 16033 at *32-35. However, as that court held, Sections 2339A and 2339C only require knowledge or intent that the resources given to terrorists are to be used in the commission of terrorist acts.  Neither requires the specific intent to aid or encourage the particular attacks that injured plaintiffs.

> subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act) [8 U.S.C. § 1182(a)(3)(B)], or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989) [22 U.S.C. § 2656f(d)(2)].

*See Humanitarian Law Project v. Reno*, 393 F.3d at 1133-34.[10]   Congress thus appears to have expressed its disagreement with decisions, relied upon by Arab Bank, imputing an intent requirement into Section 2339B equivalent to the intent requirement of Section 2339A, *e.g.*, *U.S. v. Al-Arian*, 308 F. Supp. 1322, 1337-39 (M.D.Fla. 2004).[11]   *See Humanitarian Law Project*, 2005 U.S. Dist. LEXIS 16033 at *36-37 (noting that, in adopting the 2004 amendment, Congress incorporated the Ninth Circuit's holding in *Humanitarian Law Project v. Reno* and rejected the holding of *United States v. Al-Arian*).

As explained by the district court in *Humanitarian Law Project v. Gonzales*, the legislative history of Section 2339B indicates that it was enacted in order to close a loophole left by Section 2339A, which would have allowed terrorist organizations to raise funds "under the cloak of a humanitarian or charitable exercise" and then divert the funds to terrorist activities.  *Humanitarian Law Project*, 2005 U.S. Dist. LEXIS 16033 at *33 (citing H.R. Rep. 104-383, at *43 (1995)).  Also,

---

[10] Defendant does not argue that the December 2004 amendment to Section 2339B does more than clarify the statute's reach; that is, it does not argue that the amendment changed the statute from one requiring specific intent to one no longer requiring specific intent. *See also Humanitarian Law Project*, 2005 U.S. Dist. LEXIS 16033 at *36 (noting that the 2004 amendment "clarified" the *mens rea* requirement).

[11] I note that the court in *Al-Arian* considered its conclusion consistent with the Seventh Circuit's decision in *Boim* insofar as *Boim* required, for civil liability, that the defendant intend to help in the terrorist organization's unlawful activities.  *Al-Arian*, 308 F.Supp.2d at 1339 n.33. Insofar as *Boim* is read as requiring more than knowledge that the organization to which material support is provided is designated or is engaged in terrorist activities, I find that it is not consistent with the language of Section 2339B.

Congress expressly found that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-32, § 301(a)(7), 110 Stat. 1214, 1247 (1996). Thus, Section 2339B is violated if the Bank provides material support in the form of financial services to a designated foreign terrorist organization and the Bank either knows of the designation or knows that the designated organization has engaged or engages in terrorist activities.

Defendant cites the decision in *In re Terrorist Attacks on September 11, 2001*, 349 F.Supp.2d 765 (S.D.N.Y. 2005), in which claims brought against a number of Middle Eastern banks under the ATA were dismissed, as dispositive of the claims in this case. *In re Terrorist Attacks* concerned a group of consolidated actions bringing claims against a range of defendants related to the terrorist attacks of September 11, 2001. Each of the pleadings contained only a few paragraphs of allegations against the defendant banks. The Court held that, absent knowledge of the terrorist activities, the banks could not be liable for injuries caused by money routinely passing through them. Although plaintiffs in those cases did allege that some of the banks had ties to HAMAS, there was no allegation of any connection between HAMAS and Osama Bin Laden, Al Qaeda, or the September 11th attacks, so those allegations were insufficient to state a claim against the banks for injuries arising from the September 11th attacks. *See In re Terrorist Attacks*, 349 F.Supp.2d at 831-35.

By contrast, here, plaintiffs allege both that the Bank plays a central role in a well-publicized plan to reward terrorists killed and injured in Palestinian suicide attacks in Israel and that the Bank knows that the groups to which it provides services are engaged in terrorist activities. The very groups that the Bank is alleged to support are the same groups alleged to be responsible for the terrorist attacks that injured the plaintiffs. Nothing in the complaints suggests that Arab Bank is a

mere unknowing conduit for the unlawful acts of others, about whose aims the Bank is ignorant. Although the Bank would like this court to find, as did the court in *In re Terrorist Attacks*, that it is engaged in "routine banking services," *see* 349 F.Supp.2d at 835, here, given plaintiffs' allegations regarding the knowing and intentional nature of the Bank's activities, there is nothing "routine" about the services the Bank is alleged to provide.

Arab Bank also seeks dismissal on the ground that plaintiffs fail to allege the involvement of upper level management employees in the misconduct alleged. Once again, defendant attempts to impose a standard of pleading beyond that required by the rules. It is sufficient, for pleading purposes, for plaintiffs to allege the knowledge and intent of Arab Bank and not spell out their proof. For that reason, it is unnecessary to address whether the allegations made regarding the conduct of certain high level employees, including the Chairman of the Arab Bank, are sufficient as an evidentiary matter.

Claims Based Upon Violations of 18 U.S.C. § 2339C

Each of the three complaints asserts a claim that the Bank provided and collected funds "with the knowledge that such funds have been and will be used, in part, to facilitate acts intended to cause death or serious bodily injury to civilians," in violation of 18 U.S.C. § 2339C. Arab Bank argues that plaintiffs' allegations are insufficient to plead a violation of this section. As used in Section 2339C, "the term 'provides' includes giving, donating, and transmitting," and "the term 'collects' includes raising and receiving." 18 U.S.C. § 2339C(e)(4) & (5). Reading this section together with the material support provisions, the statute thus distinguishes between providing "financial services," which is addressed in Sections 2339A and 2339B (which include "financial services" in

their definition of "material support"), and financing, *i.e.*, the providing or collecting of funds, which is addressed in Section 2339C. However, as just noted, the term "provides" includes "transmitting" funds, and the term "collects" includes "receiving" funds. It is these terms upon which plaintiffs rely in pleading a violation of Section 2339C. Plaintiffs seek to reach the banking activities of receiving deposits and transmitting funds between accounts on the basis that the accounts (and funds) belong to groups engaged in terrorist activity, *i.e.*, the charity fronts that operate as agents of HAMAS.

Plaintiffs acknowledge that, under this claim, they will have to prove that Arab Bank knew that the funds it received as deposits and transmitted to various organizations were to be used for conducting acts of international terrorism. Because the complaints allege such knowledge on the part of the Bank, this claim will not be dismissed.


Scope of Injuries Actionable Under the ATA

Defendant argues that the claims of over fifty plaintiffs in the Coulter case and over fifty plaintiffs in the Litle case must be dismissed because they have failed to allege that their claims arise from an injury to a U.S. national. Section 2333(a) states, in relevant part, that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor . . . ." Defendant argues that the scope of this language is not sufficiently broad to reach these plaintiffs, who are U.S. citizens suing for various non-physical injuries, such as emotional distress and loss of consortium, after their family members, who were not U.S. nationals, became victims of acts of international terrorism. The specific question raised by defendants' argument is whether Section 2333(a)'s language

specifying that a U.S. national may recover for injuries to his or her "person, property, or business" encompasses the injuries alleged by these plaintiffs. Defendant has not sought dismissal of the similar claims brought by other nationals whose decedents were also nationals. In effect then, defendant argues that the claims it seeks to dismiss are derivative, not independent, and must be dismissed for that reason.[12]

The parties recognize that only one court has examined this issue. That court concluded that injuries of this type constitute injuries in the plaintiff's "person" under the ATA, stating, "[t]he statute does not specifically require that a plaintiff suffer *physical* harm prior to filing suit" and that "the plain language, as well as a common-sense interpretation, of the ATA" dictate that such plaintiffs should be able to recover. *See Biton v. Palestinian Interim Self-Government Authority*, 310 F.Supp.2d 172, 181-182 (D.D.C. 2004) (emphasis in original). The court expressed doubt that Congress could have intended that U.S. nationals could recover for losses of property yet not for losses of family members, simply because those family members were not U.S. nationals. *See id.* Defendant argues that the *Biton* holding is inconsistent with the legislative history of the ATA, and cites the minutes from the Senate Anti-Terrorism Act Hearing and the House Committee report on the ATA. Def't's Reply Mem. at 19-20, citing ATA Hearing at 31 ("These tragedies reinforce our belief that it is essential that both the Congress and the Executive Branch take measures, such as the present bill, to deter terrorist attacks against American nationals overseas. . . ."); H.R. REP. NO. 102-

---

[12] Different American jurisdictions have treated spousal claims either as derivative, and therefore requiring the existence of a claim in the physically injured spouse, see, e.g., *Liff v. Schildkrout*, 49 N.Y.2d 622, 632 (1980), RESTATEMENT (SECOND) OF TORTS § 693 cmt. e (1977), or as independent. *See, e.g.*, *Laureau v. Paige*, 39 F.3d 384, 390 (1st Cir. 1994) (noting that, "[u]nder Massachusetts law, claims for loss of consortium are independent, rather than derivative, of the claim of the injured person").

1040 at 4 ("Summary and Purpose: The purpose of H.R. 2222, the 'Antiterrorism Act of 1991' is to provide a new civil cause of action for international terrorist attacks against U.S. nationals.").

These general statements of purpose, not addressed to the issue here in dispute, offer little if any guidance. In the absence of any limiting language in the statute, the court will not limit the scope of Section 2333(a) to physical injuries to U.S. nationals. The congressional purpose was to grant a remedy to U.S. nationals and their families who suffered from injury to an individual or property as a result of international terrorism. The claims of the U.S. nationals suing based on their nonphysical injuries resulting from acts of international terrorism will not be dismissed.

Claims Based Upon Violations of 18 U.S.C. § 2339B(a)(2)

The fifth counts of the Linde and Coulter complaints each allege that the Bank, by failing to comply with its obligation under 18 U.S.C. § 2339B(a)(2) to retain any funds under its control in which it knows a foreign terrorist organization has an interest and to report the existence of such funds to the Secretary of the Treasury, provides material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1). (The Litle complaint does not assert this claim.) Section 2339B(a)(2) provides that,

> Except as authorized by the Secretary [of the Treasury], any financial institution that becomes aware that it has possession of, or control over, any funds in which a foreign terrorist organization, or its agent, has an interest, shall–
>
> (A) retain possession of, or maintain control over, such funds; and
>
> (B) report to the Secretary the existence of such funds in accordance with regulations issued by the Secretary.

Subsection (b) of Section 2339B provides for civil penalties imposed by the government against

financial institutions that violate these requirements.

Plaintiffs appear to contend that violations of Section 2339B(a)(2) constitute, in and of themselves, material support for foreign terrorist organizations. As I held in my decision denying a preliminary injunction based on alleged violations of Section 2339B(a)(2), violations of the reporting requirements "are neither criminal violations nor acts of international terrorism, as defined by the statute." *Linde*, 353 F.Supp.2d at 331. Because this claim is an attempt to recast civil violations of the reporting requirements as criminal acts of providing material support, it must be dismissed. Thus, Count Five of the Linde First Amended Complaint and Count Five of the Coulter complaint are each dismissed.

I note, however, that plaintiffs' claim that the Bank provided material support to a designated FTO (found in Count Four of all three complaints), which does constitute an act of international terrorism, may be shown through a variety of evidentiary means, which may include proof of violations of the requirements regarding retention and reporting of FTO funds.

**Intentional Infliction of Emotional Distress**

Finally, those Linde and Litle plaintiffs who sue as survivors bring common law claims for intentional infliction of emotional distress. Defendant argues that the complaints fail to state a claim for intentional infliction of emotional distress and that the claims of a number of plaintiffs are time barred.

The tort of intentional infliction of emotional distress has four elements: (1) extreme and outrageous conduct; (2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe

emotional distress.  *E.g., Howell v. New York Post Co., Inc.*, 81 N.Y.2d 115, 121 (1993).

Violent terrorist attacks, almost by definition, qualify as the type of conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community," as to come within the ambit of the tort.  *See* Restatement (Second) of Torts, § 46 cmt. d (1965).  However, plaintiffs' claims of intentional infliction of emotional distress do not seek to reach the conduct of the terrorists who carried out the suicide attacks; rather, they are aimed at the Bank's conduct in supporting those who are responsible for carrying out the attacks.  Although plaintiffs' allegations are sufficient to make out statutory claims under the ATA, which is aimed at "cut[ting] off the flow of money to terrorists at every point along the causal chain of violence," *Boim*, 291 F.3d at 1021, the Bank's conduct is too removed to support common law claims for intentional infliction of emotional distress.  If plaintiffs succeed in proving their civil claims under the ATA, they will be able to recover for their emotional damages.  However, the allegations in the complaints fall short of stating a separate claim for intentional infliction of emotional distress against the Bank under the common law.[13]

---

[13] Defendant also argues that the complaints should be dismissed on the ground of *forum non conveniens* and that plaintiffs should refile their claims in Jordan.  The ATA has a provision that deals expressly with issues concerning convenience of the forum in cases brought under Section 2333.  It reads:

> The district court shall not dismiss any action brought under section 2333 of this title on the grounds of the inconvenience or inappropriateness of the forum chosen, unless –
>
> (1) the action may be maintained in a foreign court that has jurisdiction over the subject matter and over all the defendants;
>
> (2) that foreign court is significantly more convenient and

## CONCLUSION

The motions to dismiss are granted in part and denied in part. The following claims are dismissed: Count Five (violation of the reporting requirements in 18 U.S.C. § 2339B(a)(2)) and Count Eight (intentional infliction of emotional distress) of the Linde Complaint; Count Seven (intentional infliction of emotional distress) of the Litle Complaint; and Count Five (violation of the reporting requirements in 18 U.S.C. § 2339B(a)(2)) of the Coulter Complaint. Defendant's motions to dismiss the remaining claims are denied.


### SO ORDERED.


*/s/ Nina Gershon*
**NINA GERSHON**
**United States District Judge**

**Dated:** **September 2, 2005**
          **Brooklyn, New York**

---

appropriate; and

(3) that foreign court offers a remedy which is substantially the same as the one available in the courts of the United States.

18 U.S.C. § 2334(d).
          Defendant has failed to meet its burden of showing that this heightened standard for dismissal under the ATA has been met. Given the deference owed to plaintiffs' choice of forum; that the locations of the activities alleged are Israel and New York; the defendant's failure to establish that a Jordanian court would be significantly more convenient and appropriate; and the absence of "substantially the same" remedy in a Jordanian court, dismissal on *forum non conveniens* grounds is denied.