James P. Bonner (JB0629)
Shalov Stone Bonner & Rocco LLP
485 Seventh Avenue, Suite 1000
New York, New York 10018
(212) 239-4340

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

PHILIP LITLE, ET AL

                                  Plaintiffs,

           -against-

ARAB BANK, PLC,

                              Defendant.

------------------------------------------------------------x

**Case No.: CV 04-5449 (NG)(VVP)**

**[CORRECTED]**[1]
**SECOND AMENDED COMPLAINT**

Plaintiffs Philip Litle, Philip Litle for the Estate of Abigail Litle, Elishua Litle, Hannah Litle, Heidi Litle, Josiah Litle, Noah Litle ("Litle Plaintiffs"); Natan Applebaum for the Estate of David Applebaum, Debra Applebaum, The Estate of Jacqueline Applebaum, Natan Applebaum, Natan Applebaum for the Estate of Naava Applebaum, Shira Applebaum, Yitzchak Applebaum, Shayna Applebaum, Tovi Belle Applebaum, Geela Applebaum Gordon ("Applebaum Plaintiffs"); Billy Baxter, Catherine Baxter, Fran Strauss Baxter, Jack Baxter ("Baxter Plaintiffs"); Chaya Tziporah Cohen ("Cohen Plaintiff"); Deborah Fenichel, Ilanit Fenichel, Netanel Fenichel, Moshe Fenichel ("Fenichel Plaintiffs"); Faye Chana Benjaminson, The Estate of Moshe Gottlieb, Seymour Gottlieb, Sheila Gottlieb ("Gottlieb Plaintiffs"); The Estate of John Linde, Jr., Courtney Linde ("Linde Plaintiffs"); The Estate of Foruk Naimi, Moshe Naimi ("Naimi Plaintiffs"); Naphtali Nevies, Rebecca Nevies ("Nevies Plaintiffs"); Barbara Psaroudis, Mary Lazin, Agnes Parsons, John W. Parsons, The

---

[1] Modified per Magistrate Judge Viktor V. Pohorelsky's March 22, 2007 Opinion and Order.

Estate of Mark Parsons,  Catherine Tyokody ("Parsons Plaintiffs"); Ariela Freirmark, Menachem Freirmark, Hadassah Freirmark, ("Freirmark Plaintiffs"); Ari Horovitz, Batsheva Horovitz, David Horovitz, Bernice Wolf for the Estate of Debra Ruth Horovitz, Bernice Wolf for the Estate of Eli Natan Horovitz, Leah Horovitz, Moshe Horovitz, Nechama Horovitz, Shulamite Horovitz, Tovi Horovitz, Tvi Horovitz, Uri Horovitz, Bernice Wolf, Brian Wolf, Stanley Wolf ("Horovitz Plaintiffs"); Dov Klieman, The Estate of Esther Klieman by its Administrator Aaron Kesner, Gavriel Klieman, Nachman Klieman, Ruanne Klieman, Yosef Klieman ("Klieman Plaintiffs"); Deborah Margalit, Natan Margalit, Evyatar Margalit ("Margalit Plaintiffs"); Phyllis Pam, Rivka Reena Pam ("Pam Plaintiffs"); Rachel Potolski, Ovadia Topporowitch, Tehila Topporowitch, Yisrael Topporowitch, Yitzchak Topporowitch ("Nathenson Plaintiffs"); Miriam Ehrenfeld, Joseph Rose, Leibel Reinitz, Malvia Reinitz, Margali Reinitz, Mendy Reinitz, Miriam Reinitz, Rivka Reinitz, Samuel Reinitz, Shmuel Reinitz, Yakov Reinitz, The Estate of Yissocher Dov Reinitz, Yitzchok Reinitz, Raizel Shimon Leah Tauber, Helen Weider ("Reinitz Plaintiffs"); Avrohom D. Richter, Breina Richter, Miriam Leah Richter, Moshe Richter, Nechama Richter, Sara Malka Richter, Shlomo Chaim Richter, Tranne Richter, Yakov Yosef Richter, Yechiel Richter, Yehudis Richter, Yisroel Richter, Yitzchok Richter ("Richter Plaintiffs"); Erik Schecter ("Schecter Plaintiff"); Shlomo Tratner, The Estate of Tiferet Tratner ("Tratner Plaintiffs"); Perl Brailofsky, Yosef Brailofsky, Malky Breuer, Ester Buxbaum, Gittel Cohen, Chaya Freisel, Rachel Rosner, Elizabeth Schwartz, Jacob Schwartz, Max Schwartz, Michael Schwartz, Phillip Schwartz, Abraham Zarkowsky, Aron Zarkowsky, Bshava Zarkowsky, Mendel Zarkowsky for the Estate of Eli Zarkowsky, Ezriel Zarkowsky, Gittel Zarkowsky, Mendel Zarkowsky for the Estate of Goldie Zarkowsky, Joseph Zarkowsky, Mendel Zarkowsky, Miriam Zarkowsky, Shrage Zarkowsky, Trany Zarkowsky, Yehuda Zarkowsky ("Zarkowsky Plaintiffs"); Shoshana Tita, Ezra Tita, and Ephraim Tita, Individually and for the Estate of Bertin Tita ("Tita Plaintiffs"); Norman

Blaustein, Samuel Berg, the Estate of Sara Blaustein, Adena Mark, Jonathan Berg, Atara Blaustein, Rebecca Unterberg, David Unterberg, Tema Furmansky   ("Blaustein Plaintiffs"); Bernard Remez ("Remez Plaintiff", Andrew Feibusch ("Feibusch Plaintiff"), Nethaniel Bluth ("Bluth Plaintiff"), Averham Grossman ("Grossman Plaintiff"), Michael Spitz ("Spitz Plaintiff"), Meshulam Ben Meir ("Ben Meir Plaintiff"), Elitzur Lilintal ("Lilintal Plaintiff"), Jacob Rand, Dalit Comet-Murciano Rand ("Rand Plaintiffs"), Joseph Leifer and Devorah Chechanow Leifer ("Leifer Plaintiffs"), Obadiah Waxler, Chana Waxler, Arthur Waxler, Dina Waxler, Ezekial Waxler, Abraham Waxler, Haggi Waxler, Nachum Waxler, Yoel Waxler, Zacharia Waxler, Gedalia Waxler, Baruch Waxler, Yaakov Waxler, Chaya Rosenberg, Bracha Milstein, and Shifra Miller ("Waxler Plaintiffs), and each of them, by their attorneys, respectfully submit this Corrected Second Amended Complaint to the Honorable Court and allege the following upon information and belief:

## NATURE OF THE ACTION

1.      This is a civil action for damages brought pursuant to 18 USC § 2333 against the Arab Bank, PLC ("Arab Bank") – a Jordanian bank headquartered in Amman, Jordan with a federally licensed and regulated branch office in the State of New York.  Arab Bank  knowingly and willfully provided, distributed, and administered the distribution of financial benefits, money and financial services as rewards and incentives to (a) terrorists who have killed, injured and maimed United States nationals, or attempted to do so, (b) the families and beneficiaries of such terrorists, and (c) Foreign Terrorist Organizations as part of a scheme, plan and design to encourage, aid, assist, incentivize, reward and facilitate acts of international terrorism as defined by 18 U.S.C. § 2331.

2.      Arab Bank knowingly provided material support and substantial assistance during the Second Intifada to terrorist organizations which were responsible for killing or injuring Plaintiffs in scores of international terror attacks. Arab Bank also knowingly and intentionally joined a conspiracy

to provide material support to unlawful terror organizations which were responsible for killing or injuring Plaintiffs by reason of international terrorism. Arab Bank is therefore liable to Plaintiffs for the damages that Plaintiffs have suffered.

3.      Plaintiffs are all United States nationals or family members of such nationals who have been injured, maimed, harmed or killed by reason of international terrorism, as defined by 18 U.S.C. § 2331.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332(a)(2), and 18 U.S.C. §§ 2333 and 2334, as a civil action brought by nationals of the United States, their estates, survivors, and heirs who have been killed or injured by reason of acts of international terrorism. This Court also has subject matter jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2). The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5.      Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. § 1391(d). Additionally, as alleged below, several Plaintiffs reside in this District.

6.      Arab Bank is subject to personal jurisdiction in the State of New York pursuant to N.Y. CLPR § 301 because, among other things, it continuously and systematically does business in the State of New York. Arab Bank also is subject to personal jurisdiction in the State of New York pursuant to N.Y. CPLR § 302 because, based on the facts alleged herein and upon information and belief, Arab Bank (a) transacts business within the State of New York; (b) contracts to supply goods and services in the State of New York; (c) has committed tortious acts within the State of New York and (d) has committed tortious acts outside the State of New York causing injury within the State of New York and (i) derives substantial revenue from goods used or consumed in the State of New York or (ii)

expected or should reasonably have expected such acts to have consequences in the State of New York and derived substantial revenue from international commerce.  Arab Bank also is subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a).

## THE PARTIES

A.    **The Plaintiffs**

**The Litle Family (1)**

7.    Abigail Litle was a citizen of the United States.  She was, at the time of her murder, living with her parents and family in Haifa, Israel when she was killed in the terrorist bombing of Bus No. 37 in Haifa, Israel on March 5, 2003.  HAMAS, a designated Foreign Terrorist Organization, claimed responsibility for the bombing, which was committed by HAMAS terrorist, Mohamad Al Kawasmi.  This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

8.    A Baptist activist in Arab-Jewish co-existence projects and an eighth-grade student majoring in biology and environmental studies, Abigail was riding the bus on her way home from school when a suicide bomber detonated a bomb filled with metal shrapnel killing 17 people, including Abigail, and wounding 53 other persons.  The terrorist left behind a note praising the September 11, 2001 attacks on the World Trade Center in New York City.

9.    Philip and Heidi Litle are nationals of the United States and presently reside in the City of Haifa in the State of Israel pursuant to their work with the Baptist ministry.  They are the mother and father of Abigail Litle.

10.    Mr. and Mrs. Litle first learned of the bus bombing when a family friend called their house to ask if their five children were all right.  Mr. and Mrs. Litle turned on the television to view news reports of the terrorist attack.  The reports initially provided misinformation regarding the

location of the attack and in which direction the bus had been traveling.   The Litles accordingly believed all of their children were okay, but as further news reports and photographs came in, they became increasingly alarmed.

11.     By looking at photographs of the charred remains of the bus, the Litles could recognize its location and realized that it had been traveling in a different direction than they previously thought. All of the Litles' children other than Abigail were either at home or their location had otherwise been accounted for.

12.     The mobile phone network was down and Mr. and Mrs. Litle were unsure if Abigail had a mobile phone with her, so they clung to the belief that she could be alive, but fearing that she might be dead.  Abigail's friends began calling her house to see if she was all right, and Mr. and Mrs. Litle began to realize that most of Abigail's friends had been accounted for.  However, Mr. and Mrs. Litle had still heard nothing from their daughter when Mr. Litle saw a picture of the destroyed remains of Bus. No. 37, with a blue coat that he believed to be Abigail's draped across one of the seats.

13.     Mr. and Mrs. Litle called the three major hospitals in the area. The first two hospitals had no matching description.  Mr. and Mrs. Litle were unable to get through to the third so their pastor went to the hospital to search for Abigail among the victims.  Mr. and Mrs. Litle finally got through to the hospital and were told they could come look for their daughter.  When they neared the hospital entrance, Mr. and Mrs. Litle received a telephone call from the hospital telling them to come immediately.

14.     Mr. and Mrs. Litle located the hallway within the hospital designated as the meeting point for those attempting to locate loved ones injured or killed in the attack.  The Litles' pastor was waiting and told them the dreaded news that he had personally seen Abigail and she was dead.  Mr. and Mrs. Litle waited to identify their daughter in the morgue for the Israeli police.

15.     Both the death of their beloved daughter and watching the various newscasts about the terrorist attack that displayed the bus' charred remains have caused Mr. and Mrs. Litle severe mental anguish, pain and suffering and extreme emotional distress.

16.     The Litles' other children waited at their home with a family friend for their parents to return.

17.     Elishua Litle is a citizen of the United States and currently resides in Israel with his parents and family. He is the 12-year-old brother of Abigail Litle.

18.     While his parents went to the hospital, he waited at his family's home with his siblings, other than Abigail, and a family friend, anxiously awaiting his parents' return.

19.     Elishua found out about his sister's death when his parents returned with the family pastor, a social worker, and a family friend who was also a psychologist.

20.     The murder of his sister Abigail has caused Elishua severe mental anguish, pain and suffering and extreme emotional distress over the loss of his sister.

21.     Hannah Litle is a citizen of the United States and currently resides in Israel with her family. She is the 13-year-old sister of Abigail Litle.

22.     While her parents went to the hospital, Hannah waited at her family's home with her siblings, other than Abigail, and a family friend, anxiously awaiting her parents' return.

23.     She found out about her sister's death when her parents returned with the family pastor, a social worker, and a family friend who was also a psychologist.

24.     The murder of her sister Abigail has caused Hannah severe mental anguish, pain and suffering and extreme emotional distress over the loss of her sister.

25.     Josiah Litle is a citizen of the United States and currently resides in Israel with his family.  He is the brother of Abigail Litle.

26.     While his parents were at the hospital, Josiah waited at his family's home with his siblings, other than Abigail, and a family friend, anxiously awaiting his parents' return.

27.     He found out about his sister's death when his parents returned with the family pastor, a social worker, and a family friend who was also a psychologist.

28.     The murder of his sister Abigail has caused Josiah severe mental anguish, pain and suffering and extreme emotional distress over the loss of his sister.

29.     Noah Litle is a citizen of the United States and currently resides in Israel with his family.  He is the brother of Abigail Litle.

30.     While his parents went to the hospital, Noah waited at his family's home with his siblings, other than Abigail, and a family friend, anxiously awaiting his parents' return.

31.     He found out about his sister's death when his parents returned with the family pastor, a social worker, and a family friend who was also a psychologist.

32.     The murder of his sister Abigail has caused Noah severe mental anguish, pain and suffering and extreme emotional distress over the loss of his sister.

### The Applebaum Family (2)

33.     Dr. David Applebaum and his daughter Naava Applebaum were both citizens of the United States. Dr. Applebaum and Naava , were both murdered in the terrorist bombing of Café Hillel in Jerusalem, Israel on September 9, 2003.  HAMAS has claimed responsibility for the bombing, which was committed by HAMAS terrorist Ramez Slmi Abu-Salem. This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

34.     Dr. Applebaum was born and educated in the United States.  At the time of his death, he was the director of the Shaarei Zedek Hospital Emergency Room located in Jerusalem, Israel.  He

supervised the Mobile Intensive Care Units of Magen David Adom (Jerusalem). Magen David Adom, which in Hebrew means the Red Star of David, is the Israeli organization that is the equivalent of the American Red Cross. Magen David Adom is an Israeli relief, medical and humanitarian organization that works in cooperation with the International Red Cross. Dr. Applebaum directed the Terem Clinics, whose Jerusalem pre-hospital urgent care facility sees over 90,000 patients a year. He had personally assisted many injured victims of terrorism in Israel, and removed the remains of many victims of terrorism who had been murdered in Israel. On the night of his own death, one night before the planned marriage of his daughter, Naava, he and Naava had gone together to Café Hillel in Jerusalem.

35.     Dr. Applebaum and Naava were arriving at the café when the HAMAS suicide bomber entered the restaurant and detonated a bomb, brutally and intentionally murdering both Dr. David Applebaum and his daughter, Naava, along with 5 other people.

36.     Debra Applebaum is a national of the United States and presently resides in Israel. She is the wife of David Applebaum and the mother of Naava Applebaum.

37.     Upon hearing of the bombing, Mrs. Applebaum immediately began attempting to contact her husband on his cell phone, and by calling his pager, knowing that Dr. Applebaum and Naava were headed to Café Hillel in order to make a quick stop there to pick up some food for the family members who were at home working on the next evenings wedding preparations. When Dr. Applebaum did not answer his cell phone, nor his pager, nor make some kind of contact with the family as he would do after every terrorist attack (he was often one of the first medical personnel in Israel to be contacted by the authorities in the event of a terrorist attack), two of the Applebaum children, Shira and Yitchak, ran to the scene of the attack to find their father and sister. Mrs. Applebaum then went to Shaarei Zedek hospital, as she had received news from eyewitnesses that they

had seen Naava placed on a stretcher.  Debra Applebaum has suffered irreparable and irreplaceable loss over the terrorist murder of her husband and daughter.  It is inconceivable to her that her husband and daughter, on the eve of her wedding, could have been murdered at the local Jerusalem coffee shop, Café Hillel.  It is beyond comprehension that a father and daughter, on the eve of her wedding, could have gone out for a quiet moment together in preparation for the daughter's wedding, and that instead of joy over the upcoming wedding, the family suffered the tragic death and loss of these beautiful people.  Instead of a wedding, they attended a funeral and mourned their loss, sitting shiva in accordance with traditional Jewish customs and law.  Debra Applebaum has suffered, and continues to suffer, severe mental anguish, pain and suffering and extreme emotional distress over the loss of her husband and daughter, loss of consortium and loss of income, all to her damage.

38.     Jacqueline Applebaum was a citizen of the United States who lived in Israel.  She was the mother of David Applebaum.  She was anxiously and excitedly awaiting the wedding of her granddaughter, Naava.  Instead of a wedding, she attended their funeral and mourned their loss until her own passing.

39.     Upon hearing of the murder of her son and granddaughter, Jacqueline Applebaum suffered severe mental anguish, pain and suffering and extreme emotional distress, all to her damage.

40.     Recently Jacqueline Applebaum passed away.  Her estate is a plaintiff in this action.

41.     Natan Applebaum is a citizen of the United States and currently resides in England.  He is the son of David Applebaum and the brother of Naava Applebaum.  At the time of their murder he was residing with his family in Jerusalem, and was anxiously and excitedly awaiting the wedding the following evening of his sister, Naava.  Instead of a wedding, he attended their funeral, and mourns their loss.

42.     The murder of his father, David, and sister, Naava, has caused Natan severe mental anguish, pain and suffering and extreme emotional distress as a result of said losses, all to his damage.

43.     Shira Applebaum is a citizen of the United States and currently resides in Israel.  She is the son of David Applebaum and the brother of Naava Applebaum.  At the time of their murder she was residing with her family in Jerusalem, and was anxiously and excitedly awaiting the wedding the following evening of her sister, Naava.  Instead of a wedding, she attended their funeral, and mourns their loss.

44.     The murder of her father, David, and sister, Naava, has caused Shira severe mental anguish, pain and suffering and extreme emotional distress as a result of said losses, all to her damage.

45.     Yitzchak Applebaum is a citizen of the United States and currently resides in Israel. He is the son of David Applebaum and the brother of Naava Applebaum.  At the time of their murder he was residing with his family in Jerusalem, and was anxiously and excitedly awaiting the wedding the following evening of his sister, Naava.  Instead of a wedding, he attended their funeral and mourns their loss.

46.     The murder of his father, David, and sister, Naava, has caused Yitzchak severe mental anguish, pain and suffering and extreme emotional distress as a result of said losses, all to his damage.

47.     Shayna Applebaum is a citizen of the United States and currently resides in Israel. She is the daughter of David Applebaum and the sister of Naava Applebaum.  At the time of their murder, she was residing with her family in Jerusalem, and was anxiously and excitedly awaiting the wedding the following evening of her sister, Naava.  Instead of a wedding, she attended their funeral, and mourns their loss.

48.     The murder of her father, David, and sister, Naava, has caused Shayna severe mental anguish, pain and suffering and extreme emotional distress as a result of said losses, all to her damage.

49.     Tovi Belle Applebaum is a citizen of the United States and currently resides in Israel. She is the daughter of David Applebaum and the sister of Naava Applebaum.  At the time of their murder, she was residing in Jerusalem with her family.  Instead of a wedding, she attended their funeral., and mourns their loss.

50.     The murder of her father, David, and sister, Naava, has caused Tovi Belle severe mental anguish, pain and suffering and extreme emotional distress as a result of said losses, all to her damage.

51.     Geela Applebaum Gordon is a citizen of the United States and resides in Israel.  She is the sister of David Applebaum.  At the time of their murder, she was in Israel awaiting the wedding of her niece.  Instead of a wedding, she attended their funeral, and mourns their loss.

52.     The murder of her brother, David, and niece, Naava, has caused Geela severe mental anguish, pain and suffering and extreme emotional distress as a result of said losses, all to her damage.

**The Baxter Family (3)**

53.     Jack Baxter is a United States national and a resident of the State of New York.

54.     Jack, an American film producer, was seriously injured by a suicide bomber while at Mike's Place, a music club in Tel Aviv, Israel, on April 30, 2003.  HAMAS claimed responsibility for the bombing. Two HAMAS terrorists traveled from the United Kingdom and carried out the attack: Assef Mohammed Hanif and Omar Sharif.  One of the terrorists detonated a bomb inside the club.  The other terrorist's bomb malfunctioned and did not detonate.   He later drowned in the sea while attempting to escape.  The nightclub is located next door to the US Embassy to Israel and is frequented by many tourists and US Embassy personnel. This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

55.     Jack Baxter was on the front patio of Mike's Place at around 1:00 a.m. The bar was near capacity when a suicide bomber detonated his explosives at the entrance of the club, killing 3 people and wounding more than 50 (fifty), including Jack, who was just a few steps from the blast.

56.     Jack Baxter was knocked into a coma and clung to life for three days at Ichilov Hospital in Tel Aviv.  Film footage depicts the terrible carnage and reflects the impact of this terror attack at Mike' Place.  The film is called *Blues by the Beach*.  .

57.     As a result of the terror attack, Mr. Baxter is still suffering from a brain contusion, hearing loss, and burns that have peeled away skin from his face and arms.  Mr. Baxter is also partially paralyzed.  Jack Baxter has suffered immense pain, suffering, mental anguish, extreme emotional distress, permanent disabling injuries, medical expenses, life's expenses, loss of income, loss of consortium and irreparable disruption to his life, work and family life, all to his damage.

58.     Fran Strauss Baxter is a citizen of the United States and a resident of the State of New York.  She is the wife of Jack Baxter.

59.     Fran Strauss Baxter tried to fly to Israel to see him but was stopped by Israel's general work strike and other problems.  She suffered terribly upon learning of the attack upon her husband, and her inability to be at her husband's side while he was in a coma, clinging to life.  She arrived two days after the attack, on a flight organized and paid for by the Israeli Embassy, just as Jack left the intensive care unit.

60.     The attack against her husband, Jack. has caused Fran severe mental anguish, pain and suffering and extreme emotional distress, as well as irreparable disruption to her family life, relations with her husband, loss of consortium, loss of income and resultant damages, all to her damage.

61.     Billy Baxter is a citizen of the United States and a resident of the State of New York. He is the father of Jack Baxter.

62.     The attack against Jack has caused Billy severe mental anguish, pain and suffering and extreme emotional distress, all to his damage.

63.     Catharine Baxter is a citizen of the United States and a resident of the State of New York.  She is the mother of Jack Baxter.

64.     The attack against Jack has caused Catharine severe mental anguish, pain and suffering and extreme emotional distress, all to her damage.

65.     Barbara Psaroudis is a citizen of the United States and a resident of the state of New Jersey.  She is the sister of Jack Baxter.

66.     The attack against her brother Jack has caused Barbara severe mental anguish, pain and suffering and extreme emotional distress, all to her damage.

**Chaya Tziporah Cohen (4)**

67.     Chaya Tziporah ("Tzippy") Cohen is a citizen of the United States and a resident of Brooklyn, New York.

68.     Tzippy was seriously injured along with 50 others on September 9, 2003 when a Palestinian suicide bomber entered the Café Hillel in Jerusalem, Israel and detonated his explosives. Tzippy was in Israel for a 2 ½ week vacation.  Seven people were killed in the terror attack, including Dr. David Applebaum and his daughter, Naava Applebaum.  HAMAS claimed responsibility for the terror attack, which was carried out by HAMAS terrorist Ramez Slmi Abu-Salem.  This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

69.     Tzippy was struck with shrapnel in the back from the bomb and was hospitalized for several days.  She saw and heard horrible things as she ran from the blown up cafe with her friends.

She has suffered pain, scars and severe emotional distress and mental anguish as a result of this terror attack, all to her damage.

### The Fenichel Family (5)

70.     Plaintiff Netanel Fenichel is an eighteen (18) year old citizen of the United States. He is a resident of the Israeli city of Efrat.

71.     Plaintiff Ilanit Fenichel, Netanel's twin sister, is also a United States citizen and a resident of the Israeli city of Efrat.

72.     Netanel and Ilanit were seated in their parents' automobile on March 31, 2002 while their mother was driving past the local supermarket and medical center when a suicide bomber detonated his explosives.   This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

73.     Shrapnel from the blast pierced the roof of the Fenichels' family car and fractured the top of Netanel's skull, seriously injuring him and horrifying his mother and sister.   Netanel was rushed to the nearby medical center and was quickly operated on at Hadassah Hospital in Jerusalem.   He has a permanent hole in the top of his skull.   As a result of the attack, Netanel and Ilanit Fenichel, and their family, have each suffered severe physical pain,  mental anguish and extreme emotional distress, all to their damage.

74.     The Al Aqsa Martyrs Brigade (AAMB), a terrorist organization that is the armed wing of the Fatah terrorist organization, operating within the Palestinian territories, claimed responsibility for the terror attack, which wounded five people, including four paramedics from the nearby medical center.   The suicide bomber was Jamil Khalaf Hamied.

75.     Ilanit has been psychologically traumatized by the terror attack.   For more than one week following the attack, she would not leave her parents' house.   The sound of emergency vehicles

or news about additional recent terrorist attacks trigger Ilanit's recurring anxiety attacks. As a result of the attack that injured her brother, Ilanit Fenichel has suffered severe mental anguish, pain and suffering and extreme emotional distress, all to her damage.

76.     Plaintiff Moshe Fenichel is a citizen of the United States and a resident of the Israeli city of Efrat. He is the father of Netanel and Ilanit Fenichel.

77.     As a result of the attack that seriously injured his son and daughter, he has suffered severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

78.     Plaintiff Deborah Fenichel is a citizen of the United States and a resident of the Israeli city of Efrat. She is the mother of Netanel and Ilanit Fenichel and the wife of Moshe Fenichel.

79.     Deborah was driving her car with her two children in the vehicle when the suicide bomber detonated his explosive charge and the shrapnel seriously injured her son. She spent eight (8) hours in clothing soaked with her son's blood, unaware of his prognosis. She has provided care to her son during his continued recovery from his injuries. As a result of the attack that seriously injured her son and daughter, Deborah Fenichel has suffered severe mental anguish, trauma and extreme emotional distress, all to her damage.

**The Gottlieb Family (6)**

80.     Moshe Gottlieb was a United States national who was residing in Israel on June 18, 2002, when he was murdered by a Palestinian terrorist. HAMAS was responsible for this terror attack, which was carried out by HAMAS terrorist Mohammed Haza'Kaied al-Ghoul.

81.     Dr. Gottlieb was killed on June 18, 2002, when the suicide bomber boarded Egged Bus No. 32A at 7:50 a.m. near Gilo, Israel and detonated a large bomb which was carried in a bag stuffed with ball bearings. Nineteen people were killed (from age 11 to 72) and 74 were injured in this terror attack. The attack completely destroyed the crowded bus carrying many young students to school and

others to work. This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

82.     Dr. Gottlieb boarded the bus en route to Bnei Brak, located within the State of Israel, where he was due to work with a group of children with Down's Syndrome.  For years, Dr. Gottlieb had been treating these children for free once a week.

83.     Sheila Gottlieb is a citizen of the United States and is the wife of Dr. Gottlieb.  The murder of her husband has caused her severe mental anguish, pain and suffering, loss of consortium and extreme emotional distress, all to her damage.

84.     Seymour Gottlieb is a citizen of the United States and is the son of Dr. Gottlieb.  The death of his father has caused him severe mental anguish, pain and suffering and extreme emotional distress, all to his damage.

85.     Faye Chana Benjaminson is a citizen of the Untied States and is the daughter of Dr. Gottlieb.  The death of her father has caused her severe mental anguish, pain and suffering and extreme emotional distress, all to her damage.

### The Linde Family (7)

86.     John Linde, Jr. was a United States citizen and resident of the State of Texas.

87.     John Linde, Jr. was a third generation United States Marine and parachute jumpmaster. John left the Marine Corps after eight and a half years of active duty and two years of duty as a full time reservist to join the Virginia-based private security firm DynCorp in order to earn more money to support his young wife, Courtney, who had recently been diagnosed with bone cancer.  John and two other DynCorp employees were part of a security detail escorting U.S. diplomats on their way to interview Palestinian applicants for Fulbright scholarships when the vehicle he was in was blown up

by a remote-controlled bomb near the Beit Hanoun junction in Northern Gaza, in Palestinian territory, on October 15, 2003. He was 30 years old at the time of his death.

88.     The attack that murdered John Linde, Jr., Mark Parsons and another young American was an act of international terrorism within the scope of the scheme and conspiracy of which Arab Bank was part, as alleged in detail below. While the identities of the particular terrorists who carried out this terrorist attack pursuant to the conspiracy in which Arab Bank participated are currently known only to Arab Bank's co-conspirators, the attack is believed to have been committed by HAMAS, PIJ, AAMB, the Popular Resistance Committees, Hezbollah or some combination of those terrorist organizations. Defendant Arab Bank provided financial services, directly or indirectly, to some or all of those terrorist organizations. The Popular Resistance Committees is an alliance of various armed terrorists that has actively pursued terrorist attacks during the Second Intifada, primarily in Gaza. It consists mainly of terrorists belonging to Fatah and dissident members of the PA security forces. It was led by Abu Samhadaneh at the time of the terror attack on the American diplomatic convoy.

89.     Courtney Linde is a citizen of the United States and resident of the State of Texas. She is the widow of John Linde, Jr. She is the legal representative of the Estate of John Linde, Jr. and brings this action individually, and on behalf of the Estate of John Linde, Jr., which is a Plaintiff in this action.

90.     Courtney was diagnosed with bone cancer on July 10, 2002, less than two weeks before she and John Linde, Jr. planned to be married. They were married on July 22, 2002.

91.     Courtney was notified of her husband's death when she received a phone call from DynCorp at 4:00 a.m. local time on October 15, 2003.

92.     The murder of her husband has caused Courtney to suffer severe mental anguish, pain and suffering, trauma, loss of consortium, loss of income, other economic damages and extreme emotional distress, all to her damage.

**The Naimi Family (8)**

93.     Foruk Naimi was a citizen of Israel when she was murdered in Israel on March 27, 2002 while celebrating the Passover Seder.

94.     Foruk was killed when a Palestinian suicide bomber entered the Park Hotel in Netanya, Israel and detonated a bomb in the midst of the Passover holiday Seder.   HAMAS claimed responsibility for this suicide bombing of a religious event which killed 30 people and wounded more than 100. This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

95.     The homicide bomber and HAMAS terrorist who committed this atrocity was Abdel Bassat Qassem Odeh.   Odeh was assisted with the planning and execution of the terror attack by others, including, but not limited to, Abbas al-Sayed, from Tulkarem.   In 2005, Abbas al-Sayed was found guilty by a District Court in Tel Aviv, Israel of overseeing the Park Hotel attack.

96.     Plaintiff Moshe Naimi is a citizen of the United States and resides in New Jersey.   He is the son of Foruk.   The death of his mother has caused him severe mental anguish, pain and suffering, trauma and extreme emotional distress, all to his damage.

**The Nevies Family (9)**

97.     Rebecca Nevies is a thirty six (36) year old citizen of the United States and of the State of Israel.   She resides in Israel.

98.     Rebecca was riding the No. 14 bus in Jerusalem on Sunday, February 22, 2004 when a suicide bomber detonated his explosives, murdering eight (8) people and wounding more than sixty

(60) others, including Rebecca. This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

99.    Rebecca suffered a shrapnel injury to her foot, hearing loss, and cuts and burns to her legs and face. She suffered serious physical injuries as a result of the terror attack. Rebecca also suffers from severe mental anguish, pain and suffering, trauma, loss of consortium and extreme emotional distress which was intensified by the horrific scene she witnessed in the aftermath of the explosion, all to her damage. She is the mother of four children.

100.    Al Aqsa Martyrs Brigade claimed responsibility for the terror attack, which was committed by AAMB terrorist Mouhammad Issa Khalil Za'oul.

101.    Naphtali Nevies is a citizen of Great Britain and a citizen of the State of Israel. He is a resident of Israel. Naphtali Nevies is the husband of Rebecca Nevies.

102.    As a result of the attack, and as the father of four small children, , Naphtali Nevies has suffered severe mental anguish, trauma, loss of consortium and extreme emotional distress, all to his damage.

### The Parsons Family (10)

103.    Mark Parsons was a United States national and a resident of the State of Colorado. He was 31 years old at the time of his death.

104.    On October 15, 2003, Mark Parsons and two other DynCorp employees, including John Linde, Jr., were part of a security detail escorting U.S. diplomats on their way to interview Palestinian applicants for Fulbright scholarships when the vehicle he was in was blown up by a remote controlled bomb near the Beit Hanoun junction in northern Gaza.

105.    The attack that murdered Mark Parsons, John Linde, Jr. and another young American was an act of international terrorism within the scope of the scheme and conspiracy of which Arab

Bank was a part as alleged in detail below.  The particular terrorists who carried out this terrorist attack pursuant to the conspiracy in which Arab Bank participated are currently known only to Arab Bank's co-conspirators, the attacks was committed by HAMAS, PIJ, AAMB, the Popular Resistance Committees, Hezbollah or some combination of those terrorist organizations.  Defendant Arab Bank provided financial services, directly or indirectly, to some or all of those terrorist organizations.

106.    John W. Parsons and Agnes Parsons are citizens of the United States and residents of the State of New Jersey.  They are the parents of Mark Parsons.  The murder of their son has caused John W. and Agnes Parsons severe mental anguish, pain and suffering, trauma and extreme emotional distress, all to their damage.

107.    Recently John W. Parson passed away.  His estate is a plaintiff in this action.

108.    Mary Lazin is a citizen of the United States and a citizen of the State of New York.  She is the sister of Mark Parsons.

109.    The murder of her brother Mark has caused Mary severe mental anguish, pain and suffering, trauma and extreme emotional distress, all to her damage.

110.    Catherine Tyukody is a citizen of the United States and a citizen of the State of New Jersey.  She is the sister of Mark Parsons.

111.    The murder of her brother Mark has caused Catherine severe mental anguish, pain and suffering, trauma and extreme emotional distress, all to her damage.

**The Freirmark Family (11)**

112.    Ariela Freirmark and her parents are United States nationals.  They currently reside in the State of Israel.

113.    On June 11, 2003, Ariela Freirmark was on Bus 14A in Jerusalem, Israel on her way to a course in sign language.  Ariela is a speech therapist who works with handicapped children and she

had left home to take the bus to attend the course.  At the time, Ariela was 26 years old.  She is the daughter of Menachem and Hadassah Freirmark.  The Freirmark family grew up in Detroit, Michigan and have resided in  Israel since approximately 1982 when Ariela was 4 years old.  Around 5:30 p.m., an individual dressed as an ultra-orthodox religious Jewish person boarded Egged Bus No. 14A at the Mahane Yehuda Market, and a short while later, as the bus drove down Jaffa Road, in Jerusalem, within the State of Israel, he detonated his bomb wrecking the bus and killing sixteen passengers.  Over 100 people were wounded, including dozens of nearby pedestrians.   HAMAS claimed responsibility for the bombing.  The suicide bomber who committed this brutal attack on behalf of HAMAS was Abed Al Mo'ti Mohammad Shabana.  The terrorist was carrying a huge bomb containing a great deal of metal fragments, creating massive injuries.  This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

114.    Ariela suffered serious physical, personal and emotional injuries, pain, suffering, mental anguish, trauma and damage as a result of the explosion.  The blast caused her to lose consciousness. When she awakened on the bus, she saw scores of people dead and injured lying around her.  She suffered shrapnel wounds and a hearing loss which has required numerous operations and medical attention, as well as the expenditure of significant medical expenses on her behalf.  Her injuries are permanent and ongoing and she has suffered pain, scars and severe emotional distress and mental anguish.  She required surgery to remove the bolts from her body that were contained in the bomber's explosives.

115.    Menachem and Hadassah Freirmark are the parents of Ariela Freirmark. They have suffered severe emotional distress and trauma as a result of their daughter being a victim of this terrorist attack.  They have also incurred medical and life expenses for the reasonable and necessary care of Ariela that was caused by this incident, all to her and their damage.

**The Horovitz Family (12)**

116.    Eli Natan and Debra Ruth Horovitz, husband and wife, were citizens of the United States and were in their apartment on Friday, March 7, 2003 eating Shabbat dinner when terrorists disguised as students infiltrated Kiryat Arba, Israel shooting and killing them both.  The Estates of each are Plaintiffs herein.  HAMAS claimed responsibility for the terror attack.  This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

117.    Moshe and Leah Horovitz are United States nationals who currently reside in Israel. They are the natural parents of Eli Natan Horovitz, and the in-laws of Debra Ruth Horovitz..

118.    They heard about their son's and daughter-in-law's deaths through their granddaughter. Their son's and daughter-in-law's deaths caused them severe mental anguish, pain and suffering, trauma and extreme emotional distress.

119.    Shulamite Horovitz is a citizen of the United States and currently resides in Israel. She is the daughter of Eli Natan and Debra Ruth Horovitz.

120.    Shulamite was the first in her family to hear about her parents' death.

121.    She was visiting friends in Eilat on the day her parents were murdered.  Her parents were scheduled to go to Eilat with her, but, because her mother was not feeling well, they decided to meet Shulamite in Eilat the following day instead.

122.    Shulamite learned of her parents' murders while still in Eilat, but could not reach any of her family members and could not return to Jerusalem to be with her family because of Shabbat.

123.    She returned to Jerusalem and told her family the tragic news.

124.    The family in Israel congregated together at Eli's parents' house and prepared the funeral arrangements.

125.    Her parents' deaths and the pain, mental anguish, trauma and suffering she endured while waiting to be able to return to Jerusalem and be with her family caused Shulamite severe mental anguish, trauma and extreme emotional distress.

126.    Batsheva Horovitz is a citizen of the United States and currently resides in Israel.  She is the daughter of Eli Natan and Debra Ruth Horovitz.

127.    She found out about her parents' deaths through her sister Shulamite.  Her parents' deaths caused her severe mental anguish, trauma and extreme emotional distress.

128.    Nechama Horovitz is a citizen of the United States and currently resides in Israel.  She is the daughter of Eli Natan and Debra Ruth Horovitz.

129.    She found out about her parents' deaths through her sister Shulamite.  Her parents' deaths caused her severe mental anguish, trauma and extreme emotional distress.

130.    Tvi Horovitz is a citizen of the United States and currently resides in Israel. He is the son of Eli Natan and Debra Ruth Horovitz.

131.    He found out about his parents' deaths through his sister Shulamite.  His parents' deaths caused him severe mental anguish, trauma and extreme emotional distress.

132.    Ari Horovitz is a citizen of the United States and currently resides in Israel. He is the brother of Eli Natan Horovitz.

133.    He heard of his brother's and sister-in-law's murders through his family in Israel.  Their deaths caused him severe mental anguish, trauma and extreme emotional distress.

134.    David Horovitz is a citizen of the United States and currently resides in Israel. He is the brother of Eli Natan Horovitz.

135.    He heard of his brother and sister-in-law's murders through his family in Israel.  Their deaths caused him severe mental anguish, trauma and extreme emotional distress.

136.    Tovi Horovitz is a citizen of Florida and Washington and currently resides in Israel. He is the brother of Eli Natan Horovitz.

137.    He heard of his brother's and sister-in-law's murders through his family in Israel. Their deaths caused him severe mental anguish, trauma and extreme emotional distress.

138.    Uri Horovitz is a citizen of the United States and currently resides in Israel. He is the brother of Eli Natan Horovitz.

139.    He heard of his brother's and sister-in-law's murders through his family in Israel. Their deaths caused him severe mental anguish, trauma and extreme emotional distress.

140.    Bernice Wolf is a citizen of the United States and currently resides in Israel. She is the natural mother of Debra Ruth Horovitz.

141.    Mrs. Wolf lived in Florida when her daughter was killed, but had plans to move to Israel to live with her daughter.

142.    Accordingly, she did not hear the news of her daughter's and son-in-law's murders with the rest of the family in Israel, but was alone when she learned of her daughter's murder.

143.    Mrs. Wolf originally learned that a couple in Kiryat Arba was murdered by terrorists when she read about the attack on the Internet on Friday, March 7, 2003.

144.    Because the article she read did not give the names of the victims, Mrs. Wolf had no confirmation that her daughter and son-in-law were the couple murdered in their home, although she was severely distressed by the news and feared that they were the ones killed.

145.    Mrs. Wolf could not reach her daughter and had heard nothing by the next morning.

146.    Mrs. Wolf attended the Saturday morning service at her synagogue.

147.    When she returned, she received a telephone call from her granddaughter in Israel informing her that her daughter and son in law, Debra and Eli, were murdered in the attack.

148.    Mrs. Wolf was devastated upon hearing the news of her daughter's and son-in-law's murders.

149.    Despite her immense personal grief, Mrs. Wolf had just two hours to pack her belongings, pass on the horrible news to her family in the United States and meet with officials from the Israeli Embassy to retrieve her ticket to Israel, so she could attend her daughter's and son-in-law's funeral the next day.

150.    Mrs. Wolf waited frantically in her home for someone to arrive from the Embassy, but nobody came.

151.    Eventually, Mrs. Wolf was forced to buy a ticket to Israel, as she feared she would miss her daughter's and son-in-law's funeral.

152.    She flew by herself to Canada, where she met her son, Stanley, and they completed the remainder of the trip to Israel together.

153.    When they arrived in Israel, they met Mrs. Wolf's other son, Brian Wolf, and the three drove to Jerusalem together.

154.    When they arrived in Jerusalem, the funeral procession had begun five hours before, and they were escorted through a crowd of more than 15,000 people to reach the covered bodies.

155.    Mrs. Wolf is nearly eighty years old and currently resides in Israel.  Because she had planned to live in Israel with her daughter and son-in-law, her future there remains uncertain.

156.    In addition to the fear for her own future, the murders of Eli Natan and Debra Ruth Horovitz have caused Mrs. Wolf severe mental anguish, pain and suffering, trauma and extreme emotional distress, all to her damage.

157.    Stanley Wolf is a citizen of the United States and a citizen of the State of Florida.  He is the brother of Debra Ruth Horovitz.

158.   His mother told him of his beloved sister's death over the telephone.

159.   His sister's and brother-in-law's murders caused him severe mental anguish, trauma and extreme emotional distress, all to his damage.

160.   Brian Wolf is a citizen of the United States and a citizen of the State of Maryland. He is the brother of Debra Ruth Horovitz.

161.   Mrs. Wolf was unable to reach him by telephone, and so he found out about his sister's death through a voice mail Mrs. Wolf left for him on his answering machine.

162.   He then flew to Israel to attend his sister's and brother-in-law's funeral.

163.   Due to his immense grief, Mr. Wolf was unable to stand on his own as he viewed his sister's covered body at her funeral, which lasted more than 13 hours.

164.   His sister's and brother-in-law's murders caused Mr. Wolf severe mental anguish, pain and suffering, trauma and extreme emotional distress, all to his damage.

### The Klieman Family (13)

165.   On March 24, 2002, Esther Klieman, a citizen of the of the United States, age 23, was aboard Egged Bus Route 468 in Israel when she was struck in the heart and killed by bullets fired from a weapon held by terrorists who were positioned on a bridge near the road leading into Jerusalem, Israel. Al Aqsa Martyr's Brigade and the related Fatah group, Force 17, claimed responsibility for the terror attack. This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

166.   A number of terrorists were responsible and have been found guilty for this premeditated murder, including Hussam Abdul-Kader Ahmad Halabi aka Abu Arav, Tamer Rassam Salim Rimawi and Ahmed Hamad Rushdie Hadib aka Ahmed Barghouti. Tamer Rassam Salim Rimawi has been sentenced to life in prison as a result of his murdering of Esther Klieman. He is a

terrorist who was a member of the Al Aqsa Martyrs Brigade. He has admitted to shooting a Kalyshnikov rifle at the bus on which Esther was riding. He received orders from his superiors in the Al Aqsa Martyrs Brigade to perform the operation that murdered Esther Klieman. He was paid monies from the Al Aqsa Martyrs Brigade, the terrorist armed wing of the terrorist organization Fatah, for his services. Prior to murdering Esther Klieman, he had been injured while throwing stones at the Israeli police or defense forces. As a result of his injury, he subsequently received a call from an officer of the Arab Bank in Ramallah, located in the West Bank in Palestinian territory near Israel. He didn't have a bank account at the Arab Bank, but the officer of the Arab Bank told him to come to the Bank, to receive Saudi funds from the Arab Bank as compensation for his injury. He went to the Arab Bank in Ramallah, where the Arab Bank officer gave him a check in the amount of one thousand three hundred dollars ($1300.00) because he had been injured while throwing stones at Israeli police or defense forces. The officer of the Arab Bank had him sign the back of the check, and the officer of the Arab Bank then cashed the check for him, giving him United States dollars. It was commonly known that people who were injured in terrorist operations against Israel, and against people in Israel, would receive money from the Arab Bank, and this terrorist actually received such funds from the defendant Arab Bank, PLC. Said defendant knowingly, actively, willingly and intentionally participated in the creation, planning, designing and execution of a scheme and conspiracy to provide incentives to terrorists and terror organizations, and rewards to them for their terrorist acts, including but not limited to monies in United States dollars ("USD") if the terrorists were killed, injured, captured or imprisoned as a result of the commission, or attempted commission, of terrorists operations against Israel, her citizens, those residing in or near Israel, and those visiting or working in Israel. Defendant Arab Bank, PLC is liable to the Estate of Esther Klieman, and to her parents, brothers and other family members for their irreplaceable loss, for their trauma, their extreme emotional distress, and for the taking of the

precious life of Esther Klieman, as a result of the murder of Esther Klieman which occurred within the scope of the conspiracy, scheme, plan and design in which the Arab Bank knowingly and willingly participated by providing incentives and rewards for the commission of terrorism and of murder and maiming, all to the damage of the Plaintiffs herein, and each of them.

167.    The Estate of Esther Klieman, a Cook County, Illinois estate, is represented in this action by Aaron Kesner, duly appointed by said court as the Administrator of said Estate.

168.    Nachman and Ruanne Klieman are citizens of the United States and Israel and currently reside in Israel.  They are the natural parents of Esther Klieman.

169.    On the morning of March 24, 2002, Nachman drove his daughter Esther to the bus stop and saw her board the 7:00 a.m. Egged civilian bus which would take her to work. By 7:10 a.m., he and his wife Ruanne were driving towards Ben Gurion Airport where she worked. After dropping Ruanne off, Nachman intended to drive to his job at EL AL Israel Airlines when he heard a bulletin on the radio that a shooting attack had been carried out on a vehicle on the road that they were driving on but in the opposite direction.  The news bulletin indicated that a woman had been seriously injured.

170.    Nachman and Ruanne never considered that the vehicle might be the bus on which Esther was riding.  However, they tried to reach a friend who was a member of the emergency response team of their community in order get some information about what happened but were not able to reach him.

171.    As they continued their drive to work, reports on the radio indicated that the vehicle was indeed a civilian bus and that a woman had been seriously injured in the shooting attack.

172.    They both began to feel anxious and afraid for the life of their daughter.

173.    Nachman dropped Ruanne off but remained in the parking lot and began to make phone calls.  A news update indicated that the woman had died. Their three sons, who had also heard the

reports, called Nachman one after the other for information but he told them that he would get back to them.  Upon reaching his friend on the emergency committee, Nachman asked him about the shooting. When he did not respond, Nachman knew that it was his daughter. Nachman remembers crying and shouting at him, and asked him to tell him if it was Esther.  His reply, was a whispered,  "I can't". After hanging up, he sat in the car crying and thinking about how he could tell his wife that their daughter had been murdered.

174.    When Nachman left the car and approached his wife's office he saw her outside moving from her building to another.  From fifty feet she saw his face and instantly knew what had happened. Nachman will never forget her scream.  They held each other as people from the office poured outside after hearing her screaming. Instinctively they moved towards their car in order to be alone.  The phone in the car rang and rang as a trauma team from the community went into action and contacted them.  They intended to send a car to drive Nachman and Ruanne home where they would be attended by a Doctor and a Psychologist.  They refused the ride, and drove home together.  When they arrived home an ambulance was waiting outside and a Doctor, Psychologist, and Social Worker were all present and stood by them as they contacted their three sons who then went to their parent's house. They stood by their parents in the ensuing hours as they made funeral plans and tended to the emotional needs of their family members, who included Ruanne's eighty year old mother, a daughter-in-law and infant granddaughter.  During the funeral procession and interment, the medical team stood by them along with many friends and relatives.

175.    Nachman took an extended vacation from his job with EL AL and was subsequently granted early retirement, as he was physically and emotionally unable to continue his work after his daughter's murder.   He couldn't return to the pressure and long hours, which were a part of his work ethic.   He has spent time trying to accompany his wife and sons through their healing process and to

volunteer in the organization that Esther herself had volunteered for, working with children with limited mental and physical development. Ruanne has also joined Nachman in this endeavor. The murder of Esther Klieman has caused the Kliemans' extreme emotional distress, trauma, pain, suffering and the loss of the love and affection of their beloved daughter, Esther, who was as good as gold, and whose life and love cannot be replaced.

176.    Dov Klieman is a citizen of the United States and Israel and currently resides in Israel. He is the brother of Esther Klieman.

177.    Gavriel Klieman is a citizen of the United States and Israel and currently resides in Israel. He is the brother of Esther Klieman.

178.    Yosef Klieman is a citizen of the United States and Israel and currently resides in Israel. He is the brother of Esther Klieman.

179.    Dov, Gavriel and Yosef all shared special relationships with their sister who they loved and who loved them. Esther always had the patience and time to devote to each one and was able to relate to their different personalities.

180.    The Kliemans have all sought assistance and counseling from social workers as well as group therapy through group forums with other families who were victimized by terrorists. The mental pain and suffering, trauma and extreme emotional distress and anguish each of Esther's siblings and parents continue to experience is immeasurable, all to their damage.

### The Margalit Family (14)

181.    Evyatar Margalit is a citizen of the United States and a resident of the State of Israel.

182.    On June 11, 2002, Evyatar was a 15-year-old teenager attending school in Israel. He was seriously injured when a bomb placed in a field by a terrorist exploded. As a result, Evyatar spent several months in the hospital and suffered through over nine surgical medical operations, treating his

wounds and burns.  The perpetrator of this terrorist attack was an individual sent by Force 17, which is affiliated with the Palestinian Authority's Fatah Organization, a terrorist organization.

183.    Evyatar Margalit has suffered severe physical pain and mental anguish, trauma and extreme emotional distress as a direct result of this terrorist attack, which was within the scope of the scheme and conspiracy, described below, in which Arab Bank actively participated.

184.    Deborah and Natan Margalit are United States nationals who currently reside in Israel. They are the parents of Evyatar Margalit.

185.    As a result of the terrorist attack on their son, they have suffered severe mental anguish, pain and suffering, trauma and extreme emotional distress and have incurred medical expenses for the necessary medical treatment for their son, all to his and their damage.

### The Pam Family (15)

186.    Rivka Pam is a citizen of the United States.

187.    On June 11, 2003, 16-year-old Rivka Pam was on Bus No. 14A in Jerusalem, Israel. Around 5:30 p.m., an individual dressed as an ultra-orthodox Jew boarded Egged Bus No. 14A at the Mahane Yehuda market, and a short while later, as the bus drove down Jaffa Road, within Jerusalem, Israel, he detonated his bomb, wrecking the bus and killing sixteen passengers.   Over 100 people were wounded, including dozens of passersby.  HAMAS claimed responsibility for the bombing.   The suicide bomber who acted for HAMAS to commit this brutal attack was Abed Al Mo'ti Mohammad Shabana.  He carried a huge bomb containing a great deal of metal fragments that caused massive injuries.  This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

188.    Rivka works with children and this teenager's life has changed dramatically as a result of her injuries in this terrorist incident.  She was hospitalized for a number of days in intensive care,

suffered burns, lung damage, eye injury, scarring and severe hearing loss, which requires future medical and surgical care.  Her happy outgoing personality has been affected because of the severe emotional distress and hearing loss, pain, suffering, mental anguish, trauma and extreme emotional distress that she has experienced from this terrorist attack, all to her damage.

189.    Phyllis Pam is a United States citizen and currently resides in the State of Israel. She is the natural mother of Rivka Pam.

190.    Phyllis has suffered severe emotional distress, trauma, pain and anguish as a result of her daughter being seriously injured in this terrorist incident.  She has also incurred medical expenses for the reasonable and necessary care of Rivka that was caused by this incident, all to her damage.

### The Nathansen Family (16)

191.    Tehilla Nathansen was killed and Chana, Matanya, Shoshana and Yehudit Nathansen were injured in the bombing of Bus No. 2 in Jerusalem, Israel on August 19, 2003.  HAMAS claimed responsibility for the bombing.  The HAMAS terrorist who committed the suicide bombing was Ra'ed Abed Al-Hamed. This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

192.    The Estate of Tehilla Nathansen and Chana, Matanya, Shoshana and Yehudit Nathansen individually are listed as plaintiffs in Linde v. Arab Bank, a related action that is pending in the U.S. District Court for the Eastern District of New York, and accordingly their claims are not separately pled herein but are incorporated herein by reference.

193.    Rachel Potolski is a citizen of the United States and Israel and currently resides in Israel.  She is the sister of Chana Nathansen.

194.    The injury to her sister Chana has caused Rachel severe mental anguish, trauma, pain and suffering and emotional distress, all to her damage.

195.     Ovadia Topporowitch is a citizen of the United States and Israel and currently resides in Israel.  She is the sister of Chana Nathansen.

196.     The injury to her sister Chana has caused Ovadia severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

197.     Tehila Topporowitch is a citizen of the United States and Israel and currently resides in Israel.  She is the sister of Chana Nathansen.

198.     The injury to her sister Chana has caused Tehila severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

199.     Yisrael Topporowitch is a citizen of the United States and Israel and currently resides in Israel.  He is the brother of Chana Nathansen.

200.     The injury to his sister Chana has caused Yisrael severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

201.     Yitzchak Topporowitch is a citizen of the United States and Israel and currently resides in Israel.  He is the brother of Chana Nathansen.

202.     The injury to his sister Chana has caused Yitzchak severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

### The Reinitz Family (17)

203.     Mordechai Reinitz and his two sons, Yissocher Dov and Mendy, citizens of the United States, were on bus No. 2 in Jerusalem, Israel on August 19, 2003 when a suicide bomber detonated his weapon and the bus exploded.    HAMAS claimed responsibility for the bombing. The HAMAS terrorist who committed the suicide bombing on the crowded bus was Ra'ed Abed Al-Hamed.  This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

204.     Mordechai and Yissocher Dov were both killed, and their estates are plaintiffs herein, and Mendy Reinitz, who was injured in the bombing, is a plaintiff herein individually on behalf of himself and said estates.

205.     Mendy received shrapnel wounds in the shoulders and back and underwent intensive surgery.  The surgery was successful, but Mendy will still have some shrapnel in his body for the rest of his life.  Mendy is a citizen of the United States and of Israel and currently resides in Israel.

206.     The murder of his father, Mordechai, and brother, Yissocher Dov, has caused Mendy severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

207.     Chaya Reinitz is a legal resident of the United States and currently resides in Israel. She is the wife of Mordechai and the mother of Yissocher Dov and Mendy.

208.     The murder of her husband, Mordechai, and son, Yissocher Dov, has caused Chaya severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

209.     Malvia and Joseph Reinitz are citizens of the United States and currently reside in Israel.  They are the natural parents of Mordechai Reinitz.

210.     The murder of their son, Mordechai, and grandson, Yissocher Dov, has caused Malvia and Joseph severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to their damage.

211.     Nicha Ostreicher is a dual citizen of the United States and Israel and currently resides in Israel.  She is the daughter of Mordechai and the sister of Yissocher Dov and Mendy.

212.     The murder of her father, Mordechai, and brother, Yissocher Dov, and injury to her brother Mendy has caused Nicha severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

213.     Chaim Reinitz is a dual citizen of the United States and Israel and currently resides in Israel. He is the son of Mordechai and the brother is Yissocher Dov and Mendy.

214.     The murder of his father, Mordechai, and brother, Yissocher Dov, and injury to his brother Mendy has caused Chaim severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

215.     Margali Reinitz is a  citizen of the United States and of Israel and currently resides in Israel. She is the daughter of Mordechai and the sister of Yissocher Dov and Mendy.

216.     The murder of her father, Mordechai, and brother, Yissocher Dov, and injury to her brother Mendy has caused Margali severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

217.     Miriam Reinitz is a  citizen of the United States and of Israel and currently resides in Israel. She is the daughter of Mordechai and the sister of Yissocher Dov and Mendy.

218.     The murder of her father, Mordechai, and brother, Yissocher Dov, and the injury to her brother Mendy has caused Miriam severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

219.     Rivka Reinitz is a  citizen of the United States and of Israel and currently resides in Israel. She is the daughter of Mordechai and the sister of Yissocher Dov and Mendy.

220.     The murder of her father, Mordechai, and brother, Yissocher Dov, and injury to her brother Mendy has caused Rivka severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

221.     Shmuel Reinitz is a  citizen of the United States and of Israel and currently resides in Israel. He is the son of Mordechai and the brother of Yissocher and Mendy.

222.    The murder of his father, Mordechai, and brother, Yissocher Dov, and injury to his brother Mendy has caused Shmuel severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

223.    Yakov Reinitz is a  citizen of the United States and of Israel and currently resides in Israel.  He is the son of Mordechai and the brother of Yissocher Dov and Mendy.

224.    The murder of his father, Mordechai, and brother, Yissocher Dov, and injury to his brother Mendy has caused Yakov severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

225.    Yitchok Reinitz is a  citizen of the United States and of Israel and currently resides in Israel.  He is the son of Mordechai and the brother of Yissocher Dov and Mendy.

226.    The murder of his father, Mordechai, and brother, Yissocher Dov, and injury to his brother Mendy, has caused Yitchok severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

227.    Leah Tauber is a  citizen of the United States and of Israel and currently resides in Israel.  She is the daughter of Mordechai and the sister of Yissocher Dov and Mendy.

228.    The murder of her father, Mordechai, and brother, Yissocher Dov, and injury to her brother Mendy has caused Leah severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

229.    Miriam Ehrenfeld is a citizen of the United States and currently resides in Israel. She is the sister of Mordechai.

230.    The murder of her brother, Mordechai, and nephew, Yissocher Dov,  has caused Miriam severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

231.    Rose Joseph is a citizen of the United States and currently resides in Israel.  She is the sister of Mordechai.

232.    The murder of her brother, Mordechai, and nephew, Yissocher Dov, has caused Rose severe mental anguish, trauma pain and suffering and extreme emotional distress, all to her damage.

233.    Devora Pollack is a citizen of the United States and currently resides in Israel. She is the sister of Mordechai.

234.    The murder of her brother, Mordechai, and nephew, Yissocher Dov, has caused Devora severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

235.    Benjamin Reinitz is a citizen of the United States and currently resides in Israel. He is the brother of Mordechai.

236.    The murder of his brother, Mordechai, and nephew, Yissocher Dov, has caused Benjamin severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

237.    Leibel Reinitz is a citizen of the United States and currently resides in Israel.  He is the brother of Mordechai.

238.    The murder of his brother, Mordechai, and nephew, Yissocher Dov, has caused Leibel severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

239.    Samuel Reinitz is a citizen of the United States and currently resides in Israel. He is the brother of Mordechai.

240.    The murder of his brother, Mordechai, and nephew, Yissocher Dov, has caused Samuel severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

241.    Raizel Shimon is a citizen of the United States and currently resides in Israel. She is the sister of Mordechai and aunt of Yissocher Dov.

242.    The murder of her brother, Mordechai, and nephew, Yissocher Dov, has caused Raizel severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

243.    Helen Weider is a citizen of the United Stated and currently resides in Israel. She is the sister of Mordechai and aunt of Yissocher Dov.

244.    The murder of her brother, Mordechai, and nephew, Yissocher Dov, has caused Helen severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

**The Richter Family (18)**

245.    On August 19, 2003, Miriam Leah Richter, her great aunt, Goldie Zarkowsky, and Goldie's two children were on Bus No. 2 headed to the Western Wall in Jerusalem, Israel when a suicide bomber detonated his explosives, injuring Miriam Leah.  HAMAS claimed responsibility for the bombing. The HAMAS terrorist who committed the suicide bombing on the crowded bus was Ra'ed Abed Al-Hamed. This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

246.    Miriam Leah, who was nine years old at the time of the bombing, is a citizen of both the United States and Israel and currently resides in Israel.

247.    As a result of the bombing Miriam Leah had shrapnel lodged in her eye, neck and chest. She underwent surgery and all of the shrapnel was removed except for what was in her chest.  She will live with it there for the rest of her life.

248.    Since the attack, Miriam is traumatized.  She cannot possibly travel to school by bus. She wakes up every night very upset.  A normally studious child, she finds it difficult to concentrate. She has become a very edgy and anxious child and is easily antagonized.  She has endured great pain, suffering, mental anguish, trauma and extreme emotional distress, all to her damage.

249.    Moshe and Yehudis Richter are citizens of both the United States and Israel and currently reside in Israel.  They are the natural mother and father of Miriam Leah.

250.    The attack on their daughter Miriam has caused Moshe and Yehudis severe mental anguish, trauma, pain and suffering and extreme emotional distress, as well as medical and life care expenses, all to her and their damage.

251.    Avrohom D. Richter is a citizen of both the United States and Israel and currently resides in Israel.  He is the brother of Miriam Leah.

252.    The attack on his sister Miriam has caused Avrohom severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

253.    Breina Richter is a citizen of both the United States and Israel and currently resides in Israel.  She is the sister of Miriam Leah.

254.    The attack on her sister Miriam has caused Breina severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

255.    Nechama Richter is a citizen of both the United States and Israel and currently resides in Israel.  She is the sister of Miriam Leah.

256.    The attack on her sister Miriam has caused Nechama severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

257.    Sara Malka Richter is a citizen of both the United States and Israel and currently resides in Israel.  She is the sister of Miram Leah.

258.    The attack on her sister Miriam has caused Sara severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

259.    Shlomo Chaim Richter is a citizen of both the United States and Israel and currently resides in Israel.  He is the brother of Miriam Leah.

260.    The attack on his sister Miriam has caused Shlomo severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

261.    Tranne Richter is a citizen of both the United States and Israel and currently resides in Israel.  She is the sister of Miriam Leah.

262.    The attack on her sister Miriam has caused Tranne severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

263.    Yakov Yosef Richter is a citizen of both the United States and Israel and currently resides in Israel.  He is the brother of Miriam Leah.

264.    The attack on his sister Miriam has caused Yakov severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

265.    Yechiel Richter is a citizen of both the United States and Israel and currently resides in Israel.  He is the brother of Miriam Leah.

266.    The attack on his sister Miriam has caused Yechiel severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

267.    Yisroel Richter is a citizen of both the United States and Israel and currently resides in Israel.  He is the brother of Miriam Leah.

268.    The attack on his sister Miriam has caused Yisroel severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

269.    Yitzchok A. Richter is a citizen of both the United States and Israel and currently resides in Israel.  He is the brother of Miriam Leah.

270.    The attack on his sister Miriam has caused Yitzchok severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

**The Schecter Family (19)**

271.    On January 29, 2004, a little before 9 a.m., Erik Joseph Schecter was on Bus No. 19 in Jerusalem, Israel when a suicide bombing occurred that killed eleven people and injured several, including Erik.   Hamas and Al Aqsa Martyrs Brigade claimed responsibility, naming a 24-year-old Palestinian policeman from Bethlehem as the suicide bomber.   The terrorist bomber was Ali Mounther Ja'ara.  This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

272.    Erik is a  citizen of both the United States and of Israel.

273.    Erik was severely injured during the terror attack.   His left knee was broken, his left shoulder blade was fractured and shrapnel severed his left popliteal vein.   He was not able to walk again after three months of rehabilitation.

274.    Even after recuperation, Erik's legs are scarred.   There is still nerve damage that causes super-sensitivity to his left calf.   He walks with a limp because his leg is held together by two titanium pins.

275.    The attack has caused Erik severe mental anguish, trauma, pain and suffering and extreme emotional distress, as well as economic losses and medical expenses, all to his damage.

**The Tratner Family (20)**

276.    On September 24, 2004, Tiferet Tratner, age 24, was killed in her home as she sat on the couch in Neve Dekalim by a terrorist mortar attack launched from or near the Gaza Strip. This murder took place the day before Yom Kippur.  HAMAS claimed responsibility for the terror attack and was in fact responsible. This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

277.    Tiferet was an American citizen and is the daughter of Shlomo Tratner. Prior to her murder, Tiferet worked with the elderly and with people with disabilities. Shlomo Tratner has suffered severe emotional anguish, pain, suffering and distress over the murder of his daughter and brings this action individually and on behalf of the Estate of Tiferet Tratner for her wrongful death, all to their damage.

### The Zarkowsky Family (21)

278.    Goldie Zarkowsky and her son, Eli Zarkowsky, were killed in the bombing of Bus No. 2 in Jerusalem, Israel on August 19, 2003. They were citizens of the United States and residents of the State of New York. HAMAS took responsibility for the bombing. The HAMAS terrorist who committed the suicide bombing was Ra'ed Abed Al-Hamed. This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

279.    Bshava Zarkowsky was injured in the bombing of Bus No. 2 in Jerusalem, Israel on August 19, 2003. She is a citizen of the United States and a resident of the State of New York.

280.    Bshava Zarkowsky suffered grave injuries to herself.

281.    The injuries she suffered and the murder of her mother Goldie and brother Eli has caused Bshava severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

282.    Elizabeth and Max Schwartz are citizens of the United States and the State of New York. They are the natural parents of Goldie and the grandparents of Eli.

283.    Max Schwartz was in a business meeting with one of his sons Jacob. Jacob received an urgent call but Max thought nothing of the call until Jacob returned with a look of despair on his face. Max inquired about the call but Jacob would not talk about it.

284.     The scene around the house when Max and Jacob arrived home was unexpected. So many of his friends and family members were there to break the news to Max and his wife and to be there for them in their time of need. They flew to Israel immediately to tend to the matter at hand.

285.     A Holocaust survivor, Max had endured this kind of loss before and that helped him to deal with this loss. Yet, nothing could compare to the pain, mental anguish, trauma and extreme emotional distress of losing his daughter and grandson, all to his damage. The shock and horror of the loss of his loved ones is a feeling that he will never forget.

286.     Elizabeth Schwartz was tending to her usual errands at the time of the attack. She spent her last hour of errands visiting with an elderly woman. She rushed home in order to fix supper for her husband. As she approached her home, she noticed that there were several cars parked in front of her house. She knew then that something was wrong. When she entered the house, her family members and friends collectively delivered the news to her that her daughter was on a public bus in Jerusalem, Israel when it was bombed.

287.     Elizabeth and her husband Max immediately flew to Israel to see about their daughter. That was where they found out that Goldie was also dead.

288.     Also a Holocaust survivor, Elizabeth had endured this kind of loss before and that helped her to deal with this loss. Yet, nothing could compare to the pain of losing her daughter and grandson. The shock and horror of the loss of her loved ones, mental anguish, pain, suffering, trauma and extreme emotional distress is a feeling that she will never forget, all to her damage.

289.     Mendel Zarkowsky is a citizen of the United States and the State of New York. He is the husband of Goldie and the father is Eli. Mendel Zarkowsky brings this action on behalf of himself and Estate of Goldie Zarkowsky and the Estate of Eli Zarkowsky.

290.     After a hot and humid day, Mendel was very tired and decided to relax by learning Torah in a local study hall.  Goldie traveled by bus with their daughter Bshava and their son Eli to the Western Wall to pray the afternoon prayers.  He spoke with his wife for the last time over the telephone at around 6:30 p.m., shortly before she departed for the Western Wall with Bshava and Eli.

291.     At about 9:10 p.m., Mendel was getting out of a taxi when he heard sirens.  Ambulances, police cars and fire engines were driving toward Shmuel HaNavi Street in Jerusalem, Israel.  At the time, Mendel did not pay much attention to what was going on.

292.     Mendel arrived at his nephew's apartment, where the family had been staying for his nephew's wedding.  There were no adults around, only small children.  The telephone rang and Mendel answered to the frantic voices of his brother-in-law and sister-in-law.  They told him that there had been a bombing on the bus that Goldie and the two children had been traveling on and that their daughter happened to be on the bus as well.

293.     Mendel arrived at the hospital to find his daughter Bshava covered in blood, disoriented and crying hysterically.  No one had any information on the whereabouts of his wife and son.

294.     After traveling from hospital to hospital in search of his missing wife and son, he was informed that two bodies had been recovered that could possibly be them.  After DNA testing, Mendel was told that indeed the bodies were those of his dead wife and son.

295.     Mendel's life has changed dramatically.  He is now the sole provider and caretaker for the 7 children who remain in the home.  With doctors' appointments, cooking, cleaning and all of the other things that come with caring for the children, as well as trying to help them to cope with the loss of their mother and brother, Mendel has no time for his former passions, like studying and tutoring children.

296.     As a result of the attacks, Mendel suffers severe mental anguish, pain, trauma, loss of consortium and extreme emotional distress, all to his damage.  He has spoken with many doctors, experts and families who have experienced trauma but has yet to find out how to deal with his pain and the pain of his children, who seem to think that the loss of their mother and brother is somehow his fault.

297.     The impact of this tragedy is a constant burden on Mendel.  He misses the serenity, contentment and fulfillment of the union that he shared with Goldie. .

298.     Malky Breuer is a citizen of the United States and the State of New York.  She is the sister of Goldie and the aunt of Eli.

299.     Malky was in her apartment when her niece called and told her about the attack in Israel and that Goldie was on the bus when it was bombed. Malky was so crushed that she could not move. She sat still, devastated for hours until her brother called to check on her and to tell her that her parents were going to Israel to assist in the arrangements for her sister and nephew.

300.     Malky's life has not been the same since.  She misses the long talks she had with her sister and her bright smile.  The shock and horror of losing her loved ones has caused mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

301.     Esther Buxbaum is a citizen of the United States and the State of New York.  She is the sister of Goldie and the aunt of Eli.

302.     Esther was in the same hotel at which her sister Goldie had been staying when she learned of the attack.  She arrived in Israel on the same day as Goldie.  They were about to celebrate Esther's son's engagement.  When she tried to reach Goldie, she was told that Goldie had gone back to the hotel.  Two hours later, she tried to reach Goldie several more times to no avail. Esther began to get nervous.

303.    Suddenly, she heard sirens.  She saw people holding radios and looking serious and she began to inquire about what had happened.  She was informed that there was a bombing on the bus that Goldie and her two children had been riding.

304.    Instead of celebrating her son's engagement, Esther spent the next week mourning her sister and nephew at the bedside of her niece, Bshava, who was the only one of her family members who had survived the attack.

305.    Esther's life is forever changed.  Even during her happy moments she fears that bad things will happen because the loss of her loved ones occurred during a time of happiness for her own son.  The shock and horror of the loss of her loved ones has caused mental anguish, trauma, pain and suffering and emotional distress, all to her damage.  Esther has had to seek counseling to cope with her loss.

306.    Gittel Cohen is a citizen of the United States and the State of New York.  She is the sister of Goldie and the aunt of Eli.

307.    The murder of her sister Goldie and nephew Eli has caused Gittel severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

308.    Rachel Rosner is a citizen of the United States and the State of New York.  She is the sister of Goldie and the aunt of Eli.

309.    She was in New York at a shopping mall when a friend of hers in Israel called to inform her that Goldie was missing.  Her friend then told her that she had to go because there was commotion outside and she wanted to see what was going on.

310.    Rachel then went home.  When she was not greeted by her daughter's welcoming outstretched arms, she knew that something was wrong.  Her family emerged with faces of sorrow and gave her the horrible news.

311.    Since the loss of her sister, Rachel has mourned continuously.  The shock and horror of losing her loved ones has caused mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

312.    Jacob Schwartz is a citizen of the United States and the State of New York.  He is the brother of Goldie and uncle of Eli.

313.    Jacob was in a business meeting with his father when he found out about the attack. Jacob received a call from his oldest son, Pinchas, who lives in Israel, informing him of the bus bombing in Israel and that his sister and two of her children were on the bus.  He concealed his emotions because he did not want to unnecessarily alarm his father.  His father repeatedly asked Jacob who he was speaking with when he left the meeting numerous times to call Israel for updates, but Jacob did not tell him because it looked as though Goldie and her children had perished in the attack and he did not know how to tell his father.

314.    After the meeting was over, Jacob and his father headed home.  Jacob then received a call confirming his fears; Goldie was dead.  He still did not tell his father.  Fortunately, others arranged for a friend of his father's and a doctor to break the news to Jacob's parents so that he wouldn't have to do it.  Soon after, Jacob's parents boarded a plane to Israel to take care of the arrangements for their daughter and grandson.

315.    During and after the incident, their years of growing up together flashed before Jacob's eyes.  He specifically remembered the day Goldie was born. He was eight years old at the time.

316.    After the incident, Jacob was given medication by a local doctor and also sought counseling and mental health treatment for his condition.  He suffers from depression and has a nervous condition as a result of the death of his loved ones.  His business has suffered as a result of his condition and it has also put a strain on his marriage.  The shock and horror of losing his loved ones

has caused mental anguish, trauma, pain and suffering and extreme emotional distress, all to their damage.

317.    Michael Schwartz is a citizen of the United States and the State of New York. He is the brother of Goldie and the uncle of Eli.

318.    Michael was driving on a business errand for work when he found out about the attack in Israel.  Fortunately, he had reached his destination before his children called his cell phone to give him the bad news.

319.    Michael lost consciousness immediately after hearing the news.  Bystanders revived him and his son was called and was by his side within moments.

320.    Since his sister's death, Michael experiences anxiety attacks, uncontrollable crying episodes, nervous tension and many sleepless nights.  He is unable to handle any stressful situations. The shock and horror of losing his loved ones has caused him mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

321.    Phillip Schwartz is a citizen of the United States and the State of New York.  He is the brother of Goldie and the uncle of Eli.

322.    Phillip was driving in his car listening to his radio when the station gave a report of a bus bombing in Jerusalem.  Instantly, Goldie came to his mind because she was in Israel.  His fear was confirmed when he was informed by his brother Jacob that his sister and two of her children were on the bus.

323.    Phillip has not received any medical attention to ease the pain of his loss due to financial constraints.  The shock and horror of losing his sister has caused mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

324.    Perl Brailofsky is a citizen of the United States and the State of New York.  She is the daughter of Goldie and the sister of Eli.

325.    Perl was in Spring Valley, New York when the attacks occurred.

326.    She happened to call her mother where she was staying in Israel to check up on her. The daughter of another woman that lived there answered the telephone.  When Perl asked to speak with her mother, the girl was silent. After asking the little girl several times where her mother was to no avail, the girl finally spoke up and said that there had been a bombing.  Perl bombarded the child with questions, but she had no answers.

327.    Perl has had to seek counseling to cope with the loss.  The shock and horror of losing her mother has caused mental anguish, pain and suffering and extreme emotional distress.

328.    Perl's life changed instantly after the loss of her mother.  She is very withdrawn and no longer has the many friends that she once had.  The burden of helping to care for siblings has fallen on her.

329.    The murder of her mother Goldie and brother Eli has caused Perl severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

330.    Abraham Zarkowsky is a citizen if the United States and the State of New York. He is son of Goldie and the brother of Eli.

331.    The shock and horror of losing his loved ones has caused him mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

332.    Aron Zarkowsky is a citizen if the United States and the State of New York.  He is the son of Goldie and the brother of Eli.

333.    The shock and horror of losing his loved ones has caused him mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

334.    Ezriel Zarkowsky is a citizen of the United States and the State of New York. He is the son of Goldie and the brother of Eli.

335.    Ezriel was at home on his lunch break when the attack occurred.

336.    Ezriel called his aunt's house and was informed about the tragic incident.  He was given pills by the EMS crew that attended to him at the time he was notified about the attack.

337.    After his mother's death, Ezriel suffered intense phobias.  He suffers from nightmares and wakes up in cold sweats.  Whenever family members are not where they said they would be or do not arrive when they said they would, he becomes hysterical and apprehensive. Despite seeing numerous psychologists, nothing has alleviated his phobias.

338.    The shock and horror of losing his mother has caused him severe mental anguish, trauma, pain and extreme emotional distress, all to his damage.  Ezriel has had to seek counseling to cope with his loss.

339.    Gittel Zarkowsky is a citizen of the United States and the State of New York. She is the daughter of Goldie and the sister of Eli.

340.    The shock and horror of losing her loved ones has caused her mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

341.    Joseph Zarkowsky is a citizen of the United States and the State of New York. He is the son of Goldie and the brother of Eli.

342.    Joseph was engrossed in his studies when he heard about the attacks in Israel.

343.    Once Joseph heard about the attacks, he left the study hall where he had been studying and went to his parents' home.  When he arrived, Joseph was greeted by the sad faces of his family members.  He then called his wife, informed her of the tragic incident and told her that he was flying to Israel to be with his family.

344.    After the incident, Joseph was not the same.  He could not concentrate on his studies and lost his study partner of four years as a result.  He has nightmares and is constantly distracted.

345.    Although he has not sought professional help to help him to cope, the shock and horror of losing his mother and brother has caused severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

346.    Miriam Zarkowsky is a citizen of the United States and the State of New York.  She is the daughter of Goldie and the sister of Eli.

347.    The shock and horror of losing her loved ones has caused her mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

348.    Shrage Zarkowsky is a citizen of the United States and the State of New York.  He is the eldest son of Goldie and the brother of Eli.

349.    Shrage was in New York substitute teaching at a summer camp when the attack occurred.

350.    Shrage received an urgent call from his wife while teaching at a summer camp in New York.  She told him that there was a bus bombing in the center of Jerusalem.  He immediately shuddered, because, at the time, his mother, father and two siblings were in Israel.  It was later confirmed that his mother and siblings were on the bus.

351.    He asked his wife if she had spoken with his parents and she informed him that no one had heard from them.  Finally, his sister was found alive, but he was left to pray that his mother and brother would be located as well.  After several hours and no sign of his mother and brother, Shrage grew frustrated.  After flying to Israel, Shrage and the rest of his family were informed that his mother and brother were dead.

352.    The death of Shrage's mother left him a shattered and broken man.  Every loud noise now turns him into an emotional wreck.  The shock and horror of losing his mother and brother has caused him severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

353.    Trany Zarkowsky is a citizen of the United State and the State of New York.  She is the daughter of Goldie and the sister of Eli.

354.    The murder of her mother and brother has caused Trany severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

355.    Yehuda Zarkowsky is a citizen of the United State and the State of New York. He is the son of Goldie and the brother of Eli.

356.    The murder of his mother and brother has caused Yehuda severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

### The Tita Family (22)

357.    On June 11, 2003, Bertin Tita, age 75, was riding in Jerusalem, Israel on Egged Bus No. 14A.  Bertin was a United States citizen who had lived for many years in the State of Texas.  She and her husband, Ephraim, had returned to Israel shortly before 2003.

358.    At around 5:30 p.m. on June 11, 2003, a terrorist dressed as an ultra orthodox religious Jewish person boarded Egged Bus No. 14A at one of the larger outdoor markets in Jerusalem.  As the bus drove through the heart of Jerusalem, within the State of Israel, the terrorist detonated his bomb, wrecking the bus and killing Bertin Tita and 15 other passengers on the public bus.  In addition to these murders, the terrorist also injured over 100 people.  HAMAS claimed responsibility for the attack, which was carried out by Maanti Shavana aka Abed Al Mo'ti Mohammad Shabana.  This terror attack

was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

359.    Bertin Tita was retired from the fashion business, but had been spending time in Israel helping those in need.   She was on her way to help a needy family when she was murdered by the HAMAS terrorist.  Adding to the tragedy, Bertin's daughter, Shoshana Tita, a journalist living in the United States at the time, had come to visit her mother and father in Israel to celebrate her upcoming marriage.   Shoshana was married in Israel just forty-eight hours before her mother was murdered. Bertin and Ephraim's son, Ezra, is also a United States citizen, like Bertin, Ephraim and his sister, Shoshana.  Ezra was educated in the United States and resides in the State of Texas.

360.    Ephraim, Shoshana and Ezra have all suffered severe mental anguish, trauma, pain and suffering and extreme emotional distress over the murder of their mother and wife, Bertin, all to their damage and loss to the Estate of Bertin, a Plaintiff herein.  Instead of the family spending many days together celebrating Shoshana's wedding, they spent the period in deep mourning for the tragic and brutal death of Bertin.  As the heirs and survivors of Bertin, they bring this wrongful death action. They also bring this action on behalf of the Estate of Bertin Tita, and individually, for their damages sustained as described herein.

### The Blaustein Family (23)

361.    On May 29, 2001, Norman Blaustein and his wife, Sara Blaustein, both United States nationals who had recently moved to Israel, were riding with others in their family car to Jerusalem. At that time, they were attacked by Palestinian terrorists on the road near Efrat.  The terrorists opened fire on the car being driven by Norman.  Bullets fired from the terrorists' automatic weapons peppered the Blaustein vehicle, causing serious injuries and death to the occupants.  This terror attack was within

the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

362.    Sara Blaustein was mortally wounded and died in her husband's arms awaiting help. Norman was wounded in the attack, and suffered severe mental anguish, trauma, pain and suffering and extreme emotional distress from the attack and the wrongful death of his wife, Sara, all to his damage.

363.    Samuel Berg, one of Sara Blaustein's three children from her first marriage was visiting Sara and Norman from New York. He was in the automobile with them and was wounded in the terror attack as well. Samuel was shot in the back and shoulder but remained conscious and saw his mother die from her wounds. Samuel is a United States citizen. In addition to suffering his own physical injuries, which required hospitalization and physical therapy, Samuel suffered severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage, as a result of being present during his mother's murder by the terrorist murderers.

364.    Norman lives in Israel and Samuel Berg resides in Nassau County, New York. Adena Mark, Jonathan Berg and Atara Blaustein are the children of Sara Blaustein. They are the heirs and survivors of Sara and are all US nationals. Rebecca Unterberg, a US national, is the mother of Sara and the heir and survivor of Sara. David Unterberg and Tema Furmansky are the brother and sister of Sara and are her heirs and survivors. David and Tema are both US nationals. Each asserts their claims herein.

365.    The terrorists who committed this murder and assault were leaders or member of the Fatah-Tanzim terrorist organization in Bethlehem. They included, but are not limited to, Atef Ahmad Salem 'Abayat. The murder and assault took place within the scope of the conspiracy and activities of

Defendant Arab Bank, PLC, as did each of the actions set forth in this complaint on behalf of each of the Plaintiffs named herein.

### Bernard Remez (24)

366.   Bernard Carl Remez was injured in a terror attack on September 25, 2002 when he was shot in a drive by shooting by Palestinian terrorists while in Israel. Bernard was returning to his home in Ateret, Israel with his nephew when automatic rifle fire from Palestinian terrorists peppered his vehicle, wounding him and his nephew. This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant

367.   As a result of the attack, Bernard suffered major medical damage to his left arm and was hospitalized for treatment numerous times. He continues to suffer a permanent disability from this injury. Bernard is a citizen of the United States who resides in Israel, and sues for his pain, suffering, trauma, mental anguish, extreme emotional distress, all to his damage.

### Andrew Feibusch (25)

368.   Andrew Feibusch is a United States citizen who was studying in Israel when the Intifada began in the Fall of 2000. After being attacked and injured by Palestinian terrorists twice, Andrew has returned to live in the United States.

369.   Andrew was first attacked on September 29, 2000, when he was 19 years old. He was beaten, along with other American students, when they were dragged from a cab in Jerusalem, Israel. Photographs of the attack were published around the world. Andrew and his friends were going to the Western Wall in Jerusalem to pray. Palestinian terrorists brutally attacked these young men and attempted to kill them. Andrew was treated for his physical injuries at Hadassah Hospital in Jerusalem. He required stitches to close lacerations caused by the terror attack.

370.    A second terrorist attack injured Andrew on August 18, 2001, when he was shot in the leg by a Palestinian terrorist while he was riding on a bus in Jerusalem.  He was hospitalized for several days at a Jerusalem hospital as a result of this terror attack.  He sues for his pain, suffering, trauma, mental anguish and extreme emotional distress, all to his damage. The terror attacks in which Andrew was injured were within the scope of the scheme and conspiracy alleged below in which Arab Bank knowingly participated.

### Nethaniel Bluth (26)

371.    Nethaniel Bluth is a citizen of the United States who for some time has resided in Israel with his parents, Ephraim and Shoshana.  On March 7, 2002, Nethaniel was a 19 year old student at Otzem, which is located in the community of Atzmona, Israel.  Nethaniel began his studies there in August, 2001.

372.    On March 7, 2002, while Nethaniel was studying with about 80 other students in a lesson being led by one of the Rabbis, a small explosion occurred.  Nethaniel and the other students rushed to the window to see what happened.  A Palestinian terrorist who was in the midst of attacking the students had thrown a grenade into one of the dorm rooms.  It was late at night, around 11:00 p.m., and the students looked in horror as the terrorist opened fire on the students with a burst from an automatic weapon.  The attacker threw additional grenades in an attempt to kill and injure as many of the students as possible.  Nethaniel was struck by shrapnel when a grenade exploded only a few feet from him.  His arms, legs and scalp were injured.  One piece of shrapnel pierced his chest and hit his chest bone. He sues for his pain, suffering, trauma, mental anguish and extreme emotional distress, all to his damage HAMAS claimed responsibility for the attack, which was committed by Mohammed Fathi Farahat aka Mohammed Nadal Farhath.  This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant

373.    Nethaniel was rushed to Tel HaShomer Hospital for surgery to save his life. Five of his classmates were murdered in the attack. Nethaniel underwent three surgical procedures following the attack. His chest wound was closed, a gash in his scalp was surgically treated and the various wounds to his arms were stitched. Nethaniel has scars from these injuries. After rehabilitation, Nethaniel regained most of the use of his hands, arms and legs. He also suffered severe damage to both of his ear drums when the grenade exploded close to him. His hearing is permanently impaired in his left ear.

### Averham Grossman (27)

374.    On December 1, 2001, at approximately 11:30 p.m., Averham Grossman was in the Ben Yehuda pedestrian mall in Jerusalem, Israel when two suicide bombers detonated explosive devices. The pedestrian mall was filled with many young people on a Saturday night. A car bomb also exploded about 20 minutes after the initial attack, killing and injuring more people. HAMAS claimed responsibility for the attack, which was carried out by Nabil Halabia, aka Mahmoud Nabeel Halabey, and Osama Mohammed Id Bahr. This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

375.    As a result of the attack, Averham Grossman was traumatized and suffered severe mental anguish and pain and suffering, all to his damage. He injured his back and was struck by the second bomb while helping those wounded from the first bomb.

376.    Averham Grossman is a United States citizen.

### Michael Spitz (29)

377.    On September 22, 2004, Michael Spitz was injured in a Palestinian terrorist attack near the French Hill section of Jerusalem, Israel when a female terrorist blew herself up, killing 2 border patrol policemen and wounding 17 people waiting at a bus stop nearby. Michael's ears were damaged from the blast and he continues to suffer pain, trauma, mental anguish, extreme emotional distress,

both emotionally and psychologically from the attack, all to his damage.  Al Aqsa Martyrs Brigade claimed responsibility for the terror attack, which was committed by Zaynab Ali Abu Salem.  Michael Spitz is a citizen of the United States.  This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

### Meshulam Ben Meir (32)

378.    Meshulam Ben Meir is a United States citizen who lives in Ofra, Israel.  On July 30, 2002, he was attacked by a Palestinian suicide bomber who detonated a bomb about five meters away from Meir.  Meir was seriously injured.  He lost all hearing in his left ear and suffered some loss of hearing in his right ear.  He has suffered pain, trauma, mental anguish, extreme emotional distress, medical expenses and losses, all to his damage. The terrorist who exploded the bomb was Muhssien Attah.  This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

### Elitzur Lilintal (33)

379.    Elitzur Lilintal, a US national, was attacked by Palestinian terrorists on July 25, 2002 while he was riding in a car in Israel with Rabbi Elimelech Shapira, 43, of Peduel.  The shooting attack by the Palestinian terrorist killed Rabbi Shapira and seriously injured Elitzur Lilintal.  The shooting attack occurred near the community of Alei Zahav, west of Ariel.  The Fatah Al-Aqsa Brigade claimed responsibility for the terror attack. He has suffered pain, trauma, mental anguish, extreme emotional distress, incurred medical expenses and losses, all to his damage.  This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

**The Rand Family (34)**

380.    On August 31, 2002, Jacob Rand and his wife, Dalit Rand, both of whom are United States citizens, were walking hand in hand from the synagogue located in the West Bank community of Har Bracha near Nablus in the State of Israel.  A Palestinian terrorist from the Popular Front for the Liberation of Palestine ("PFLP"), a designated Foreign Terrorist Organization, opened fire at the young couple as they walked along a path.  The gunman shot round after round at the couple as they ran for their lives.  Dalit, who was pregnant at the time, was shot six times.  Her husband, Jacob, was shot twice.  Both required emergency hospitalization to treat their wounds.  Dalit suffered gunshot wounds to the chest, shoulder and hip.  Jacob Rand, in an effort to save his pregnant wife and unborn child, fell over Dalit to shelter her from the terrorist's bullets. While doing so, Jacob was shot in the upper back and hip. He was air-lifted to a hospital.

381.    The terrorist attack was committed by Yusef Atalla, age 20, from the Balata Refugee Camp near Nablus. Atalla used wire cutters to break into the community and then hid in wait for victims.  The PFLP claimed responsibility for the attack on Lebanon's *Al-Manar* television channel. *Al-Manar,* which is affiliated with the Hezbollah terrorist group, was itself designated as a terrorist organization by the United States in December 2004.  The PFLP was in fact responsible for the terror attack, which was intended to kill, maim, and injure as many men, women and children as possible. Atalla was shot and killed by a resident of Har Bracha, thereby stopping the attack and saving the lives of Jacob and Dalit Rand and potentially many others as well.

382.    Dalit Rand grew up in New Rochelle, New York as Dalit Comet-Murciano. Dalit is the daughter of Dr. Robert Comet-Murciano, a respected pediatrician who practiced in the Bronx for many years.  Dalit graduated from a high school in Manhattan and moved with her family to live in Israel in 1997.  Dalit is now attending medical school and is known as Dalit Cayam.

383.    Jacob Rand also was born and raised in New York.  He moved to Israel and was attending law school at the time of the terrorist attack.  He is known as Yakov Cayam.  He and Dalit had been married only 14 months at the time of the terrorist attack.

384.    Jacob and Dalit have suffered serious personal injuries, including emotional distress and pain and suffering as a result of the terror attack described herein. They join as Plaintiffs in this action.

### The Leifer Family (35)

385.    Joseph Leifer and Devorah Chechanow Leifer, both U.S. nationals who reside in Brooklyn, New York, were visiting Israel in December 2001 when they were injured in a terror attack that took place on the Ben Yehuda pedestrian mall in downtown Jerusalem.

386.    On December 1, 2001, the pedestrian mall was filled with many young people on a Saturday night.  At about 11:30 p.m., two suicide bombers detonated explosive devices among the crowd on the mall.  A car bomb also exploded about 20 minutes after the initial attack, killing and injuring more people.  HAMAS claimed responsibility for the attack, which was carried out by Nabil Halabia and Osama Mohammed Id Bahr.  HAMAS was in fact responsible for this terror attack.

387.    As a result of the attack, Joseph suffered serious life threatening wounds. Devorah Chechanow Leifer, who was present with Joseph, suffered less serious personal injuries. Both Joseph Leifer and Devorah Chechanow Leifer suffered severe mental anguish and pain and suffering and join as Plaintiffs in this action.

### The Waxler Family (36)

388.    Obadiah Waxler, a U.S. national who resides in Brooklyn, New York, was visiting Israel in December 2001 when he was critically injured in a terror attack that took place on the Ben Yehuda pedestrian mall in downtown Jerusalem.  He joins as a Plaintiff to this action to recover for the injuries he suffered in this terror attack.

389.   On December 1, 2001, the pedestrian mall was filled with many young people on a Saturday night.  At about 11:30 p.m., two suicide bombers detonated explosive devices among the crowd on the mall.  A car bomb also exploded about 20 minutes after the initial attack, killing and injuring more people.  HAMAS claimed responsibility for the attack, which was carried out by Nabil Halabia and Osama Mohammed Id Bahr.  HAMAS was in fact responsible for this terror attack.

390.   As a result of the attack, Obadiah Waxler suffered serious personal injuries, mental anguish and pain and suffering.  Numerous surgeries were necessary to save Obadiah's life and he required almost three years rehabilitating from the life-threatening injuries.  During this time, Obadiah was unable to work.  While he was hospitalized in Israel before his transfer to New York, Obadiah's brother, Ezekial Waxler, who lived in Israel, ceased work to care for his seriously injured brother.

391.   At the time of the terror attack, Obadiah Waxler was engaged to be married.  He was married on June 10, 2002.  His wife, Chana Waxler, cared extensively for Obadiah for several years as he recovered from his serious wounds.  This necessitated that she take off from work.  She was only able to work part time so she could care for her husband.

392.   Obadiah's family in New York also took turns giving him care and support for several years. These family members of Obadiah join as Plaintiffs in this action to recover their loss of consortium and solarium and loss of earnings as a result of the injuries suffered by Obadiah Waxler. They also seek just compensation for their own mental anguish they suffered as proximate cause of the terror attack on Obadiah.  These plaintiffs are Obadiah Waxler's parents, Arthur Waxler and Dina Waxler; his wife, Chana Waxler; and brothers and sisters, Ezekial Waxler, Abraham Waxler, Haggi Waxler, Nachum Waxler, Yoel Waxler, Zacharia Waxler, Gedalia Waxler, Baruch Waxler, Yaakov Waxler, Chaya Rosenberg, Bracha Milstein, and Shifra Miller. All of these plaintiffs are citizens of the

United States of America.  All of them currently reside in Brooklyn, New York, except for Ezekial Waxler, who currently resides in Israel.

**B.**   **The Defendant Arab Bank**

393.   Arab Bank, PLC is a Jordanian bank with headquarters in Amman, Jordan, the common stock of which is publicly traded on the Amman Stock Exchange.  Arab Bank is majority owned and controlled by the shareholders of Arab Bank Group, a Jordanian holding company.  Arab Bank and Arab Bank Group constitute a single Jordanian banking institution.  Arab Bank owns, controls, and/or operates bank branches worldwide, including several branches that are situated in Palestinian Authority controlled territories and a wholly owned branch office located at 520 Madison Avenue, New York, New York, that is regulated by the Controller of the Currency of the United States Treasury Department.  Arab Bank conducts business in, and is registered to conduct business under, the laws of the State of New York.  The Bank does business in the United States and approximately 30 other countries on five continents and has over 7,000 employees.  Arab Bank's affiliate, Arab National Bank ("ANB"), has over 100 branches in Saudi Arabia.  Arab Bank is a 40% shareholder of ANB.

394.   Arab Bank has operated a branch in New York since 1982.  The New York branch was designated as a wholesale bank, and among the banking and financial services that it conducted in New York were the provision of clearing and correspondent bank services for its foreign bank branch offices and affiliated banking institutions as well as other foreign banks.  The New York branch has approximately 50 employees working in or for the New York City operation.  According to the Arab Bank Group's 2003 Annual Report, the New York Branch of Arab Bank clears all of the worldwide branches' dollar transactions in New York, New York, which includes the many transactions described below.

395.     On or about February 25, 2005, the U.S. Office of the Comptroller of the Currency ("OCC") announced drastic restrictions on Arab Bank's New York operations. The OCC determined that the branch "had internal control weaknesses, particularly with regard to its international funds transfer activities." The OCC also found that "the inadequacy of the Branch's controls over its funds transfer business is especially serious in light of the high risk characteristics of many of the transactions." www.occ.treas.gov/ftp/eas/ea2005-14.pdf. During an investigative audit by the OCC of Arab Bank in late 2004 and early 2005, U.S. officials discovered, among other things, that Arab Bank had as customers 40-60 supported terrorists and terrorist groups with alleged connections to Al Qaeda, HAMAS, and Hezbollah. The investigative audit also revealed that Arab Bank knowingly allowed such groups to transfer money through Arab Bank's New York branch at 520 Madison Avenue in New York City, in violation of the laws of the United States. In August, 2005, Arab Bank was forced to pay a $24 million fine to the United States for its failure to comply with OCC regulations.

396.     The Shoman Family founded the bank in Jerusalem in 1930 and have played key roles in the management of the Bank ever since. Until his recent death in 2005, Abdul Majeed A.H. Shoman was the Chairman of Arab Bank and Arab Bank Group. His son, Abdel Hamid A.M. Shoman, was Deputy Chairman and Chief Executive Officer of Arab Bank and Arab Bank Group until his father's death. He assumed his father's job titles shortly after his father's death.

397.     The Bank's current Chief Banking Officer is Shukry Bishara, who was responsible for the opening of the Bank's offices in New York in 1982 and who then moved to Ramallah in approximately 1994 to oversee the Bank's operations in the West Bank and Gaza. He was promoted to Chief Banking Officer and moved to Amman, Jordan only in February 2002.

398.     Arab Bank has consolidated assets of approximately US$32 billion. Arab Bank has approximately 22 branches operating in Gaza and the West Bank, the first of which was opened in late

1994 in Nablus.  Since 1996, when the Israeli Central Banking Authority's supervisory role over Arab

Bank's conduct in Gaza and the West Bank ended, the Palestinian Monetary Authority has had the

duty to regulate the bank's branches in the Palestinian territories which are primarily under the control

of the Palestinian Authority or "PA."

## FACTUAL ALLEGATIONS

399.    Several prominent terrorist organizations operate in Palestinian-controlled territory,

most notably the Islamic Resistance Movement ("HAMAS"), the Palestinian Islamic Jihad (the "PIJ"),

and the Al Aqsa Martyrs Brigade ("AAMB"), the armed wing of Fatah. The Popular Resistance

Committee is a small alliance of various armed terrorists primarily active during the Second Intifada in

Gaza.  It consists mainly of terrorists belonging to the Fatah organization and dissident members of the

PA security forces.  It has been led by Abu Samhadaneh.  Other terrorist groups also conducted terror

attacks during the Second Intifada.  Several terror attacks were committed as "joint operations" and

involved terrorists from more than one of these groups.

400.    PIJ and HAMAS are both primarily radical Islamist terrorist organizations that are

committed to the globalization of Islam through violent "Jihad" or holy war.

401.    These groups are formally committed to the destruction of the State of Israel, are

extremely anti-American and are committed to achieving their objectives by violent means, including

acts of international terrorism.  HAMAS is an acronym for "Harakat Muqawama Islamiyya," the

Islamic Resistance Movement, which was founded in December 1987.

402.    The HAMAS Charter states that the very purpose of HAMAS is to create an Islamic

Palestinian state throughout Israel by eliminating the State of Israel through violent jihad. HAMAS

propaganda since the September 11th World Trade Center attacks have praised and glorified Osama

bin Laden and his supporters engaged in global jihad. HAMAS, directly and through its network of

"charitable" front organizations, has engaged in a campaign of hate and virulent anti-Semitism designed to indoctrinate the Palestinian population, including young kindergarten children, to hate Jews and to incite violence against them.

403.    HAMAS is the largest of these terror groups and is nominally divided into two separate wings, the political wing which supports the so-called "Dawa" (its social service or humanitarian component) and the paramilitary wing known as the Izz-el-Din al Qassam Brigade.  Although these two components have separate responsibilities, the organization operates seamlessly, with each component working to conduct the operations and to achieve the illegal objectives of the terrorist group as a whole.

404.    HAMAS' social services are, in large part, administered by local "zakat" committees and other "charitable organizations" ("Zakat" means charity in Arabic).  These committees and organizations are controlled by HAMAS members, operatives and activists sitting as members of their governing committees, a fact well known to Arab Bank.

405.    Due to the substantial expenditures of the HAMAS organization and the fungible nature of money, significant sums of money collected externally under charitable and humanitarian banners are routed for HAMAS' military and other operational uses, in addition to being used to free up other funds for specific terrorists' acts.  HAMAS uses such funds for, among other things, the provision of weapons, explosives, transportation services, safehouses, and salaries for its terrorist operatives and for terrorist recruiters.  Thus, donations to HAMAS charitable organizations increased the ability of HAMAS to engage in acts of terrorism.

406.    HAMAS commits numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, solicitation to commit murder and numerous other acts

of international terrorism activities, as defined by 18 U.S.C. § 1331, in violation of the federal criminal code of the United States.

407.   Since September 2000, HAMAS has launched hundreds of terror attacks that killed and injured hundreds of individuals, including over twenty (20) mass murders that have killed more than three hundred (300) people, including numerous American nationals.   HAMAS has claimed responsibility for the attacks on Plaintiffs David and Naava Applebaum, Jack Baxter, Chaya Tziporah Cohen, Netanel Fenichel, Ariela Freirmark, Moshe Gottlieb, Debra and Eli Horovitz, Abigail Litle, John Linde, Jr., Foruk Naimi, Rebecca Nevies, Rivka Pam, Miriam Leah Richter, Mordechai and Yissocher Dov Reinitz, Tiferet Tratner, Erik Schecter, Goldie and Eli Zarkowsky, Joseph and Devorah Leifer and others.   Other terrorist organizations identified in this complaint have claimed responsibility for other terrorist murders and attacks upon innocent civilians who are Plaintiffs herein.

408.   On January 25, 1995, HAMAS was designated as a Specially Designated Terrorist and, on October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS as a Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act (the "INA") and the AEDPA.   HAMAS is also designated as a Specially Designated Global Terrorist Organization.

409.   The formal designation has been renewed every two years since 1997, including a renewal in October 2005.

410.   Like HAMAS, PIJ is a radical Islamic terror group.   The PIJ knowingly, willfully, and unlawfully commits numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, and solicitation to commit murder in violation of the federal criminal code of the United States.

411.    The PIJ has committed numerous terrorist attacks, including several that have killed and injured American citizens.  Since September 2000, the PIJ has conducted and taken credit for at least 28 murderous attacks, including at least seven mass murder bombings that have killed over 90 civilians, including U.S. nationals.

412.    On October 8, 1997, the PIJ was designated as a Foreign Terrorist Organization by the U.S. government under the AEDPA.  The designation has since been renewed every two years, including in 2005.

413.    AAMB is a paramilitary offshoot, or armed wing, of the governing Fatah movement which emerged at the outset of the Second Intifada.  Force 17 and Tanzim are also paramilitary offshoots of Fatah that have committed acts of terrorism since at least early 2001.

414.    AAMB's, Tanzim's and Force 17's political lineage is secular and not Islamist in orientation, but they have adopted both the religious rhetoric and murderous acts of their radical Islamist counterparts.

415.    AAMB, Tanzim and Force 17 (with support, direction and aid from Fatah) knowingly, willfully, and unlawfully commit numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, and solicitation to commit murder in violation of the federal criminal code of the United States.

416.    For example, these organizations have committed numerous terrorist attacks, including several that have killed and injured American citizens.  Since September 2000, AAMB has conducted and taken credit for dozens of murderous attacks, including a pair of January 2003 suicide bombings in downtown Tel Aviv that killed 23 people and injured approximately a hundred others, and a string of other attacks that have killed more than 70 civilians and wounded more than five hundred (500) others, including U.S. citizens.  AAMB has claimed responsibility for the attack that killed Esther Klieman

and injured Rebecca Nevies, Netanel and Ilanit Fenichel, Erik Schecter, Michael Spitz, and Elitzur Lilintal and others.

417.    On March 21, 2002, the Secretary of State of the United States officially designated AAMB as a Foreign Terrorist Organization pursuant to Section 219 of the INA and the AEDPA.  The Government of Israel as well as other countries have designated many of these organizations as terror organizations in addition to the United States.

**The Al Aqsa Intifada or Intifada Al Quds**

418.    Following the collapse of the peace negotiations at the presidential retreat at Camp David in the summer of 2000, HAMAS and other Palestinian terror organizations launched a broad-based terror campaign against the State of Israel, marked from the outset by numerous acts of extreme violence, including multiple murders of civilians.

419.    This explosion of violence was widely termed the so-called Al Aqsa Intifada or Intifada Al Quds or, in western parlance, the Second Intifada (to distinguish it from an earlier period of violence in the 1980s). Whereas the total number of attacks from 1993-2000 totaled less than 1,000, since September 2000 various Palestinian terrorists attempted approximately 23,000 attacks.  These attacks have claimed more than 8,000 casualties, including about 900 civilian deaths.   These indiscriminate acts of violence have likewise resulted in the deaths of at least 30 U.S. citizens and caused serious bodily injury to scores of others.

420.    The preferred, although not exclusive, method of mass murder used by Palestinian terrorist groups is the suicide bombing, which involves an individual carrying an explosive device, which he or she detonates in a bus, restaurant or other crowded public gathering place.

421.    The device is typically packed with nails, bolts and ball bearings, which, when detonated, lodge themselves deep within the bodies of those unfortunate individuals who happen to be

inside the blast radius, causing cruel and horrific injuries.  The suicide bomber is thereby regarded as a "martyr" (or "Shahid" in Arabic) by the terrorist groups and their sympathizers.

422.    The objectives of the Al Aqsa Intifada terror campaign include intimidating and coercing the civilian population of Israel and attempting to influence the policy of the Israeli and U.S. governments by compelling Israel to withdraw from territory it presently controls.

423.    The eruption of the Al Aqsa Intifada in late September 2000 changed the dynamics of Palestinian terrorism in four material respects:

A.  The Second Intifada, from its inception, was marked by a massive escalation of violence, which quickly transformed the tactics of the Islamist terrorist groups from the margins to the mainstream of Palestinian politics.

B.  The unrestrained violence of the Second Intifada and the increasing credibility and prestige it provided for the Islamist groups forced other (secular) Palestinian terrorist groups to adopt Islamist rhetoric and tactics.

C.  The main rival terrorist groups began cooperating and coordinating their activities, including but not limited to HAMAS, PIJ, Fatah (Tanzim/AAMB/Force 17), PFLP and The Popular Resistance Committees.

D.  Saudi financial support for the terrorist groups coalesced into a more ambitious and more formal structure through the formation of the Saudi Committee in Support of the Intifada Al Quds, which not only raised money to support the Intifada, but which caused said monies to be transferred into the hands of terrorists in the Palestinian territories, through such banking institutions as the Arab Bank, for delivery to terrorists and their families as incentives and rewards for the murder and maiming of Israeli citizens, visitors, workers, students and others.

## Arab Bank's Conspiracy To Finance Palestinian Terrorism

424.    In the fall of 2000, Arab Bank knowingly joined a conspiracy and scheme to aid and support the terrorism of the Second Intifada.  It was known by the terror organizations and those that conspired with and aided them that a wave of violent terror attacks would be launched and would span many months or even years.  The scheme therefore included a system to finance and encourage the violence for a sustained period of time.  The terror attacks that killed and injured the plaintiffs in 2001-

2004 were overt acts in furtherance of that conspiracy and were within the scope of the scheme described herein.

425.    One reason for Arab Bank's willful support of the unlawful scheme was the ideology of the Bank's founders.  In 1984, the Shoman family published a biography of Mr. Abdulhameed Shoman (the bank's founder) entitled *The Indomitable Arab* in which he consistently set forth his antipathy towards Jews, Zionists and the State of Israel.  He also clearly describes his abhorrence for the United States, which he claimed to have once admired, but then loathed because of its support for Israel.

426.    Prior to the establishment of Arab Bank, its founder, Abdulhameed Shoman, described his great anger toward Zionists, Jews, and others whom he believed stood in the way of the growth of the Arab economy.  In his biography, he is quoted as saying that within a few years Zionism will have grown strong enough to control the entire economy.  "I believe that all business dealings with the Jews — buying, selling or banking transactions — are damaging to our country's best interests."

427.    In his final speech before four hundred employees of Arab Bank, Mr. Shoman also explained his hatred for Americans that had developed over the years:

> I liked the Americans.  I once bore their nationality, and gathered my fortune in their country.  But since they started to help the Zionists and supply them with arms to fight us, I have come to detest them.  It was not the Jews, but the Americans, who fought us.

428.    Mr. Shoman's son, Abdul Majeed Shoman, the recently deceased chairman of the Arab Bank, was a vocal supporter of the Intifada who often made public remarks demonstrating his extremist anti-Israeli views.

429.    He was, for example, the chairman of the Popular Committee in Support of the Palestinian Intifada, which was established during the first Intifada in 1987-1988.  The Committee managed to raise approximately eight million Jordanian Dinar (JOD 8,000,000) or approximately $11,000,000, for "martyrs' families," paying 1,000 JOD ($1,400) to each martyr's family and 300 JOD

($425) to each Palestinian injured in the violence.  From 1995 to 2000, the Popular Committee raised an additional 1,200,000 JOD for the families of martyrs of the first Intifada.

430.     On November 22, 2000, Arab businessmen held a meeting with Yasser Arafat, at which time they formed a new entity, the Fund for Support of the Persistence of the Palestinian People, to further bankroll the Palestinian Authority and the Intifada.

431.     Defendant Arab Bank pledged $2,000,000.00.   Mr. Shoman pledged $500,000.00, personally.

432.     The Shoman family's support of the terrorist Intifada continued in June of 2001 when the Cultural Center of the Abdul Hamid Shoman Institute launched an exhibition on the subject of "the martyrs of the Palestinian Intifada."  The express purpose of the exhibit was to "honor the martyrs of the blessed al-Aqsa intifada" by means of conveying the human and spirited image of their lives.  The exhibit featured presentations of the martyrs' personal belongings, such as clothing and "tools" they used, along with an introduction to their lives and deeds until the day of their 'martyrdom'.

433.     Accordingly, the Bank's financial and ideological support for the terrorist Intifada is a matter of public record and its participation in diligently implementing the universal terrorist death and dismemberment insurance scheme is knowing and deliberate.  By its acts, Defendant Arab Bank knowingly, willingly and substantially assists in the recruitment of terrorists.

**The Formation of the Saudi Committee for the Support of the Intifada**

434.     A meeting of the Arab League was held in Cairo, Egypt in October of 2000.  At that meeting, it was agreed, with the knowledge and participation of Defendant Arab Bank and Bank Chairman Abdul Majeed Shoman, that a financing distribution network or mechanism needed to be put in place to fund and fuel Palestinian terrorism to achieve various political and nationalistic goals. It was believed that millions and millions of dollars would be necessary to support the wave of terrorism

which was planned to last months or even years. The plan included making substantial payments to those engaged in the violent intifada: "the martyrs, the wounded and the prisoners."

435. On or about October 16, 2000, the Saudi Committee in Support of the Intifada Al Quds (hereinafter referred to as the "Saudi Committee") was established as a private charity registered with the Kingdom of Saudi Arabia in furtherance of this plan.

436. According to the Saudi Committee, its purpose was to support the "Intifada Al Quds" and "all suffering families – the families of the martyrs and the injured Palestinians and the disabled." The suicide bomber is regarded by HAMAS and the other terror groups, the Saudi Committee and even by the Palestinian Authority (PA) as a "martyr" or "shahid" in Arabic.

437. The Saudi Committee decided to bestow financial support to the martyrs' families and to call upon the Jordanian government to make the donations tax-exempt. Abdul Majeed Shoman, then the Chairman of the Arab Bank, opened a meeting to support the Intifada by saying:

> After the blessed Intifada [erupted] I thought that we should discuss what to do about it. There are some organizations which are fundraising donations including the Welfare Association [headed by Mr. Shoman]. The Welfare Association received donations and it has funds. I received phone calls and donations from benevolent people and the Arab Bank's board and the bank's employees decided to donate 5% from October's salaries [for the Intifada]. In spite of the fact that donations were collected and are available, nothing was transferred to anybody. It is our duty to act and therefore I summoned this meeting to hear from you.

438. Monies collected but not transferred would undermine fundraising efforts for the Second Intifada, which would threaten the ability of HAMAS, PIJ, AAMB, Fatah and other factions to launch terrorist attacks. The Arab Bank, with its professional expertise, experience and institutional efficiency, stepped into this breach.

439. Mr. Shoman objected to locating the committee's office in Arab Bank's Amman headquarters building but he left open the possibility of "loaning" an accountant to the committee.

440.    Ultimately, it was decided that the committee's office would be located in the Amman Chamber of Industry headquarters, where it in fact opened on November 1, 2000.

441.    As referenced by Mr. Shoman in his speech, on or about October 7, 2000, Arab Bank announced that it would make financial donations to Palestinians injured during the Intifada. At the urging of the Arab Bank, its employees donated 5% of their monthly salaries to the Palestinian cause. All of this activity was conducted publicly in Jordan.

442.    The Saudi Committee constitutes a professional fundraising apparatus intended to subsidize and finance the Intifada Al Quds, i.e., to subsidize the Palestinian terror campaign and to bankroll HAMAS and other terrorist organizations and their related charitable front organizations in the West Bank and Gaza. Those facts were known to Defendant Arab Bank, which knowingly and willfully joined with the Saudi Committee to fulfill this goal. The activities of the Saudi Committee were often publicized, even by the Saudi Embassy in Washington, DC. Arab Bank was intimately aware of and involved with the activities of the Saudi Committee. The Saudi Minister of Finance and other high ranking member of the Saudi government have acted as spokespersons for the Committee. The Saudi Minister of Finance sits on the board of director of Arab Bank. Arab Bank's affiliate, ANB, is one of the largest banks in Saudi Arabia and it played a substantial role in collecting funds for the Saudi Committee, and in transferring those monies within the Arab Bank system to the various terrorist organizations, terrorists, prisoners and their families. Abdel Hamid Shoman sits on the boards of ANB, as did Abdel Majeed Shoman prior to his death.

443.    The ability of the Saudi Committee to fulfill its goal of bankrolling HAMAS and other Palestinian terror organizations to fuel the violence of the Second Intifada depended on the knowing participation and substantial assistance of Arab Bank.

**Incentivizing Suicide Bombers With Cash Rewards**

444.   The first, but not the only, way in which Arab Bank and its co-conspirators seek to accomplish their common scheme and goals is to provide a comprehensive "insurance death benefit" of 20,000 Saudi Riyals (the equivalent of about USD $5,316.06) to the families of Palestinian terrorists, guaranteeing "universal coverage" to terrorists and their beneficiaries whenever a terrorist is killed.  The lump sum initial payment is often followed with lesser monthly payments. These are not legitimate insurance payments but "cash rewards" for committing crimes.

445.   Benefits (less than if a terrorist is killed) as incentives and rewards to the terrorists, prisoners and their families are also provided if the terrorist is injured either by Israeli security forces or captured as a result of his or her criminal conduct.

446.   The Saudi Committee has provided millions of dollars in benefits to the families of the so-called "martyrs," i.e., the families of suicide bombers and individuals killed by Israeli forces during the commission or attempted commission of terrorist acts, and to the families of Palestinians wounded during violent confrontations with Israel's security forces, as well those activists held in Israeli custody.  This type of support is critical to the terror organizations' efforts to win the hearts and minds of the Palestinian people and to create an infrastructure capable of solidifying their position within Palestinian society.

447.   The "insurance benefit" not only provides universal coverage for specific members of preferred terrorist organizations such as HAMAS, but is intended as universal coverage available to terrorists belonging to any terrorist organization or to none at all, thereby incentivizing and rewarding all terrorists in Israel and eliminating the potential distinctions between terrorist groups, between individual (freelance) terrorists and the more established terrorist cells, and between the secular and radical Islamist terrorist organizations.

448.   Defendant Arab Bank knowingly and willfully encourages, supports, aids and actively administers this comprehensive terrorist insurance scheme by distributing the benefits in accordance with lists of families of "martyrs" and others eligible for "coverage."  This financial support is a key inducement to terror.  It has encouraged, incited and made possible the terror attacks of the Second Intifada.  According to terrorists, it was well known that if a terrorist was injured, or killed, during an operation against Israel, her citizens, workers and visitors  to Israel and the surrounding territories, they would receive Saudi monies from the Arab Bank, PLC.  As pled herein, the murderer of Esther Klieman received from an officer at the Arab Bank in Ramallah one thousand three hundred dollars months after his injury, and subsequently murdered Esther Klieman in an attack upon a public  bus on the road into Jerusalem, Israel, where she was heading to provide care for special needs children. This terrorist attack, but one tragic example of the result of the active, intentional, knowing participation in the scheme, plan and design of the conspiracy that included the Arab Bank, acting in concert with the Saudi Committee and various terrorist organizations, and others, renders the Arab Bank liable for the foreseeable consequences, including the murder of innocent civilians who are plaintiffs herein, and their families, and their estates, each of whom are entitled to receive damages as allowed by applicable US law.

449.   In furtherance of the conspiracy, Arab Bank actively and knowingly participates in a formalized and extensive process that requires the families of so-called martyrs to obtain an official certification of their deceased relative's status as a bona fide martyr, replete with an individualized identification number.

450.   Arab Bank, in turn, is provided relatively detailed lists by the Saudi Committee and representatives of the leading terrorist groups through their "charitable" front organizations consisting

of the names of the martyrs, certain of their personal information and details concerning the date and manner of death.

451.   Arab Bank, in consultation with the Saudi Committee and local representatives of HAMAS and other terror groups, finalizes the lists, maintains a database of persons eligible under this universal coverage plan, and opens a dollar account for each beneficiary.  Every Palestinian family eligible under this universal coverage plan is encouraged to collect the terrorism benefits through a local branch of Arab Bank in the West Bank or Gaza.

452.   If they choose to collect the insurance benefit, the families are required to present to the bank an "official" certification from the Palestinian Authority (replete with a unique identification number) establishing the bona fides of the martyr.

453.   If the documentation proves satisfactory, Arab Bank issues a receipt to the designated recipient of the martyrdom insurance benefit.  For example, Dia A-Tawil perpetrated a suicide bombing attack on March 27, 2001 on behalf of HAMAS.  He was designated Palestinian Authority Martyr No. 449.  His father, Hussien Mohamed Favah Tawil, presented the "official" certification to Arab Bank, and received a confirmatory receipt stating that the benefit was paid to his Arab Bank account in Ramallah.

454.   A report from the website of the Saudi Committee for Relief of the Palestinians (originally known as the Saudi Committee in Support of the Intifada al Quds), describes the mechanism of the donations and the transfer of the money:

The Mechanism of delivering relief:

1.   Assessment study of the Aids-relief inside Palestine
2.   Choosing the Programs that help in achieving the Aims and goals of the Committee
3.   Exploring How to deliver Aids-relief to beneficiaries
4.   Choosing some recommended Palestinian personalities for Follow-up
5.   Setting a Coordination council in Gaza and West Bank

6. Listing names of beneficiaries of Committee programs and completing and revising the information
7. Studying names of beneficiaries and opening files for them for taking the needed procedures later
8. Sending Name-lists of beneficiaries to his Highness, the General Supervisor for taking the needed procedures
9. **Opening accounts for each beneficiary in the branches of Arab Bank in Palestine**
10. Transferring Money for each beneficiary and notifying them

(http://www.alquds-saudi.org/static/mechanism.htm)

455. The conspiracy among Arab Bank, the Saudi Committee, HAMAS and others terror groups is ultimately designed to provide substantial material support to Palestinian terrorist organizations and to provide a meaningful incentive both to prospective recruits and to individuals contemplating the commission of independent acts of violence in the name of the "popular resistance."

456. According to a sworn declaration of the Chief Banking Officer of Arab Bank made on November 11, 2004, "beginning in December of 2000, the Saudi Committee made approximately 200,000 payments into Palestine through Arab Bank branches totaling over US$90,000,000." This astounding sum of money and individual payment disbursements, constitute substantial and direct material support for, and financial services to, terrorists and their organizations, which could not have been accomplished without the active, integral involvement and participation of Defendant Arab Bank.

457. For example, this extraordinary activity of the Arab Bank in transferring monies through its system, starting with foreign currency, and exchanging said currency into US dollars through its New York branch; and transferring said funds through its offices and systems and personnel to such locations as the Arab Bank branch in Ramallah for distribution to such terrorists as the murderer of Esther Klieman, is clear and convincing evidence, irrefutable proof, of the active, knowing and intentional involvement of the Arab Bank in the conspiracy to incentivize murder, and to

reward murder, thereby rendering the Arab Bank liable for all damages to which the plaintiffs are entitled under US law, as claimed herein.

458.   Any person who chooses to participate in a suicide bombing or other terrorist attack does so secure in the knowledge that, if he or she is killed in that attack, the financial needs of his or her family will be more than met for some time.   This acts as a material inducement because such persons are virtually assured of receiving a substantial stipend if they are injured or arrested.

459.   In short, the Saudi Committee raises funds from private donors in Saudi Arabia and elsewhere in the Persian Gulf region and then allocates payments to defendant Arab Bank to fulfill its public pledge of universal insurance coverage to Palestinian terrorists.

460.   Former Secretary of State Colin L. Powell, Defense Secretary Donald H. Rumsfeld and his former deputy, Paul D. Wolfowitz, have all stated that cash rewards for suicide bombers encourage suicide bombing attacks.   In July 2004, Vice President Cheney criticized Saddam Hussein's supply of cash to suicide bombers' families, identifying the payments as "financial rewards."

461.   A November 2001 Federal Bureau of Investigation memorandum explored the effect of these cash awards for suicide bombing: "Hamas provides a constant flow of suicide volunteers and buttresses a terrorist infrastructure heavily reliant on moral support of the Palestinian populace…"

462.   Through the program administered by Arab Bank, the Saudi Committee paid death benefits to at least 200 fallen "martyrs" in the first year of its existence alone.   As of November 2001, the Saudi Committee paid more than forty-two million dollars ($42,000,000) to terrorists and/or their beneficiaries.   After only 18 months, the Saudi Committee had raised over $57,000,000.   In one widely publicized telethon, the Saudi Committee raised over $100,000,000 in just a few days!

463.   Arab Bank serves as the near exclusive administrator for the Saudi Committee's universal insurance coverage plan for Palestinian terrorists and their families.   Arab Bank substantially

assists its co-conspirators in advancing their unlawful objectives by allowing those terrorists access to Arab Bank' computer system, membership in SWIFT, personnel, accounting services, worldwide offices and other resources.

464. Indeed, on its original website, the Saudi Committee openly declared that its funds were distributed to the families of martyrs through local branches of Arab Bank in Palestine. Although it has since been removed from the Internet, the original archived webpage located at www.alquds-saudia.org\indexa.htm provided a list under the caption: "What has been done with your donations?"

465. Item number ten (10) on the web page responds with the answer: "Opening a bank account for every entitled [Palestinian] through the Arab Bank in Palestine." The website further listed numerous "martyrs" whose cause of death was listed as "suicide attack."

466. The Saudi Committee's web site at one time disclosed thousands of payments it had made to martyrs. A Congressional Research Service ("CRS")[2] report reveals that the Saudi Committee did not treat the identify of the beneficiaries of its funds as confidential or private, but rather published this information on its web site. According to this Report to Congress, the Saudi Committee web site contained over 40,000 transaction records that "feature the names of individuals who received money" from the Saudi Committee. This enabled the Congressional analysts to compare those names with those of known and confirmed "suicide bombers." The Saudi Committee web site records reflect it paid money to over 60 known Palestinian militants from October 2000 to March 2002, including suicide bombers. A "sample of five names of beneficiaries on the Committee website matched those of":

> -**Said Hassan Hussein Hotari**, who blew himself up in Tel Aviv on June 1, 2001, killing dozens of teenagers at the Dolphinarium nightclub;

---

[2] CRS is a research arm of the U.S. Congress within the Library of Congress. It works exclusively for members of Congress, their committees and staff.

-**Izzedin Shahil Ahmed Masri,** who blew himself up in Jerusalem on August 9, 2001, killing 15 people at Sbarro Pizza;

-**Maher Muhiaddin Kamel Habeishi,** who blew himself up on a Haifa bus on December 2, 2001;

-**Wa'fa Ali Khalil Idris,** who blew herself up in Jerusalem in January 2002;

-**Mohammed Ahmed Abdel-Rahman Daraghmeh,** who blew himself up in a neighborhood of Jerusalem.

The Congressional Report cited lists of the Saudi Committee which were on its web site that showed the recipient of the funds had died in a *"amaliya istishadiya,"* i.e., a "martyrdom operation." On information and belief, Arab Bank made numerous other transfers for the Saudi Committee to pay other terrorists their rewards. Some of these additional transfers include, but are not limited to, transfers made to the families of the following terrorists:

      a. **Osama Muhammad `Eid Bahr,** ID no. 944791169, killed on December 1, 2001 in the Ben-Yehuda attack in Jerusalem. His family received 20,000 SR.

      b. **Atef Ahmad Salem `Abayat,** ID no. 911665107, killed on October 18, 2001. His family received 20,000 SR.

467. In the annual report issued by the Saudi Committee and published in the Saudi newspaper *Al-Jazira* on February 11, 2001, the Saudi Committee identified payments made to Palestinian prisoners as well as Palestinian "martyrs." Notably, Table 4, Column 10 of the report helpfully identifies the cause of death for each martyr. For example, Musa Abd al-Qadir Ghanimat, the HAMAS operative who perpetrated a suicide attack at the Apropo restaurant in Tel Aviv, is listed as an illustrative martyr.

468. Accordingly, there can be no confusion as to whether the "insurance plan" includes the families of suicide bombers and no question that defendant Arab Bank possesses knowledge of this fact.

469.    Defendant Arab Bank provides a convenient means for distributing this universal coverage death and dismemberment benefit across Palestinian-controlled territories, which would be far more difficult if attempted by other means, such as courier. Israeli territory separates Gaza from the West Bank and Israeli military checkpoints often separate one Palestinian city from another.

470.    Arab Bank makes it possible for the terrorist groups to transcend physical obstacles and to provide an organized and professional distribution system that literally underwrites the terror campaign. Arab Bank knowingly allows the terrorist groups to use the speed and efficiencies of the international banking system, including the SWIFT system of wire transfers, to further their terrorism agenda. It also made its facilities and staff available to its co-conspirators to facilitate the financial services it provides terrorist groups.

471.    The Saudi Committee and local HAMAS and PIJ "charitable" front organizations have publicly and repeatedly advertised their unlawful purpose in both Saudi and Palestinian newspapers, on television and on the Saudi Committee's website. Arab Bank was well aware of the unlawful acts and objectives of these front organizations and terrorists and potential terrorists were well aware of the substantial support Arab Bank provided to those terrorist organizations. For instance:

- In the February 10, 2001 edition of the Saudi newspaper *Al-Jazirah*, the Saudi Committee published an annual report in which it listed the names of Palestinian prisoners to whom it provided terrorism benefits as well as the names of the Palestinian martyrs (including the names of those killed in suicide bombings) whose families received terrorism death benefits;

- In a November 23, 2001 edition of the Palestinian newspaper, *Al Quds*, the Saudi Committee placed an announcement listing the names of more than 1,000 individuals who had been injured during the Intifada or held in Israeli custody and invited them or their families "to go to the branches of the Arab Bank in their places of residence to receive their allocations donated by the Committee..."; and

- In a February 18, 2002 advertisement in the Palestinian newspaper *Al Hayyat Al Jedida*, a HAMAS charitable front organization in Ramallah announced that the Saudi Committee "requests that the families of the martyrs whose names are listed herein to go to a branch of the Arab Bank in their place of residence to receive the tenth payment offered by the Saudi Committee in the amount of $5,316.06 ...."

472.    Since the Saudi Committee raises its funds in Saudi currency, which cannot conveniently be converted into Israeli currency (most commonly used in Palestinian controlled areas), those funds are primarily converted into U.S. dollars through the New York branch of Arab Bank and then routed to the local branches of Arab Bank in the West Bank.  Arab Bank's role is material and essential to the furtherance of the criminal conspiracy in at least two (2) important respects.

473.    Firstly, Arab Bank provides both professionalism and transparency to the process, thereby reassuring wealthy Saudi and Gulf State donors that the money they are contributing will not be siphoned off by corrupt officials, but will in fact reach the families of terrorists as intended.  The willingness of a major institution in the Middle East to perform services for the terrorists helps to legitimize terrorism and, in that way as well, further assists the terrorists.

474.    Secondly, Arab Bank, through its extensive network of local branches in the West Bank and Gaza, provides an ideal distribution system that offers both convenience to the families of the terrorists, who are able to bypass both the corruption of the Palestinian Authority and the uncertainty of cash payments delivered by courier, and the certainty of an accounting system that minimizes the risk of duplicate payments and unreliable record-keeping.

475.    By knowingly and actively participating in this process, Arab Bank and its  co-conspirators, the Saudi Committee and others, have knowingly aided and abetted each and every terrorist act committed by Palestinian terrorists since the formation of the Saudi Committee's universal insurance coverage scheme in October 2000, including those that have injured, harmed or killed Plaintiffs.

476.    The names of the "suicide bombers" of the Second Intifada were widely disseminated promptly after each terrorist act occurred.  Television, radio and newspaper coverage was extensive. Posters, marches and other large public events in the PA controlled territories occurred which

extensively published the identities of the homicide bombers.  Lists of the names of the bombers were even proudly maintained and disseminated by the terror organizations, the PA, and various groups such as the Palestinian Human Rights Monitoring Group.  Clearly, Arab Bank actually knew who these terrorists were and that the Bank was rewarding them by distributing money at the Bank to the bombers' families.  Posters of the suicide bombers often hung on the Bank's branches and in the offices of many of the "charities" that had accounts at Arab Bank.

477.    Arab Bank was aware of the methods and means by which HAMAS and other Foreign Terrorist Organizations sought to carry out their objectives.  Arab Bank continued its course of conduct throughout the Second Intifada, from the first attacks in the fall of 2000 to the most recent in 2005.  In fact, Arab Bank's own support of, and commitment to, the violent goals of its co-conspirators are embodied by the personal commitment of Arab Bank's Chairman, Abdul Majeed Shoman.  According to published reports in *Al Bayan* (a newspaper in the United Arab Emirates), Abdul Majeed Shoman traveled to Qatar to attend a meeting called to raise money to finance and support the Al Aqsa Intifada.

478.    In a July 2000 published report in the Jordanian daily newspaper *Addustour,* Abdul Majeed Shoman is described as favoring the destruction of the State of Israel.

479.    A published report in an October 2000 issue of the Jordanian daily newspaper *Addustour* stated that both the management and employees of Arab Bank were donating funds to support the Intifada.

480.    Neither the ideology nor the actual conduct of Arab Bank is passive or indifferent to the goals of, and means employed by, the terrorists; rather, Arab Bank is a knowing, willful and material participant in the terrorists' conduct.  This is consistent with the ideology of the Bank's founders, the Shoman Family, who have been long-time supporters and even executives of the PLO.

481.   The website section dealing with Arab Bank's Palestine branch reflects certain direct financial donations of Arab Bank for "Palestinian community projects." These payments reveal Arab Bank's clear role in supporting the violence against civilians.

Among the donations listed are:

- 17/8/2004 - Mandella Organization/ Donating School Bags to Prisoners' Children

- Arab Bank offered prisoners' children with school bags as well as stationery, aiming to help and support them and their children with their suffering

- 2/5/2004 - Arab Bank offered donations to Abu Jihad's Center for Prisoner Movement in Jerusalem University

- Arab Bank offered donations to Abu Jihad's Center for Prisoner Movement in Jerusalem University. The donations were given through buying books about Palestinian Prisoners' lives, thus supporting the Prisoner's Movement in Palestine

- 21/3/2003 - Arab Bank sponsors the Event of Recognizing Mothers of Martyrs and Prisoners

- Arab Bank sponsored the event of recognizing the mothers of Martyrs and Prisoners in Al Amari refugee camp. The event was organized by the Women Center in the refugee camp.

(http://www.arabbank.ps/english/inner.asp?item=3&mtitle=4&stitle=1)

482.   The Bank explicitly acknowledges its support of "mothers of Martyrs and Prisoners," showing its direct involvement in assisting families of terrorists.

## Arab Bank Provides Material Support to Foreign Terrorist Organizations At All Levels of Their Global Financial Network

483.   In addition to providing the comprehensive universal "insurance coverage" described above, Arab Bank provides financial services and material support to known terrorist groups and their agents and alter egos, as described below. HAMAS has created a global financial network to support its campaign of violent jihad through terrorism for the establishment of an Islamic State in Palestine. At the base level where it raises and collects funds worldwide for this purpose, it has created and/or taken control over various alleged "charities" to raise money in certain parts of the world. For

example, HAMAS raises fund though: the "International Relief Fund for the Afflicted and Needy" ("IRFAN") in Canada; the Holy Land Foundation ("HLF") in the United States; the Palestinian Relief and Development Fund ("INTERPAL") in the United Kingdom; the *Commite de Bienfaisance et de Secours aux Palestiniens* ("CBSP") in France; the Al Aqsa Foundation or Fund in Germany; the Palestinian Association in Austria ("PVOE") in Austria; the *Association de Secours Palestinien* ("ASP"), which is a subsidiary of CBSP, in Switzerland; the Sanbal Al Aqsa in Sweden; the Sanibil Association for Relief and Development in Lebanon; and the Saudi Committee in Saudi Arabia and the surrounding Persian Gulf region. HAMAS also has organizations in Qatar and Dubai that collect funds for HAMAS in those regions. The leaders of these organizations are often well known HAMAS leaders. These HAMAS entities also have substantial interconnections. For example, Sanibil represents INTERPAL in Lebanon.

484. At the outbreak of the Second Intifada, in October, 2000, the "Union of Good" ("UG") or in Arabic, *'l'tilaf al-Khayr,* was created as part of the conspiracy and scheme to raise funds for terrorist activity. The UG was established to serve as an umbrella organization for global fundraising for Palestinian jihad. The UG is headed by Dr. Yussuf al-Qardawi, who has issued a *fatwa* authorizing suicide bombing attacks against Israel. The UG is run by 'Essam Yussuf, a leading figure in INTERPAL. The PA considers UG to be a body supporting HAMAS. Arab Bank has provided financial services to UG and has allowed it to solicit funds to support terrorism that UG directed donors to transfer to Arab Bank accounts all over the world. Arab Bank has also transferred funds of UG to the Nablus based *Al-Tadhamun* which are then distributed to *shaheed* families, including those who committed suicide bombing attacks in Israel.

485. Arab Bank has provided financial services to most, if not all, of the HAMAS fundraising entities described in the preceding paragraphs. Arab Bank has done this with actual

awareness of the unlawful nature and purpose of the activities of these organizations. In May 1997, the Government of Israel declared four of these organizations -- HLF, INTERPAL, Al AQSA FUND and CBSP -- unlawful because of their association, support and control by HAMAS. Despite this and other means by which Arab Bank knew of the unlawful activities of these organizations, it has nevertheless used its worldwide banking branches to assist HAMAS with its unlawful purposes. For example, Arab Bank branches in London, Paris, Frankfurt, Geneva, New York, and Rome have been used to transfer funds for these HAMAS entities. In August 2003, the United States designated CBSP, ASP, INTERPAL, PVOE, and SANABIL as Specially Designated Global Terrorists ("SDGTs") because they were controlled by HAMAS. The US designated Al Aqsa Foundation as a SDGT in May, 2003.

486. After HAMAS raises funds through these organizations and others to support their terrorist acts, it transfers the funds downstream. The funds are often directed toward HAMAS operatives who plan and carry out terror actions. These payments are often sent through "charitable" front organizations which HAMAS controls. On a smaller scale, PIJ has followed the same pattern.

487. HAMAS (and PIJ to a smaller degree) also raise funds to finance an educational and social services network through which they indoctrinate the Palestinian population with a hatred for Israel, Jews, Americans and other non-radical Islamists, while glorifying acts of violence by "shaheeds." HAMAS and PIJ engage in these "educational" activities so that they will have a Palestinian population ready and willing to engage in terrorism.

488. Arab Bank not only provides financial services at the base level to the organizations which raise and collect the funds, but it also knowingly provides banking services to the "charitable" committees that are the vehicles used to distribute the funds downstream. Arab Bank affirmatively and substantially assists HAMAS in distributing funds to support the Intifada terror and hate campaign.

Arab Bank does not merely provide routine banking services to these groups. Rather, throughout the al-Aqsa Intifada, Arab Bank has knowingly assisted various terrorist organizations and terrorists by providing them with bank accounts and financial services in order to facilitate their collection and distribution of funds for terrorist purposes. Arab Bank has often provided such services in connection with public fundraising efforts conducted by terrorist organizations through radio, TV, and Internet solicitation efforts. Arab Bank has also materially assisted PIJ's efforts to finance terrorist acts by permitting PIJ to urge donors to transfer funding for jihad in Palestine to specific Arab Bank accounts.

489. Arab Bank knowingly provides banking services to HAMAS directly through its Al-Mazra Branch Account # 3-810-622473-0330 in Beirut, which collects funds directly in the name of HAMAS, and through charitable front organizations controlled by HAMAS, which Arab Bank affirmatively assists in distributing funds to support the terror campaign. Arab Bank has also maintained accounts for individual terrorist operatives, including but not limited to a Hamas operative from Qalqiliya, and Fatah/Tanzim leaders from Jenin and Nablus. It also knowingly provides financial services directly to the families of suicide bombers.

490. The United States Department of Justice has identified the website: www.palestine-info.com as one of the "official" websites of HAMAS. The website solicits funds and asks contributors to send money to its Al-Mazra Branch Account # 3-810-622473-0330 at Arab Bank in Beirut, but it also asks donors "to cite only the account number and not the name of the [Palestine Information] Center or any other names."

491. This request is necessary because Account # 3-810-622473-0330 is one of the few accounts that Arab Bank operates on behalf of HAMAS and that HAMAS controls and maintains directly.

492.   To assist it in carrying out its terrorist activities and to conceal its unlawful conduct, HAMAS has established or taken over numerous "charitable organizations," including:

   i.   Al-Ansar Charity;

   ii.   Ramallah Charitable Committee or Society;

   iii.   Tulkarem Charitable Committee;

   iv.   the Islamic Association (Gaza) a/k/a Al Jamaya Al-Islamiya;

   v.   Al Mujama Al-Islami;

   vi.   Nablus Charitable Committee;

   vii.   Jenin Charitable Committee or Society;

   viii.   Islamic Charitable Society of Hebron aka Al-Jamiyah Al-Khiriah Al-Islamiyah;

   ix.   Bethlehem Orphan Care Society aka jami'yya ri'aya al-yatim; and

   x.   Al-Tadhamun Charitable Society.

493.   Arab Bank provides financial services to Al-Ansar Charity, Ramallah Charitable Committee, Tulkarem Charitable Committee, the Islamic Association (Gaza) a/k/a Al Jamaya Al-Islamiya, Nablus Charitable Committee and Jenin Charitable Committee. It also provides financial services to the Union of Good, which transfers funds to many of these "charitable societies."

494.   The Tulkarem Charitable Committee, Nablus Charitable Committee, Ramallah Charitable Committee, Jenin Charitable Committee and Islamic Charity Society of Hebron have all been identified by the United States Department of Justice as HAMAS front organizations and the management of each of these "charities" is in fact controlled by HAMAS operatives.

495.   The Tulkarem, Ramallah and Jenin Charitable Committees, the Islamic Charity Society of Hebron and Al-Tadhamun were all designated as "Unlawful Organizations" by the government of Israel in February 2002 because of their connection to HAMAS, a fact which either was known or but

for its willful blindness would have been known to Defendant Arab Bank. The PA closed many of these organizations from time to time because of their ties to HAMAS. For example, the PA closed Al-Tadhamun in December 2001.

496. The ties among Arab Bank, HAMAS and Tulkarem Charitable Committee have been demonstrated. For example, a document posted on the HAMAS internet web site on July 10, 2004 reveals that, in appealing to an Arab Bank director for support from the Saudi Committee, the chairman of the Tulkarem Charitable Committee stated:

> To save the holy Temple Mount and the intifada of the valiant Palestinian people…to reveal the Zionist danger to the Arab and Islamic world…to save Jerusalem and Al-Aqsa, to support the fighters and to publicize their courage and brave resistance…to expose the truth other are trying to hide, ignore and distort…the Palestinian Information Center [the HAMAS internet site], Palestine's voice to the world…[calls upon you to] contribute to the Palestinian Information Center site on the Internet contribute to the site so that it can continue to expand…help us, participate in the truth by supporting Palestinian and Islamic media. The Palestinian Information Center accepts contributions and financial participation. The account is in American dollars.

**Hamas Alter Egos**

497. Plaintiffs allege that the following entities are fronts, agents, instrumentalities or alter egos of Hamas:

        a.      Islamic Charity Association aka Islamic Charitable Society in Hebron;

        b.      Charity Committee in Ramallah aka Ramallah Zakat Committee;

        c.      Jenin Zakat Committee aka The Charity Association in Jenin;

        d.      Nablus Zakat Committee;

        e.      Tulkarem aka Tulkarm Zakat Committee;

        f.      Orphan Care Association (Bethlehem);

        g.      Qalqulia, aka Qalqiliyah Zakat committee;

        h.      Hebron Zakat Committee aka Hebron Tithing And Alms Committee;

      i.      Halhul Zakat Committee;

      j.      Al Aslah Association in el Bireh; and

      k.      Al-Tadhamun Charitable Society (*jam'iyyat al-tadhamun al-khayriyyah al-islamiyyah*)

498.    Plaintiffs will show that these entities are the alter ego of HAMAS and knowingly act as agents for HAMAS, all of which is well known to Arab Bank because, among other things:

      a.      leaders of the committees are HAMAS operatives;

      b.      the Committees are connected to HAMAS military operations;

      c.      The PA has treated the entities as HAMAS' entities;

      d.      The Palestinian population considers the committees "to be HAMAS."

499.    Arab Bank continues to knowingly render financial services for many of these HAMAS fronts, terrorist operatives and their families, and others.  Arab Bank has also knowingly served as a conduit for transferring money from Iran and Syria and its agents and instrumentalities to persons and organizations in Gaza and the West Bank who use such funds to engage in terrorism and incite violence.

**PIJ Alter Egos**

500.    The PIJ has also established numerous front organizations, including but not limited to:

      a.      Al-Ihsan Charitable Society aka Elehssan Society aka Elehssan Charitable Society; and

      b.      Islamic An-Naqqa Society for Women, Bethlehem.

501.    Arab Bank provides financial services to Al-Ihsan Charitable Society with knowledge of or willful blindness to its role in supporting PIJ.

502.    The HAMAS charitable front, Al-Ansar Charity, maintains a website proclaiming that:

Al-Ansar Society opens its doors to the families of the martyrs who intend to register their dead who, with their splendid blood, saturated pure Palestine and

drew the lines of liberty and the coming dawn.  The Al-Ansar Society is following in their footsteps and shares in the sorrow and the hopes of the families of the martyrs and their relatives.

503.   The website further boasts that it has given money to Palestinians who were wounded, incarcerated or killed during the Intifada, including $6,000.00 to the family of Iz Aldin (also spelled: "Azzadin") Al Masri, the suicide bomber who massacred 15 people, including 7 children, and injured more than one hundred people at the Sbarro pizzeria in downtown Jerusalem on August 9, 2001.

504.   The website of Al-Ansar shows the vital role of Arab Bank:

The Director General of the Al-Ansar Charitable Society and the person in charge of the portfolio for the care of the martyrs at the Society's website said that the Society has furnished the management of the Arab Bank with lists of names of the martyrs and the families of the entitled beneficiaries, in order to pay the monies to which the martyrs are entitled.

505.   Al-Ansar maintains an account with Arab Bank in Gaza.

506.   Defendant Arab Bank has also knowingly laundered funds for the Holy Land Foundation for Relief and Development ("HLF"), a Texas based "charity" which has raised funds in the United States for HAMAS for more than a decade.  Arab Bank, in turn, channeled tens of thousands of dollars for HLF through its New York branch to the Ramallah Charitable Committee, an agent of HAMAS.

507.   HLF and its officers have been criminally indicted in the United States District Court for the Northern District of Texas for providing material support to a designated Foreign Terrorist Organization (HAMAS) – including for specific transactions involving payments made by HLF to the Ramallah Charitable Committee, Tulkarem Zakat Committee, and the Islamic Charity Society of Hebron.

508.   The indictment specifies particular financial transactions initiated by HLF that resulted in monetary transfers to the Ramallah Charitable Committee, which violate 18 U.S.C. §2339B. HLF

has been adjudicated liable for violating the ATA in the recent summary judgment order in the case of *Boim v. Quranic Literacy Institute*, et al., 2004 WL 2554446, __F. Supp. 2d__(N. D. Ill. Nov. 10, 2004).

509.   Over 7 years ago, on May 6, 1997, the government of Israel designated HLF as a HAMAS front organization and declared that HLF "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks …."

510.   Nonetheless, Arab Bank continued to provide financial services to HLF and its New York branch and continued to wire thousands of dollars to the Ramallah Charitable Committee at HLF's behest.

511.   On January 10, 2001 a federal district court in Illinois rendered a decision declining to grant a motion to dismiss in a civil case initiated by the parents of David Boim, who was killed by a HAMAS terrorist in 1997.  The Boims had sued, among others, HLF, for providing material support to HAMAS, a designated Foreign Terrorist Organization.

512.   Nonetheless, Arab Bank continued to deposit HLF fund transfers and credit the Arab Bank account of the Ramallah charitable front even after the *Boim* case placed Arab Bank on further notice of HLF's criminal activities.

513.   Similarly, the New York branch of Arab Bank has facilitated the transfer of significant sums to Tulkarem Charitable Committee, despite the fact that in some cases both the "donor" of the funds as well as the recipient had been previously formally designated as "Unlawful Organizations" by the government of Israel.

514.   Moreover, following the Israeli army's military operations in the spring of 2002, the government of Israel obtained and subsequently disclosed extensive materials (most of them available on the internet) demonstrating the Tulkarem Charitable Committee's connections to HAMAS.

515. One of the signatories on the Tulkarem Charitable Committee account is Ammar Tawfiq Ahmad Badawi, a prominent member of the Muslim Scholars Association, who was a signatory on the infamous *Fatwa* – or Islamic religious ruling – declaring that suicide bombings are permitted by Islamic law. Mr. Badawi is a leading figure in HAMAS.

516. Arab Bank has also knowingly laundered funds for INTERPAL, a London based "charity" that has raised funds in Europe for HAMAS for more than a decade. Arab Bank, in turn, channeled tens of thousands of dollars for INTERPAL through its New York branch to various HAMAS zakat committees. Arab Bank has also knowingly laundered and permitted PIJ to solicit funds on its website (www.Palestineway.com or www.abrarway.com) for its terrorist activities by sending money to various accounts maintained by Arab Bank. Often, the account designated is one of the "charitable" front organizations to try to mask the true nature of the money. It is clear from the solicitation that money is being sought for military uses and jihad and not humanitarian uses. Arab Bank knows of these solicitations or is willfully blind to them.

517. Arab Bank also provides financial services and material support to individual terrorists and their families by making accounts available to them despite actual general awareness that they are engaged in unlawful terror activities.

**Cultivation of the Culture of Death**

518. The "charitable" front organizations play a central role in financing the terror campaign by providing the means of raising funds to maintain the institutions that serve as recruiting grounds for terrorist organizations. This fact is known to Defendant Arab Bank.

519. As set forth in an internal HAMAS memorandum recently captured by the Israeli army during a raid of the offices of the Hebron Charitable Committee, HAMAS has arranged for the

"transfer [of] large sums" to the charitable committee and other HAMAS front organizations through the "charity activities" of their operatives abroad.

520.    The memorandum emphasizes that HAMAS "require[s] new bank account numbers for money transfers" and promises that the HAMAS will:

> invest efforts to transfer money for the martyrs (the shahids) and prisoners, via the transfer [to] charitable institutions. This is a primary goal in the framework of the effort to transfer aid money to these institutions, so that these budgets are released in the best manner and in order to bring about an improvement in the level of the movement's performance.

The memorandum concludes with the promise that HAMAS will continue to "build up the activities and operations" of its front organizations by, among other things, "*taking advantage of the conditions and the atmosphere of death*."

521.    Each of these front organizations officially holds itself out to the general public as a charitable organization with a purely humanitarian and benign purpose. In fact, however, the primary mission of these organizations, which is known and understood by Defendant Arab Bank, is to raise and launder funds for terrorist organizations and otherwise to coordinate and conduct activities that are essential to the conduct of terrorist operations and to the material support of terrorist operations. Funds raised by the "charitable" front organizations are fungible and are allocated in part to terrorist activities. Plaintiffs allege, as the Assistant Director of the FBI's Counterterrorism Division (Dale L. Watson) has stated, that crucial financial support for families of HAMAS suicide bombers is assisting HAMAS by providing a constant flow of suicide volunteers and buttresses a terrorist infrastructure. Further, HAMAS uses the zakat committees to provide needed social services for the Palestinian population, thereby gaining support for their movement, including their illegal terrorist attacks against civilians.

522. The front organizations make money available to HAMAS and the PIJ in accordance with the instruction of their leaders. These organizations then disburse a percentage of the funds they receive from their front organizations to purchase weapons and explosive materials, to recruit and train operatives and otherwise to plan and carry out terrorist attacks.

523. By knowingly providing banking and administrative services to "charitable" front organizations that are controlled and directed by designated Foreign Terrorist Organizations, including collecting, transferring and laundering funds for those organizations through its New York branch, Arab Bank has substantially assisted HAMAS, Al Aqsa Martyrs Brigade, PIJ and other terrorist organizations in the furtherance of a murderous conspiracy to commit multiple acts of international terrorism as defined by 18 U.S.C. §§ 2331 and 2332 and has committed numerous overt acts in furtherance of the conspiracy. This wrongful conduct was approved and ratified by senior executives of the bank and by management level employees of Arab Bank who were included on correspondence in which the Bank was instructed to send payments to the families of suicide bombers.

524. Arab Bank knowingly maintained accounts for organizations affiliated with terrorist organizations, including, but not limited to:

| Branch | Account No. | Name on Account | Associated Terrorist Organization |
|---|---|---|---|
| Jenin | 581345 | Jenin Charitable Society | HAMAS |
| Nablus | 400271 | Nablus Al-Tadamun Charitable Society | HAMAS |
| Nablus | 400336 | Nablus Islamic Aid Committee | HAMAS |
| Qalqiliya | 542042 | Al-Qur'an wa al-Sunnah Society Qalgiliya | HAMAS |
| Tulkarem | 500010 | Tulkarem Charitable Society | HAMAS |
| Tulkarem | 503375 | Tulkarem Charitable Society | HAMAS |
| Nablus | 445444 | Al-Lod Charitable Society | HAMAS |
| Nablus | 400415 | Social Center, Rehabilitation Committee, Al-Wafaa' Building Charitable Society | HAMAS |
| Qalgiliya | 540939 | Qalgiliya Charitable Society | HAMAS |

| Nablus | 400739 | Tubas Charitable Society | HAMAS |
|---|---|---|---|
| Ramallah | 666473 | Jama'ah al-lslamiya | HAMAS |
| Al-Manara-Qalgiliya | 610686 | Ramallah Charitable Society | HAMAS |
| Al-Bireh | 649611 | A1-Bireh Al-Islah Society | HAMAS |
| Bethlehem | 717520 | Bethlehem Elehssan Society | HAMAS |
| Bethlehem | 709966 | Bethlehem Society for Orphans | Palestinian Islamic Jihad |
| Hebron | 760376 | Hebron Young Muslims' Society | HAMAS |
| Hebron | 750049 | Hebron Young Muslims' Society | HAMAS |
| Hebron | 751100 | Hebron Young Muslims' Society | HAMAS |
| Bethlehem | 713392 | Zakat Committee Dehaishe Refugee Camp | HAMAS |
| Hebron | 751542 | Hebron Elehssan Society | HAMAS |
| Bethlehem | 711161 | Al-Islah Charitable Society | HAMAS |
| Al-Bireh | *609509* | Al-Huda Society — Ramallah | HAMAS |
| Gaza | 124109 | Central Islamic Society — Gaza Strip | HAMAS |
| Ramal | 100208 | Charitable and Children's Mercy Society — Gaza Strip | HAMAS |
| Gaza | 10188 | House of the Qur'an and Sunnah Society | HAMAS |
| Ramal | 100605 | Trusteeship for the Care of the Aged Society | HAMAS |
| Ramal | 100541 | Al-Ansar Society | Identified with Iran |
| Ramal | 120655 | Al-Ansar Society | Identified with Iran |
| Gaza | 3683 | The Islamic Society | HAMAS |
| Gaza | 365459 | The Al-Nur Prisoner Society | HAMAS |
| Khan Yunis | 2001438 | Khan Ynnis Charity and Mercy Society | HAMAS |
| Gaza | 5858 | Nusseirat Islamic Society | HAMAS |
| Gaza | 150/3 | Khan Yunis Charitable Society | HAMAS |
| Gaza | 35287 | Gaza Charitable Society for the Sick | HAMAS |
| Gaza | 3155 | The Islamic University — Gaza | HAMAS |
| Khan Yunis | 200139 | Qararab Islamic Society | HAMAS |
| Gaza | 15115 | Jabalia Islamic Society | HAMAS |
| Rafah | 2036 | Rafah Islamic Society | HAMAS |
| Azariya | 302656 | Azariya Society for the Fostering of Women | HAMAS |
| Gaza | 39435 | Nur Al-Ma'rifah Society | HAMAS |
| Jenin | 578669 | Jenin Elehssan Society | Palestinian Islamic Jihad |

525.    Arab Bank has also provided financial services to other terror organizations.   For example, Munir al-Maqdah, also known as Abu Hasan, transferred between $40,000 and $50,000 for weapons, expenses, and bomb-making materials to the Arab Bank account of Nasser Aweis, a senior Fatah operative, and instructed him to report back by telephone on the success of his attacks, such as the January 17, 2002, assault on the Hadera banquet hall.   Arab Bank is generally and clearly aware that it provides encouragement, aid, assistance, support and financial services to the AAMB and to various other Palestinian terrorist cells and organizations as referenced herein.

526.    On October 3, 2000, during the early days of the Intifada, Hezbollah leader Sheikh Hassan Nasrallah and Sheikh Ahmad Yassin, the former HAMAS leader who was killed on March 22, 2004, were interviewed on 'Ala al-Hawaa' ["On the air"], a program that appears on Orbit TV (an Arabic cable TV network backed by the powerful Mawarid Group of Saudi Arabia).   The program showed a slide specifying the following Arab Bank accounts where donations could be deposited for the Palestinians participating in the violent confrontation with Israel: Arab Bank, Geneva Branch, account number 2225200; and Arab Bank, Al-Shamissani, Amman, account number 9171.1.510.

527.    The Voice of Al-Aqsa Internet site (www.aqsavoice.net) (which served HAMAS) posted an announcement on May 3, 2004, condemning the Israeli Air Force's attack on the station. The announcement read as follows: "In order to help renew our broadcasts, you can donate to the Al-Ribat Lil-I'lam account, number 100835 at the Al-Rimal [Gaza] branch of the Arab Bank or [account] number 20669 at the Arab Islamic Bank in Gaza."

528.    A HAMAS-affiliated website has called for donations to "Al-Aqsa and the brothers in Palestine" through terrorist organizations around the world including Interpal, Al-Aqsa Foundation, and CBSP.   The website also requested donations to be deposited in the account of the "101 days organization" at the Arab Bank's branch in Lebanon.   Furthermore, the 101 Days Campaign published

a request on its official website that visitors to its website donate to the organization through its accounts in any branch of the Arab Bank.

529.    On September 25, 1997, the Palestinian Authority closed what it identified as 16 HAMAS institutions and associations.  HLF's Gaza office was one of the entities (temporarily) closed by the Palestinian Authority. The closure, including identification of HLF as a targeted HAMAS entity, was detailed in a *Jerusalem Post* news account on September 28, 1997.

530.    Nonetheless, Arab Bank continued to provide financial services to HLF and its New York branch continued to wire thousands of dollars to the Ramallah Charitable Committee at HLF's behest.

531.    By knowingly providing banking and administrative services to "charitable" front organizations that are agents of designated Foreign Terrorist Organizations, Arab Bank has substantially assisted HAMAS and other terrorist organizations in the furtherance of a murderous conspiracy to commit multiple acts of international terrorism and has committed numerous overt acts in furtherance of the conspiracy.  Arab Bank provided financial services and other support to the particular terror groups responsible for the attacks giving rising to Plaintiffs' injuries.

532.    Indeed, had the doors of Arab Bank not been opened to HAMAS or the PIJ during the past four and a half years, the leaders of these terrorist organizations would have had to make far more onerous arrangements to transfer foreign contributions to terrorists within Palestinian-controlled territory and the great bulk of those funds would likely have never reached their destination.  By acting in the manner described herein, Arab Bank has facilitated the increase in terrorist attacks and incentivized the conduct of the suicide bombers.

533.    A bank that knowingly provides material support of this kind, directly or indirectly, to international terror organizations such as HAMAS, PIJ, AAMB, or the others described in this

Complaint is secondarily liable for all of the foreseeable acts committed by the terror organizations. Arab Bank is therefore secondarily liable for the damages suffered by Plaintiffs, all of whom were injured or killed by terror organizations that Arab Bank supported.

## ARAB BANK'S FRAUDULENT
## CONCEALMENT OF ITS ILLICIT CONDUCT

534.    Throughout the course of the Second Intifada, Arab Bank has made substantial efforts to conceal its participation in the illicit financing of terrorism and other misconduct alleged by Plaintiffs. Those efforts at concealing the Bank's participation in terrorism financing were necessitated by the fact that the Bank is a highly regulated financial institution with substantial assets.   Thus, it was necessary for Arab Bank to conceal its misconduct both from potential claimants and the government bodies that regulate the Bank's conduct.

535.    For example, while Arab Bank has made numerous transfers from various Arab Bank accounts to accounts controlled by terrorist fronts, Arab Bank has not reported those transfers to criminal authorities, as was required by law at the time those transfers were made.   Nor has the Bank made public its support of terrorist front organizations.

536.    Arab Bank has also attempted to conceal its participation in the financing of terrorism by refusing to allow the Saudi Committee and other sponsors of terrorism to locate their offices at Arab Bank facilities although the Bank has supplied material support for those organizations.   Arab Bank has also, from time to time, caused its name to be omitted from various Web site solicitations for funds to finance terrorism in the Middle East.

537.    Plaintiffs made reasonable efforts to determine the identities of those involved in the attacks that injured them.   Until recently, however, it was impossible for Plaintiffs to determine that Arab Bank had actively and intentionally participated in the wrongdoing alleged herein.

538.    Indeed, until recently, Arab Bank's illicit conduct remained unknown to American banking regulators, although those regulators had unfettered access to Arab Bank's records.

539.    Furthermore, much of the information upon which Plaintiffs' claims are based was uncovered only in connection with the seizure of records belonging to Arab Bank and others by Israeli defense forces.  It was not possible for Plaintiffs to uncover that information until shortly before they asserted their claims.

540.    Thus, Plaintiffs undertook reasonable efforts to discover their claims against Arab Bank but were prevented from doing so until shortly before they initiated this action.

## CLAIMS FOR RELIEF

### COUNT ONE

**AIDING AND ABETTING THE MURDER, ATTEMPTED MURDER AND
SERIOUS BODILY INJURIES OF UNITED STATES NATIONALS IN VIOLATION
OF 18 U.S.C. § 2332(a); 18 U.S.C. § 2332(b); 18 U.S.C. § 2332(c)**

541.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

542.    All of the Plaintiffs have been injured in his person, property or business by reason of acts of international terrorism including acts that violate the prohibition on killing, attempting to kill, causing serious bodily injury or attempting to cause serious bodily injury to U.S. citizens set forth in 18 U.S.C. § 2332(a)-(c).

543.    The acts of the Palestinian terrorists in killing, and attempting to kill U.S. nationals and other persons were and are intended (a) to intimidate or coerce the civilian population of Israel, (b) to influence the policy of the government of Israel by intimidation or coercion, and (c) to affect the conduct of the government of Israel by mass destruction and murder.  Arab Bank could reasonably

foresee such acts would occur as a result of the Bank's substantial assistance of HAMAS, PIJ, AAMB and the other terror organizations and their agents and alter egos.

544.   The acts of international terrorism set forth herein which injured Plaintiffs are extreme and outrageous and were committed with the knowledge of and intention to cause extreme physical pain and suffering to any and all persons within close proximity of the attack and extreme emotional distress to the family members of those who were killed or injured by reason of those acts.

545.   As set forth more fully above, but for the substantial assistance provided by the Arab Bank, the funding of the terrorists and the families of terrorists would have been substantially more difficult to implement. Arab Bank's conduct encouraged terrorists to act.

546.   Because it has aided and abetted violations of 18 U.S.C. § 2332, Arab Bank is liable pursuant to 18 U.S.C. § 2333 for the damages that Plaintiffs sustained. Arab Bank had at least general awareness of its role as part of an overall illegal activity and provided knowing and substantial assistance to the terrorists and organizations that injured or killed Plaintiffs.

## COUNT TWO

### CONSPIRACY TO COMMIT MURDER AND ATTEMPTED MURDER OF UNITED STATES CITIZENS IN VIOLATION OF 18 U.S.C. §§ 2332(b) and 2333

547.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

548.   All of the Plaintiffs have been injured in his person, property or business by reason of international terrorism.

549.   The acts of international terrorism set forth herein are extreme and outrageous and were committed with the knowledge of, and intention to, cause extreme physical pain and suffering to any and all persons within the close proximity of the attack and extreme emotional distress to the family members of those who were injured or killed by reason of those acts.

550.   Arab Bank knowingly joined a conspiracy by which it knowingly and intentionally agreed to combine with other persons to act unlawfully in the manner set for in this complaint. It committed overt acts in furtherance of the conspiracy. Plaintiffs have suffered harm by reason of the conspiracy.  Arab Bank provided extensive financial services and other support to organizations and its agents that it knew to be terrorist organizations as part of this common scheme.  At all relevant times, Arab Bank knew of the conspiracy and knew and knows, in particular, of the roles of the charitable front organizations and their leaders in furtherance of that conspiracy.

551.   Arab Bank knowingly and purposefully agreed to perform extraordinary banking, financial services, encouragement, aid, support and administrative services for the Saudi Committee, HAMAS, the PIJ,  AAMB, and other terrorist organizations with the knowledge, and for the purpose, that such services facilitate the activities of its leaders and support terrorist activities pursuant to a common scheme to encourage and incentivize and reward acts of terrorism.  Arab Bank's actions, in fact, facilitated the scheme because, as set forth more fully above, but for the actions of Arab Bank, the funding of the universal coverage death and dismemberment benefit plans for terrorists and their families would have been substantially more difficult to implement.  Arab Bank has acted in concert with others, as describe herein, to commit illegal acts as part of its agreement to inflict a wrong or injury against innocent civilians, all to their damage.

552.   Because it conspired with the Saudi Committee, HAMAS, PIJ, their respective charitable front enterprises, Al Aqsa Martyrs Brigade, and other terror organizations to support, encourage and facilitate violations of 18 U.S.C. § 2332(b) that have killed or injured the Plaintiffs, Arab Bank is liable to Plaintiffs, and each of them, pursuant to 18 U.S.C. § 2333 for the damages that Plaintiffs sustained.

## COUNT THREE

### PROVIDING MATERIAL SUPPORT TO TERRORISTS
### IN VIOLATION OF 18 U.S.C. § 2339A

553.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

554.    The extraordinary financial and administrative services that Arab Bank has knowingly provided to the terrorists, their families, and HAMAS, the PIJ and AAMB and their agents and alter egos, including serving as the exclusive administrator of universal coverage insurance to the families of suicide bombers and other terrorists, provides material support to the preparation and carrying out of numerous acts of international terrorism which have caused direct injury to the Plaintiffs.

555.    By virtue of its violations of 18 U.S.C. § 2339A, defendant Arab Bank is liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs have sustained as a result of such injuries.

## COUNT FOUR

### COMMITTING ACTS OF INTERNATIONAL TERRORISM
### IN VIOLATION OF 18 U.S.C. § 2339B(a)(1)

556.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

557.    Arab Bank has provided material support to Foreign Terrorist Organizations in violation of 18 U.S.C. §§ 2339B(a)(1).

558.    A bank that knowingly provides material support of this kind, directly or indirectly, to a foreign terror organization such as HAMAS, PIJ and AAMB is secondarily liable for all of the foreseeable acts committed by the terror organizations.  Arab Bank is therefore liable for the injuries and deaths described herein.

559.   Because it committed violations of 18 U.S.C. § 2339B, Defendant Arab Bank is liable pursuant to 18 U.S.C. § 2333 for all damages that Plaintiffs have sustained as a result of such injuries.

## COUNT FIVE

### FINANCING OF TERRORISM IN VIOLATION OF 18 U.S.C. § 2339C

560.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

561.   The financial services that Arab Bank has willfully and unlawfully provided to HAMAS, the PIJ, AAMB and the Saudi Committee include the collection of funds with the knowledge that such funds have been and will be used, in part, to facilitate acts intended to cause death or serious bodily injury to civilians such as the victims of the terrorist acts described in this complaint, who were not taking part in any armed conflict.  The purpose of Arab Bank's conduct, by its nature or context, was to intimidate a population or to compel the government of Israel to do or abstain from doing an act.

562.   Because it willfully violated 18 U.S.C. § 2339C, Arab Bank is liable pursuant to 18 U.S.C. § 2333 to Plaintiffs who have suffered injuries to their business, person or property by reason of such acts.

## COUNT SIX

### ARAB BANK COMMITTED ACTS OF INTERNATIONAL TERRORISM IN VIOLATION OF 18 U.S.C. §§ 2339A, 2339B, and 2339C

563.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

564.   Defendant Arab Bank's own acts of providing banking and other services, including the provision of death benefits, to HAMAS, the PIJ, the AAMB and other international terrorists, were "a

criminal violation if committed within the jurisdiction of the United States or of any State" and "appear to be intended to intimidate or coerce a civilian population . . . to influence the policy of a government by intimidation or coercion or to affect the conduct of a government by mass destruction."

565.   Accordingly, Arab Banks' own acts constitute acts of international terrorism as defined by 18 U.S.C. § 2331.

566.   Pursuant to 18 U.S.C. § 2333, Arab Bank is therefore civilly liable for the injuries to Plaintiffs' person, property or business caused by the acts of international terrorism alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

    a)   Accept jurisdiction over this action;

    b)   Enter judgment against Arab Bank and in favor of each Plaintiff for all compensatory and other damages in such amounts for each named Plaintiff as are allowed by applicable law and as shall be determined at trial;

    c)   Enter judgment against Arab Bank and in favor of each Plaintiff for treble damages of each amount awarded pursuant to the previous prayer for relief, and pursuant to 18 U.S.C. § 2333;

    d)   Enter judgment against Arab Bank and in favor of each Plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333;

    e)   Enter an Order declaring that Arab Bank has violated, and is continuing to violate, the Anti-Terrorism Act, 18 U.S.C. § 2331 et seq.; and

    f)   Grant such other and further relief as is required by the interests of justice, including granting leave to amend this Complaint to the extent necessary to permit justice to

be served on behalf of each Plaintiff against Arab Bank and any other defendant that

may be hereafter named herein.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated:  April 10, 2007                          Respectfully submitted,

_Mark S. Werbner_
Mark S. Werbner
**SAYLES WERBNER P.C.**
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214) 939-8700

Attorneys for Plaintiffs

Of Counsel:

**SHALOV STONE BONNER & ROCCO LLP**
Lee S. Shalov (LS-7118)
James P. Bonner (JB-0629)
485 Seventh Avenue, Suite 1000
New York, New York 10018
(212) 239-4340

**HEIDEMAN NUDELMAN & KALIK, P.C.**
Richard D. Heideman
Noel J. Nudelman
Tracy Reichman Kalik
1146 19th Street, NW
Fifth Floor
Washington, D.C. 20036
(202) 463-1818

**PERLES LAW FIRM, P.C.**
Steven R. Perles
Edward Macallister
1146 19th Street, NW
Fifth Floor

Washington, D.C. 20036
(202) 745-1300

**THE DAVID LAW FIRM, P.C.**
Jonathan David
10655 Six Pines Drive
Suite 260
Woodlands, Texas  77380
(281) 296-9090

*Of Counsel For the Leifer and Waxler Families Only*

**HARRY REICHER**
Barristers Chambers
1336 50th Street
Brooklyn, NY 11219
(718) 854-0001

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2007, the foregoing document was served in accordance with the Federal Rules of Civil Procedure and/or the Eastern District's Rules on Electronic Service upon all parties.

Mark S. Werbner